[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Nicholson*, Slip Opinion No. 2024-Ohio-604.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-604

THE STATE OF OHIO, APPELLEE, *v.* NICHOLSON, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Nicholson*, Slip Opinion No. 2024-Ohio-604.]**

*Criminal law—Aggravated murder—Convictions and death sentences affirmed.*

(No. 2019-1787—Submitted January 11, 2023—Decided February 22, 2024.)

APPEAL from the Court of Common Pleas of Cuyahoga County,

No. CR-18-634069-A.

————————————

FISCHER, J.

{¶ 1} In September 2018, appellant, Matthew Nicholson, shot to death 17-year-old M.L. and 19-year-old Giselle Lopez as M.L. and Giselle fled their home. A Cuyahoga County jury rejected Nicholson's claim that he shot M.L. and Giselle in self-defense and found him guilty of two counts of aggravated murder.  On the jury's recommendation, the trial court sentenced Nicholson to death.

{¶ 2} We affirm Nicholson's convictions and death sentences.

## I. FACTS

### A. Nicholson murders M.L. and Giselle

{¶ 3} In September 2018, Nicholson lived with America Polanco and two of her children, M.L. and Giselle, at their home on East 86th Street in Garfield Heights. On the evening of September 5, Polanco, Nicholson, and M.L. were at home. M.L. was in his second-floor bedroom, and Polanco and Nicholson were in their first-floor master bedroom. Nicholson attacked Polanco after she received a text message from her former boyfriend, Terricko Marshall. Nicholson grabbed Polanco by her neck, threw her onto the bed, and began strangling her.

{¶ 4} According to Polanco, Nicholson forced her to unlock her cellphone; then he called Marshall. Nicholson told Marshall that if Polanco and Marshall were having an affair, "bad things [were] going to happen here because [he was] a big dude."

{¶ 5} Polanco testified that Nicholson yelled at her, "Your son is coming down here. I'll kill him and I'll kill your daughter too." M.L. then arrived at the master-bedroom door, "crying and screaming: 'Mommy, you okay?' " According to Polanco, Nicholson opened the door, grabbed M.L., "push[ed] him in[to] the kitchen," and then pinned him to the floor.

{¶ 6} When Polanco tried to intercede, Nicholson grabbed her and threw her against a wall, giving M.L. a chance to get up. M.L. called 9-1-1 and then called Giselle, telling her not to enter the house. When Nicholson realized that M.L. had called 9-1-1, he said to M.L., "I told you don't you ever call the police."

{¶ 7} Nicholson then obtained his gun from the master bedroom and returned to the kitchen, where Polanco confronted him near a side door. Nicholson pushed past Polanco and fired 13 shots at M.L. and Giselle, who were less than ten feet away outside the house.

{¶ 8} Around 9:35 p.m., a 9-1-1 dispatcher received two anonymous calls. The dispatcher noted that the first caller was on East 86th Street, near Polanco's address.

{¶ 9} Within minutes of the first 9-1-1 call, Garfield Heights Police Officer Robert Jarzembak responded to a report of shots being fired on East 86th Street. Officer Jarzembak testified that he approached Polanco's house with his body camera activated. He saw two people lying motionless in the driveway, between a vehicle and the side door of the house. A third person, Polanco, "was kneeling near them and crying hysterically." Officers later identified the victims as M.L. and Giselle. Officer Jarzembak testified that when he arrived, M.L. was dead and Giselle was semiconscious.

{¶ 10} Garfield Heights Police Officer Berri Cramer spoke to Polanco, who she described as being "highly upset [and] very distraught." Officer Cramer learned that Nicholson was still inside the house, "had lots of guns in the house," was "highly trained," and worked for "Homeland Security." Polanco told Officer Cramer that Nicholson had threatened to kill any law-enforcement officer who tried to enter the house. Polanco showed Officer Cramer bruises on her arms and face that she said were caused by Nicholson.

{¶ 11} Police created a perimeter around the house, and Garfield Heights Police Lieutenant Todd Vargo, a trained negotiator, called Nicholson's cellphone. Nicholson had been talking on the phone with his mother, Angel Nicholson. Lieutenant Vargo participated in a three-way conversation with Nicholson and Angel. The conversation with Nicholson lasted about four hours, until Nicholson surrendered. Lieutenant Vargo's body camera recorded about three hours of the conversation.

{¶ 12} Lieutenant Vargo testified that his discussion with Nicholson was "kind of a revolving conversation covering three or four basic subjects," including Nicholson's remorse, his state of mind during the shootings, the events leading up

to the shootings, and steering Nicholson away from suicide and toward surrendering.

{¶ 13} Nicholson admitted to Lieutenant Vargo that he had shot M.L. and Giselle. Nicholson said that he "blacked the fuck out" during the incident, that he was not a "nut" or a "psycho," that he "snapped," and that he must "answer for it." Nicholson mentioned "the texting, the relationship, the lies, [and] the kids being disrespectful," but he admitted: "It doesn't justify gunning somebody down. I did it because that's what I know. * * * Maybe if I knew Jiu Jitsu, I'd try to chop their ass up."

{¶ 14} During the call, Nicholson described his version of the altercation. He said it started when M.L. came downstairs and tried to "break in the bedroom door." (Lieutenant Vargo testified that Nicholson did not specifically identify M.L. as the subject of this assertion, but Lieutenant Vargo "assumed [the person being referred to] was" M.L.) Nicholson said that he opened the door and found M.L. "in attack mode," meaning M.L.'s "fists [went] up" and "[M.L. was] bobbing back and forth." According to Nicholson, "[that] started it." Nicholson told Lieutenant Vargo that he had reached his "breaking point" and stated, "I can't express how sorry I am. I can't express it. I can't express it." Nicholson said that the argument between he and Polanco that night and M.L. and Giselle's disrespect toward him in general had led to the shooting.

{¶ 15} When Nicholson surrendered, he told Lieutenant Vargo that the gun he had used to shoot M.L. and Giselle was in the basement.

### B. The investigation

{¶ 16} Police conducted an initial search of the East 86th Street property on September 6. Outside the house, they found a bloodstained gym shoe, a backpack with bullet holes in it, bullet fragments, and 13 expended shell casings.

{¶ 17} The shell casings, stamped "Winchester 45 Auto," were located on the driveway, near the side door of the house. A crime-scene investigator from the

Ohio Bureau of Criminal Investigation ("BCI") determined that most of the casings had come to a rest within ten feet of the side door.

{¶ 18} Investigators noted damage to doorways and doors inside the house. They found on top of a desk in the basement ten notes handwritten by Nicholson. All were read into the record. In one note, Nicholson wrote: "I am sorry * * * [there is o]nly so much a man can take." Another note read: "[Polanco], I tried. You continu[al]ly let your kids disrespect me. Why?" A third note read: "I literally snapped. I'm not crazy. I'm not an extremist." Other notes were addressed to Nicholson's parents, his employer, and the responding officers. Investigators also found ammunition, police duty belts, and uniforms in the basement.

{¶ 19} Roberto Lopez, Polanco's oldest son, testified that he and Carlos Nieves went to Polanco's house on September 13 and that Estomarys Santos was there with Polanco when they arrived. Roberto went there to remove Nicholson's belongings so that Polanco would feel more comfortable. According to Roberto, he found a holstered gun in the master-bedroom closet and put the gun in the trunk of Nicholson's car.

{¶ 20} Also on September 13, Lieutenant Robert Petrick and Detectives Peter Stroe and Mark Menary of the Garfield Heights Police Department conducted a search of Nicholson's car. The detectives inventoried the contents of the car, and Lieutenant Petrick took digital photographs of the search. Garfield Heights Police Detective Carl Biegacki indicated in his testimony that Polanco told him prior to the vehicle search that she and Roberto had put Nicholson's belongings into the car.

{¶ 21} Some of the photographs taken during that search were overwritten and never recovered. The missing photographs included pictures of "all four sides of the car, [and] every * * * piece of evidence * * * inside the trunk, then outside the trunk."

{¶ 22} At trial, the state introduced Polanco's and Nicholson's cellphone records to establish how they communicated and to corroborate Polanco's

testimony about Nicholson's physical abuse. The state also presented text messages between Nicholson and his mother and between Polanco and Marshall.

{¶ 23} Dr. Todd Barr, a deputy medical examiner for Cuyahoga County, conducted M.L.'s and Giselle's autopsies. Regarding M.L., Dr. Barr testified that he found eight gunshot wounds to his body, six of which were penetrating (i.e., without a corresponding exit wound) and two of which were perforating (i.e., with an entrance wound and an exit wound). The bullet that caused one of the six penetrating wounds had entered M.L.'s upper right arm, exited near his right armpit, and reentered M.L. through the right side of his chest. Dr. Barr recovered that bullet from the soft tissue of the right side of M.L.'s chest. The other five penetrating wounds were on both sides of M.L.'s lower back. The two perforating bullet wounds entered M.L.'s left hip/flank and traveled back to front, left to right, and upward before exiting M.L.'s abdomen.

{¶ 24} Dr. Barr testified that the bullets destroyed parts of M.L.'s liver, adrenal gland, colon, abdomen, and one of his kidneys and that several blunt-force injuries, abrasions, scratches, and lacerations were also present on M.L.'s body. Dr. Barr testified that the cause of M.L.'s death was multiple gunshot wounds to his torso and right arm.

{¶ 25} Dr. Barr testified that Giselle had sustained four gunshot wounds. The bullets respectively entered Giselle's "left upper arm, and then * * * the lower back, and left buttocks and left lower back, and left buttocks." Dr. Barr observed that Giselle's left arm had an entrance wound and an exit wound and that her chest had a reentrance wound. He recovered three bullets from Giselle's body. A fourth bullet was recovered during an exploratory laparotomy performed prior to the autopsy. He concluded that the cause of Giselle's death was multiple gunshot wounds to her torso and left arm.

{¶ 26} Investigators also learned that Nicholson had threatened to hurt Polanco or her children multiple times previously. Through text messages obtained

6

from Polanco's cellphone, the jury heard about Nicholson's specific threats and violence against Polanco. During her testimony, Polanco provided details about Nicholson's physical abuse and identified photographs of injuries to her that Nicholson had caused.

### C. Nicholson's trial-phase defense

{¶ 27} Nicholson testified in his own defense. His testimony was the only defense evidence presented during the trial phase.

{¶ 28} Nicholson was 30 years old at the time of trial. He testified that he met Polanco when they were both working at Lincoln Electric. Marshall also worked at Lincoln Electric, and Polanco was ending her relationship with him around the time she met Nicholson.

{¶ 29} Nicholson testified that Polanco had approached him because she knew that he had a "background in law enforcement" and wanted his advice on preventing Marshall from coming to her house. He explained that he became acquainted with Polanco's family while helping Polanco secure her house after her breakup with Marshall.

{¶ 30} Nicholson testified that after he met Polanco's children, he initially had a good relationship with them and was "fond of all of them." He testified that before he moved into Polanco's house, she told him not to bring up with the children their age difference (Polanco was more than 15 years older than Nicholson) because she was uncertain of how they would react. For this reason, Nicholson "was pretty careful about where [he] left [his] belongings, like [his] I.D. and [his] wallet." However, at some point, he noticed that his wallet was not where he had left it and that its contents were out of order. Nicholson testified that he believed this was how and when M.L. and Giselle discovered his age and that the level of respect they showed him changed on learning his age.

{¶ 31} Nicholson worked in security during his relationship with Polanco and regularly carried a firearm as part of his duties. For his most recent job with

Paragon Systems, he was issued a Glock .40-caliber handgun. He testified that when he was not working, he usually left his work gun and duty belt in the trunk of his car. Nicholson testified that he occasionally forgot to bring his gun to work and that on two occasions, he asked Giselle to retrieve it from his bedroom closet.

{¶ 32} Nicholson testified that on the day of the murders, he went to work at 6:00 a.m. and worked a 12-hour shift. He and Polanco communicated throughout the day. When he arrived home around 7:00 p.m., Polanco and M.L. were already there. According to Nicholson, later that night, he and Polanco were sitting on their bed watching television when her cellphone "beeped," indicating the receipt of a text message. Nicholson testified that Polanco "suddenly turned the screen of her phone off and set it down in her lap." He surmised that "she was concealing the text message."

{¶ 33} Nicholson testified that soon thereafter, Polanco told him that the text was from Marshall. Nicholson was angry that Polanco had tried to conceal the message. According to Nicholson, when Marshall returned a call he had made to Marshall using Polanco's cellphone, Polanco handed the cellphone to him and he asked Marshall whether anything was "going on" between Marshall and Polanco. Nicholson testified that Marshall then laughed and said that nothing was going on. Nicholson testified, however, that Marshall "continued chuckling" as he explained that nothing was going on, "[s]o [he] knew that it was bullshit."

{¶ 34} According to Nicholson, after he hung up on Marshall, he told Polanco that he was leaving because she had destroyed his trust in her. Nicholson testified that Polanco then "tried to come toward [him]" and that he told her to "[s]tay the fuck away from [him]" and needed her to stay away from him. According to Nicholson, M.L. then "started pounding on the door" and tried to open it. Nicholson denied that he assaulted Polanco in the bedroom that night. When asked about a photograph of injuries to Polanco's face from the night of the shootings, Nicholson denied that it showed any injuries. But he agreed that another

photograph from that night showed a bruise near Polanco's wrist that was caused when he grabbed her arm after M.L. tried to intervene.

{¶ 35} Nicholson testified that the fight between him and M.L. began in the hallway outside the bedroom door. Nicholson said that when M.L. "started swinging on [him]," Polanco "came up behind [him] and wrapped her arms around [him]." He testified that M.L. "hit [him] maybe two or three times," including once on the chin, which Nicholson said "hurt" him and "pissed [him] off." Nicholson testified that he tackled M.L. in an attempt to restrain him. Eventually, the fight moved to the kitchen. Nicholson testified that at some point, "we * * * all kind of stood there [and] caught our breath."

{¶ 36} According to Nicholson, Polanco then walked out of the kitchen and came back behind him and wrapped her arms around him while M.L. stood and looked at him. Nicholson asked Polanco, "What are you doing?" and told her to "[g]et the hell off," but Polanco "continued squeezing" him. Nicholson testified that he asked Polanco multiple times during the altercation to move her car so that he could leave.

{¶ 37} Nicholson testified that he pushed Polanco off him, which made M.L. "irate." Then M.L. and Nicholson "went back at it." Nicholson tried to restrain M.L. but noticed that Polanco had picked up a knife, so he "grabbed her wrist and tried to hit her hand up against the refrigerator * * * [a]nd she dropped it."

{¶ 38} Nicholson then saw that M.L. was using a cellphone, so he walked toward M.L. and said, "Who you texting? Are you texting [Marshall]?" Nicholson testified that after he told M.L., "[Y]ou should be happy because your mom and [Marshall] might be getting back together," Polanco and M.L. smiled at each other.

{¶ 39} Nicholson testified that Giselle then arrived home. According to Nicholson, he told Giselle to back her truck out of the driveway, but she refused, so he "went back in the [bed]room * * * and * * * started grabbing clothes to

change into, because [he] was still in [his] pajamas, so [he] could leave." And while he was in the bedroom, Polanco came to the door and told him, "You're going to pay, motherfucker, for everything you did to me." Nicholson testified,

> And when she did that, she ran back out of the room, back to the end of the hallway. And I ran to the doorway of the bedroom, to see what she was doing.
> And [Polanco] told [M.L.] and Giselle: He's about to kill us.
> And when she did that, Giselle said: Where's his gun?
> And [Polanco] reached back into the living room, and she had keys in her hand. And I didn't know whose keys they were. And [Polanco] said: His gun is in the back of his [car]. Hurry up before he gets another one.
> When she said that, * * * [M.L.] ran past her, ran down the steps, and I ran out of the room to try to tackle him.
> And as he did that, [Polanco] had my keys in her hand. I didn't know that they were my keys right then, but she put them up, she held them up, and she thumbed something on the key fob.
> And it wasn't until I ran out of the room and tried to tackle [M.L.] and he ran out of the house that I looked at those keys and seen my [car] emblem on the back of them. And it didn't dawn on me what she had done until I ran into the bathroom and I looked out the window and I seen [M.L.] in the back of the trunk of my car.

{¶ 40} Nicholson testified that he saw M.L. remove his holstered service gun from the trunk of his car and try to pull it from the holster. According to Nicholson, he tried to lock the side door of the house, but Giselle held it open; then he tried to lock himself inside the bedroom, but the door would not stay closed

because, according to him, "when [M.L.] forced it open, he had messed up the lock." Nicholson testified that he grabbed his personal gun and asked Polanco to lock the door. But "she backed up into the living room" and kept looking back and forth between Nicholson and the door as if she expected M.L. "to come back in at any second."

{¶ 41} Nicholson testified that as he walked back toward the kitchen, he "held [his] gun up in case one of [his] own stepkids came around the corner, pointed [his] own gun at [him]." When he reached the side door, Polanco "attack[ed]" him and began "hitting" him "in the side of the head" and "in the face" with a can of Lysol. According to Nicholson, Polanco "sprayed" him "all over [his] body, all over [his] face," but he was able to see M.L. and Giselle "standing there trying to get [his] gun out of [the] holster." Nicholson testified that he told them to drop the gun "at least twice" but that Giselle "got the gun out of the holster" and turned toward him. At that point, he "shot." But Nicholson could not recall how many shots he fired. He testified that he "tried [his] best to shoot low." He saw Giselle fall onto a car in the driveway and then saw both M.L. and Giselle "on the ground." Nicholson testified that he did not call the police, because he knew they were coming.

{¶ 42} According to Nicholson, after the shootings, he saw Polanco pick up his holster and service gun from the driveway and put them back into the trunk of his car. Nicholson then retreated to the basement, where he spent the next three to four hours writing notes and talking on the phone to his mother and Lieutenant Vargo.

{¶ 43} During his conversation with Lieutenant Vargo, Nicholson talked about having blacked out, and at some point he stated: "I may have to pay for it, I may have to go to jail. I hope God has their souls right now. Who the F am I to do that? I'm not God. I'm nobody. I know what I did. I've got what, 30 years a piece?" At trial, Nicholson testified that he had said those things to get his mother

to "understand the gravity of the situation." Nicholson testified that before he left the house, he told Detective Biegacki that Polanco had put his service gun and holster back into the trunk of his car and that he told Detective Biegacki to retrieve it.

## II. PROCEDURAL HISTORY

{¶ 44} Nicholson was indicted on two counts of aggravated murder in violation of R.C. 2903.01(A) (prior calculation and design) (Counts One and Two). Each of the aggravated-murder counts included one capital specification under R.C. 2929.04(A)(5) (course of conduct).

{¶ 45} Nicholson was also charged with the attempted murder of Polanco (Count Three), the murders of Giselle and M.L. (Counts Four and Five, respectively), the felonious assaults of M.L. and Giselle (Counts Six and Seven, respectively), and the attempted felonious assault of Polanco (Count Eight). Each count included one- and three-year firearm specifications. *See* R.C. 2941.141(A); R.C. 2941.145(A).

{¶ 46} Nicholson pleaded not guilty, and his case proceeded to a jury trial. The jury found Nicholson guilty of all counts and specifications, except for the count and specifications for the attempted murder of Polanco.

{¶ 47} Before the mitigation phase, the trial court determined that the counts pertaining to M.L. were allied offenses of similar import and therefore merged those counts for sentencing purposes. It did the same regarding the counts pertaining to Giselle. The court also merged the firearm specifications, leaving a single three-year firearm specification for sentencing purposes. The state elected to proceed with sentencing on Counts 1 and 2, the aggravated-murder counts.

{¶ 48} During the mitigation phase, seven witnesses testified on Nicholson's behalf. The state introduced testimony from two witnesses. The jury recommended that the trial court sentence Nicholson to death. The trial court accepted the jury's recommendation and sentenced Nicholson to death on both

aggravated-murder counts. The court sentenced Nicholson to a consecutive, three-year prison term for the firearm specification and a concurrent, three-year prison term for the attempted felonious assault of Polanco.

## III. ANALYSIS

### A. Sufficiency and manifest weight of the evidence

{¶ 49} In his first proposition of law, Nicholson argues that the evidence submitted at trial does not prove that he purposely and with prior calculation and design caused the deaths of M.L. and Giselle. *See* R.C. 2903.01(A). Although Nicholson concedes that the state presented evidence sufficient to prove that he purposely killed M.L. and Giselle, he contends that the evidence was insufficient to show that he planned, with advance reasoning, to kill them. He submits that the state's claim that he had previously threatened the victims was not supported by the evidence. And he claims that the state failed to prove beyond a reasonable doubt that he was not acting in self-defense when he killed M.L. and Giselle.

{¶ 50} Further, Nicholson argues that the jury's verdicts on the aggravated-murder counts were against the manifest weight of the evidence.

### 1. The evidence was sufficient to convict Nicholson of aggravated murder with prior calculation and design

{¶ 51} "In reviewing whether evidence is sufficient to establish the prior-calculation-and-design element of aggravated murder, a court must consider whether the evidence, when viewed in the light most favorable to the prosecution, supports a finding that [the] defendant acted with advance reasoning and purpose to kill." *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, ¶ 2 (lead opinion), citing *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 18. "Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *Walker* at ¶ 18.

**{¶ 52}** "There is no bright-line test for determining whether a defendant's actions show a premeditated decision or studied consideration to kill—each case turns on its own facts." *Jones* at ¶ 17. Although "not dispositive," we have identified three factors as "pertinent considerations" for determining whether there was sufficient evidence of prior calculation and design. *Id.* These factors are: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? (3) Was the act drawn out or 'an almost instantaneous eruption of events?' " *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976).

*a. Evidence of strain between Nicholson and the victims*

**{¶ 53}** The evidence demonstrated that Nicholson had strained relationships with Polanco, M.L., and Giselle. Nicholson believed that his relationship with M.L. and Giselle became strained around the time he moved into their house. He testified that Polanco had asked him to keep his age secret from her children and that he took pains to keep his personal identification hidden from them. He testified that after M.L. and Giselle found out how old he was, "their respect level for [him] changed." This strain and tension persisted until the murders.

**{¶ 54}** Polanco's oldest son, Roberto, testified that when he visited his mother's home in June 2017 and in 2018, the situation in the house felt "uneasy." According to Roberto, his siblings and Nicholson did not get along with each other. M.L. and Giselle would get upset because Nicholson would "leave the laundry in the basement around, * * * play music loud, and he would also just be kind of disrespectful." But Roberto never witnessed any physical altercations or arguments between Nicholson and Polanco or M.L.

**{¶ 55}** Nevertheless, the evidence showed that Nicholson threatened Polanco, M.L., and Giselle multiple times during their relationship. Polanco testified that she had tried to talk to Nicholson about moving out but that he "got

really angry" and told her that if she and the children ever left or if he left the house, they would "regret it." According to Polanco, it seemed that Nicholson was jealous of her children's relationship with her and that he was trying to drive a wedge between her and them. At one point, Nicholson told Polanco that he "hate[d] [her] kids."

{¶ 56} Polanco's friends and neighbors were aware that Nicholson had threatened Polanco and her children multiple times. Constance Allshouse, a neighbor, testified that Polanco spoke to her about Nicholson's behavior multiple times a week and that she had advised Polanco to contact the police. Allshouse also told Polanco that if her children ever felt unsafe, they could come over to Allshouse's house. Shondell Smith, Polanco's coworker, testified that Polanco had confided in him that she was afraid that Nicholson was tracking her car's movements. Smith believed that Polanco's relationship with Nicholson was "toxic," so he offered Polanco refuge at his home if she ever needed it.

{¶ 57} Polanco testified that she had been afraid that if she called the police about Nicholson's outbursts, he would make good on his threats. According to Polanco, Nicholson had told her that "he was prepared for anybody" if she ever contacted the police about him. Regarding Nicholson's words "prepared for anybody," Polanco believed that Nicholson had meant that he was prepared "[w]ith guns."

{¶ 58} Polanco testified that during one argument with Nicholson, he was yelling at and grabbing her when Giselle came to the door and asked her whether she was "okay." She testified that when Nicholson heard Giselle, he "got really angry," grabbed his gun, and said, " 'Tell your daughter to shut up, to go in her room, or I [am] going to kill her.' And he point[ed] to the wall, through [to] her bedroom." The evidence of Nicholson's multiple threats of gun violence showed that a strained relationship existed between Nicholson and M.L. and Giselle before the murders.

*b. Nicholson gave thought to his choice of weapon and the location of the murders*

**{¶ 59}** Second, the evidence shows that Nicholson gave thought to the details of the murders. *See Taylor*, 78 Ohio St.3d at 19, 676 N.E.2d 82. When M.L. called 9-1-1, Nicholson returned to his bedroom, where he kept his personal gun. He chose to take that gun, loaded, back to the kitchen and pursue M.L. and Giselle (the latter of whom he had not interacted with that night) as they ran from the house. He then pulled the trigger 13 times. This evidence, when viewed in the light most favorable to the state, supports the conclusion that Nicholson's decision to shoot M.L. and Giselle was not made after mere "momentary consideration," *Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, at ¶ 18. Despite Nicholson's assertions, "sufficient time, reflection, and activity were involved to satisfy the elements of proof that the shootings were done with prior calculation and design," *State v. Jackson*, 92 Ohio St.3d 436, 441, 751 N.E.2d 946 (2001).

*c. The murders were not an instantaneous eruption of events*

**{¶ 60}** Nicholson emphasizes that in his estimation, less than 40 seconds elapsed between when he left the kitchen to retrieve his gun and the moment he shot M.L. and Giselle. Although Nicholson acknowledges that there is no specific amount of time that must pass before a defendant may be properly found to have engaged in prior calculation and design, he urges this court to find that less than 40 seconds of planning is categorically insufficient to make that finding.

**{¶ 61}** We reject this claim. Nicholson's decision to leave the kitchen to go to his bedroom to retrieve a loaded gun and then fire 13 shots at the victims' backs shows more than a "momentary impulse," *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 46. Even if Nicholson's actions took less than a minute, they evinced his "determin[ation] to complete a specific course of action" and allowed the jury to infer "that he had adopted a plan to kill," *id*.

*d. Nicholson's other arguments*

**{¶ 62}** Nicholson contends that the evidence of his prior threats does not support a finding of prior calculation and design but instead establishes, at most, a "planned contingency to kill." He cites two cases in support of this argument: *State v. Reed*, 65 Ohio St.2d 117, 418 N.E.2d 1359 (1981), and *State v. Noggle*, 140 Ohio App.3d 733, 749 N.E.2d 309 (3d Dist.2000). Those cases, however, are factually distinguishable.

**{¶ 63}** In *Reed*, we reversed an aggravated-murder conviction for the killing of a police officer, because there was insufficient evidence of prior calculation and design. *Id.* at 117, 124. Our holding in *Reed* hinged on the fact that Reed's single, month-old threat to kill "any police officer who got in the way of a crime he might commit" was, without more, insufficient to "show that [Reed] designed a scheme in order to implement a calculated decision to kill." *Id.* at 121.

**{¶ 64}** Similarly, in *Noggle*, the state had presented no evidence of prior threats from Noggle to the victim. During deliberations, the jury asked the trial court whether "prior calculation and design" meant that Noggle and his codefendant had " 'one hundred percent plann[ed]' " to shoot the victim or whether it could mean " 'that they were prepared to kill him if the situation called for it?' " *Id.* at 748. The trial court responded that "either/or would be sufficient to satisfy the mens rea element of proof that the murder was committed with prior calculation and design." *Id.* The Third District Court of Appeals reversed, agreeing with Noggle that "merely being prepared to kill if the situation calls for it does not amount to prior calculation and design that is necessary to sustain a conviction pursuant to R.C. 2929.04(A)(7)." *Id.*

**{¶ 65}** Here, the evidence shows that Nicholson threatened to kill M.L. and Giselle immediately before the shooting. Nicholson had an opportunity to abandon his professed plan to kill them if they called the police, yet he took deliberate steps to shoot the two unarmed teenagers in their backs. Thus, the jury's finding that

Nicholson acted with prior calculation and design was supported by sufficient evidence.

## 2. Sufficiency and self-defense

**{¶ 66}** Nicholson argues that the state failed to prove, beyond a reasonable doubt, that he did not act in self-defense.

**{¶ 67}** On March 28, 2019, 2018 Am.Sub.H.B. No. 228 ("H.B. 228") took effect, amending Ohio's self-defense statute. The amendments took effect after the offenses in this case occurred but about six months before Nicholson's trial began. *See State v. Brooks*, 170 Ohio St.3d 1, 2022-Ohio-2478, 208 N.E.3d 751, ¶ 13. The self-defense statute, R.C. 2901.05, as amended, applied to Nicholson's trial. *See Brooks* at ¶ 21, 23. Before the amendments, a defendant claiming self-defense had the burden of proving the elements of self-defense by a preponderance of the evidence. *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, ¶ 15, citing former R.C. 2901.05(A), 2008 Sub.S.B. No. 184. Following the enactment of H.B. 228, a defendant claiming self-defense no longer has the burden of proving its elements by a preponderance of the evidence; under H.B. 228, the burden of proof is allocated as follows:

> If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *.

R.C. 2901.05(B)(1). Thus, under the applicable version of the statute, the state's burden to prove that Nicholson did not act in self-defense was triggered when he produced legally sufficient evidence of self-defense. *See Messenger* at ¶ 19.

18

**{¶ 68}** The trial court instructed the jury on self-defense, so it had necessarily concluded that Nicholson met his burden of production and triggered the state's duty to overcome that evidence beyond a reasonable doubt. *See id.* In support of his argument, Nicholson contends that the evidence demonstrated that M.L. "was at fault in creating the situation giving rise to the affray." However, the evidence must be viewed in the light most favorable to the state. *See Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, at ¶ 12. Applying this standard, the evidence showed that Nicholson created the situation giving rise to the affray by attacking Polanco and M.L. before Nicholson got his gun and used it to murder M.L. and Giselle. We hold that the state satisfied its burden of proving that Nicholson was not acting in self-defense when he killed M.L. and Giselle.

### 3. Nicholson's convictions are not against the manifest weight of the evidence

**{¶ 69}** Nicholson argues that his aggravated-murder convictions were against the manifest weight of the evidence. His challenge to the jury's verdicts is based primarily on his view that Polanco's testimony was not credible.

#### a. Standard of review

**{¶ 70}** This court has "carefully distinguished the terms 'sufficiency' and 'weight' in criminal cases, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus. A verdict can be against the manifest weight of the evidence even though legally sufficient evidence supports it. *State v. Robinson*, 162 Ohio St. 486, 487, 124 N.E.2d 148 (1955), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997).

**{¶ 71}** For a manifest-weight challenge, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury

clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The central question is whether "there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt." (Emphasis sic.) *State v. Getsy*, 84 Ohio St.3d 180, 193-194, 702 N.E.2d 866 (1998), citing *State v. Eley*, 56 Ohio St.2d 169, 383 N.E.2d 132 (1978), syllabus, *superseded by constitutional amendment on other grounds as stated in Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668. A manifest-weight challenge should be sustained " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

### b. Manifest weight and self-defense

{¶ 72} "The state's new burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal." *Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, at ¶ 27.

{¶ 73} Nicholson testified that he retrieved his personal gun only after he saw M.L. and Giselle remove his service gun from the trunk of his car. He said that he began firing his personal gun when Giselle "got the [other] gun out of the holster * * * [and] it looked like she had turned toward [him]."

{¶ 74} The jury did not clearly lose its way in disbelieving Nicholson's testimony, given that the physical evidence showed that M.L. and Giselle were each shot multiple times in their backs when they were about four feet from the side door and that M.L. died immediately and Giselle died soon thereafter. And M.L. fell on top of Giselle, pinning her body beneath his.

{¶ 75} The evidence described above collectively represents substantial evidence on which the jury could properly conclude beyond a reasonable doubt that Nicholson purposely and with prior calculation and design caused the deaths of M.L. and Giselle and did not act in self-defense. We reject Nicholson's argument

that the jury's rejection of his self-defense claim was against the manifest weight of the evidence.

### c. *Manifest weight and prior calculation and design*

{¶ 76} Nicholson argues that his case is in "stark contrast" to other cases in which this court has affirmed aggravated-murder convictions premised on prior calculation and design even when the defendant "quickly conceived," *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001), of his plan to kill. Nicholson contends that he formed his intent to kill less than 40 seconds before the shootings, that 40 seconds is materially distinguishable from "a few minutes," and that the jury thus lost its way when it found him guilty of aggravated murder. We disagree.

{¶ 77} The jury did not lose its way in disbelieving Nicholson's self-serving evidence that he formed his intent to kill less than 40 seconds before he shot M.L. and Giselle. Substantial evidence showed that Nicholson threatened to harm them multiple times before the murders. And after assaulting Polanco and M.L., Nicholson left the kitchen for a single purpose—to obtain a firearm to escalate the situation. *See State v. Ivery*, 9th Dist. Summit No. 28551, 2020-Ohio-3349, ¶ 11 (defendant's conduct in arming himself with a weapon following a confrontation and then using the weapon in a later confrontation escalated by the defendant constituted prior calculation and design); *State v. Smith*, 1st Dist. Hamilton No. C-190507, 2020-Ohio-4976, ¶ 53-55 (although evidence showed that the victim arguably attacked the defendant following a brief pause in an altercation between them, the defendant escalated the situation by drawing a firearm).

{¶ 78} We have "consistently held that a defendant can conceive and execute a plan to kill, even if formulated within a few minutes, when there is evidence that the defendant's actions 'went beyond a momentary impulse and show that he was determined to complete a course of action.' " *Jones*, 166 Ohio St.3d

85, 2021-Ohio-3311, 182 N.E.3d 1161, at ¶ 26, quoting *Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, at ¶ 46.

{¶ 79} Nicholson has failed to demonstrate that the jury lost its way by finding that he acted with prior calculation and design.

{¶ 80} We reject Nicholson's first proposition of law.

## B. Other crimes, wrongs, or acts

{¶ 81} In his second proposition of law, Nicholson asserts that the trial court erroneously allowed testimony and other evidence pertaining to his character and "prior bad acts." Principally, he claims that the state impermissibly elicited testimony and other evidence about his threats and violence against Polanco, M.L., or Giselle. The state counters that the evidence was admissible to establish Nicholson's motive, intent, and lack of mistake.

### 1. Applicable legal standards

{¶ 82} Evid.R. 404(A) generally prohibits using evidence of a person's character to prove that the person "act[ed] in conformity therewith on a particular occasion." But Evid.R. 404(B) allows the admission of evidence of a defendant's other crimes, wrongs, or acts when "(1) there is substantial proof that the alleged other acts were committed by the defendant, and (2) the evidence tends to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Waldron v. Voorhies*, 626 F.Supp.2d 739, 751 (N.D.Ohio 2009), citing *State v. Broom*, 40 Ohio St.3d 277, 282, 533 N.E.2d 682 (1988).

{¶ 83} We have explained that courts should engage in a three-step analysis when determining whether "other acts" evidence is admissible and consider: (1) whether the other-acts evidence is relevant under Evid.R. 401, i.e., whether it tends to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence; (2) whether the evidence is presented to prove a person's character in order to show that his conduct was in conformity therewith or whether it is presented for a legitimate other

purpose, such as those stated in Evid.R. 404(B); and (3) whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, Evid.R. 403. *See State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 19-20.

### 2. Relevant facts

{¶ 84} Nicholson argues that multiple witnesses provided improper other-acts testimony against him, including: (1) Polanco, who testified that he threatened and perpetrated violence against her and M.L. and Giselle, (2) Smith, Polanco's coworker, in whom Polanco had confided information about her relationship with Nicholson, and (3) Allshouse, Polanco's neighbor and friend, who Polanco sought out soon after Nicholson shot M.L. and Giselle.

{¶ 85} Before trial, Nicholson filed a general motion to exclude other-acts evidence. The state opposed the motion, arguing that the evidence of Nicholson's prior bad acts was admissible to prove his motive, intent, and absence of mistake. After a hearing, the trial court denied Nicholson's motion.

### a. Polanco's testimony

{¶ 86} Polanco testified about several threats Nicholson made against her and M.L. and Giselle before the incident. She detailed Nicholson's physical abuse and identified photographs of injuries she claimed Nicholson had caused. The trial court overruled Nicholson's relevancy and Evid.R. 404(B) objections to the photographs. However, the trial court ordered the state to remove labels from the photographs indicating the dates the photographs were taken.

{¶ 87} Polanco testified that in February 2015, Nicholson "started getting aggressive." She testified that Nicholson had verbally abused her by calling her names such as "bitch" and that he had aggressively grabbed her and thrown her onto the bed. She told the jury that he had threatened to kill her and her children and any "neighbors and any police" who came to the house. Polanco testified that, generally, Nicholson was "prepared for anybody."

**{¶ 88}** During Polanco's testimony, the trial court provided the following limiting instruction to the jury regarding other-acts evidence:

Commission of crimes other than the offenses with which the defendant is charged in this trial is received only for a limited purpose. It is not received and may not be considered to prove the character of the defendant in order to show that he acted in conformity or in accordance with that character.

If you find that the evidence of other incidents is true and that the defendant committed them, you may consider that evidence only for the purpose of deciding whether it proves the defendant's motive, opportunity, intent, or purpose, preparation, or plan to commit the offense charged in this trial.

That evidence cannot be considered for any other purpose.

**{¶ 89}** We note that the trial in this case took place prior to this court's decision in *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651. In *Hartman*, we cautioned against using this type of "boilerplate" limiting instruction, which simply lists the permissible uses of other-acts evidence under Evid.R. 404(B). *Hartman* at ¶ 68-70. We explained that "[g]oing forward, courts should explain, in plain language, the purposes for which the other acts may and may not be considered" and not simply list the uses of such evidence that are permitted under the rule. *Id*. at ¶ 70.

**{¶ 90}** Polanco testified about photographs she had taken of a large bruise on her leg, which she said Nicholson caused by squeezing her leg with his hands. She did not recall when she had taken the photographs, but metadata from Polanco's cellphone revealed that the photographs were taken in April 2015.

{¶ 91} Polanco testified about another incident when Nicholson became irate when he could not use the washing machine because Giselle had left her damp clothes in it. According to Polanco, Nicholson confronted Giselle that evening about the laundry and called Giselle a "little whore" and a "[b]itch." Then he "grabbed [Giselle's] laptop and threw it and threw [a] table against her, which hurt [Giselle's] feet," and he then threw something at the living-room wall and punched a wall. Polanco testified that Nicholson "grabbed [her], because [she defied] him, [saying] please don't touch the kids." According to Polanco, after this incident, she "told [her] kids, "[We] have to leave, we have to do it in the right way," because she didn't want Nicholson to hurt them.

*b. Smith's testimony*

{¶ 92} Immediately before Smith testified, defense counsel objected to his testimony on Evid.R. 404(B) grounds. The trial court overruled the objection.

{¶ 93} Smith testified that he became friends with Polanco at work and that he also knew Marshall and Nicholson through work. Smith testified that Polanco had often confided in him about her relationship with Nicholson, which Smith viewed as "kind of toxic." Smith testified that he had offered to help Polanco move on from her bad relationship with Nicholson and to help her obtain and learn to use a gun.

{¶ 94} According to Smith, Polanco had believed that Nicholson had installed a tracking device on her car. Smith told Polanco how to look for a tracking device and offered her refuge at his home. According to Smith, Polanco refused his offers because she did not want to bring any of her problems to his home. Over a defense objection, Smith testified that he had advised Polanco to secretly record her conversations with Nicholson and that he was aware "that some of the equipment that she used to record the conversations [was] destroyed."

{¶ 95} Smith told the jury that he had advised Polanco to have her children sleep at someone else's house. He felt that Nicholson had "some type of jealousy"

toward Polanco's children, and he knew that Nicholson was unhappy with Polanco's buying M.L. and Giselle cars at their young ages. Smith testified that he was watching the news in the early morning following the murders and saw "breaking news" about a shooting on East 86th Street. He testified that he "instantly * * * knew it was [Polanco's] home" and that he immediately woke up his wife and told her, "It happened * * * he shot her children."

### c. Allshouse's testimony

{¶ 96} Allshouse testified that she met Nicholson six to eight months after he moved in with Polanco. Allshouse never saw Nicholson interact with Polanco's children. However, she testified that Polanco eventually confided in her regarding the troubles with Nicholson. Allshouse told the jury that she had advised Polanco to alienate Nicholson so that he would move out. Allshouse also testified that she had offered her home as a safe haven to Polanco if she ever felt unsafe at home with Nicholson.

### 3. Analysis

#### a. State's justifications for the other-acts evidence

{¶ 97} The state argued at trial and now argues on appeal that the evidence about Nicholson's threats and violent behavior toward Polanco and M.L. and Giselle was probative of his motive, intent, and absence of mistake. We conclude that the evidence was properly admitted to show Nicholson's motive and intent.

{¶ 98} At trial, the state argued that the prior threats and violence proved that this case was "primarily about domestic violence. It's a culmination of years of abuse and psychological torture that the Defendant inflicted upon [Polanco] and her children." The state further argued, "This case cannot be tried in a vacuum. It would not be fair, it would not be accurate for us to stand up in closing arguments and say that, one day, for absolutely no reason that anyone can discern, Matthew Nicholson picked up a gun and killed [M.L.] and Giselle." The state also asserts that the evidence tended to prove that Nicholson had created the "strained

relationships at the heart of the murders" and "demonstrated that the issues in Polanco's household between herself, Nicholson, and her children caused so much concern that multiple people offered them safe places to stay if needed."

### b. Motive

{¶ 99} We recently clarified that "[i]n the Evid.R. 404(B) context, the relevance examination asks whether the proffered evidence is relevant to the particular purpose for which it is offered, as well as whether it is relevant to an issue that is *actually in dispute*." (Emphasis added.) *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123, ¶ 37. Nicholson's motive for killing M.L. and Giselle was, in fact, "actually in dispute," because he testified that he shot them in self-defense.

{¶ 100} The challenged other-acts evidence tended to show that Nicholson viewed M.L. and Giselle as competitors for Polanco's attention. Nicholson's threats to kill M.L. and Giselle, coupled with the instances of physical abuse against Polanco and them, demonstrate that he was emotionally consumed by jealousy and contempt for them. Though some of the incidents of threats and violence were more recent than others, the relative recency of the incidents affects the persuasiveness of the evidence, not its admissibility. *See State v. White*, 2015-Ohio-3512, 37 N.E.3d 1271, ¶ 35-38 (2d Dist.).

{¶ 101} Smith's and Allshouse's testimonies corroborated Polanco's testimony about Nicholson's specific threats to kill her and M.L. and Giselle if they ever called the police. This testimony was probative of Nicholson's motive to kill. *See State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 64. The evidence of prior threats and violence tended to show that Nicholson's hostility toward M.L. and Giselle was deep, long-standing, and sufficient to drive him to kill. Indeed, in his reply brief, Nicholson "concedes that the other acts evidence related to [his] prior alleged contingent death threats to kill the Polanco family may

have probative value as to motive." We hold that the trial court did not abuse its discretion when it admitted the other-acts evidence.

*c. Intent*

{¶ 102} The challenged evidence's relevance to the state's burden to prove Nicholson's intent cannot be overstated. And because Nicholson claimed he shot M.L. and Giselle in self-defense, the testimonies of Polanco, Smith, and Allshouse were directly relevant to rebut that claim. Moreover, on direct examination, Nicholson stated, "I never wanted to shoot any fucking body," which placed Nicholson's intent into dispute and permitted the introduction of the other-acts evidence for nonpropensity purposes. The probative value of this evidence was strong, and the trial court acted well within its discretion in admitting the evidence.

{¶ 103} In sum, the evidence of Nicholson's prior threats and physical violence, including the testimonies of Smith and Allshouse, was properly admitted at trial. For these reasons, we reject Nicholson's second proposition of law.

## C. Loss or destruction of material evidence

{¶ 104} In his third proposition of law, Nicholson contends that the state denied him due process by losing photographs taken of the September 13 search of his car. Had the photographs been properly preserved, Nicholson argues, he would have been able to prove that he shot M.L. and Giselle in self-defense. The state counters that Nicholson's claim fails because he cannot show that the photographs were materially exculpatory.

{¶ 105} Nicholson also maintains that his counsel were ineffective for not requesting that the trial court exclude all the evidence and testimony regarding the search of his vehicle and the recovery of his service gun or that the court "dismiss all counts related to [his] self-defense claim."

### 1. Relevant facts

{¶ 106} On September 6, 2018, the day after the murders, Garfield Heights Police Officers Robert Pitts and David Simia searched the vehicles in the driveway

28

of Polanco's house, including Nicholson's car. The officers testified that at the time of that search, the trunk of Nicholson's car contained nothing of evidentiary value.

**{¶ 107}** On cross-examination, Officer Pitts testified that "[w]ithin the last month or two," "[t]he prosecutors" told him that they "needed a little bit more information as to specifically what [he] did [on the night of the shooting], rather than the report that [he had] wrote." Pitts wrote a second report, dated August 13, 2019, in which he failed to mention that the vehicles were searched twice in September 2018—on September 6 and September 13. At trial, Officer Pitts opined that the omission of the vehicle searches from his two reports—which were written almost a year apart—was due to a "lapse in judgment at the end of a long day."

**{¶ 108}** Also, between September 11 and 13, 2018, Paragon Systems contacted the Garfield Heights Police Department in an effort to locate Nicholson's service gun. Detective Stroe testified that he had spoken to Polanco about the gun and that she told him that Nicholson's belongings, including his service gun, were moved to Nicholson's car after Giselle's and M.L.'s funerals. Polanco testified at trial that Nicholson had usually kept his service gun in the bedroom closet. But no gun was recovered from the master-bedroom closet on September 6, when Polanco's house was first searched.

**{¶ 109}** Roberto testified that he, Polanco, Nieves, and Santos went to Polanco's house on September 13, 2018, the day police conducted the second search of Nicholson's vehicle. He testified that he had wanted to "get [Nicholson's belongings] out of the house, for [his] mom to feel more comfortable." When removing Nicholson's belongings from the house, Roberto found a holstered gun in the closet in Polanco's bedroom, which he took to Nicholson's car and " just threw * * * in the trunk."

**{¶ 110}** Lieutenant Petrick testified that when he searched Nicholson's car on September 13, he saw that it was filled with Nicholson's property, including

model cars, muscle-powder containers, gun belts, jackets, and bags of clothing. Lieutenant Petrick initially stated at trial that he could not recall whether he had found a handgun in Nicholson's car, but after looking at a photograph of a Glock semiautomatic handgun (state's exhibit No. 295), he remembered that he had found the gun in the trunk.

{¶ 111} Lieutenant Petrick photographed the second vehicle search on September 13, but many of the photographs were subsequently overwritten. On cross-examination, Lieutenant Petrick admitted that his name is not on the log of persons who were at the crime scene on September 5, but he could not explain the omission. On redirect examination, Lieutenant Petrick reiterated that although police did not recover any photographs taken of the gun during the search of the trunk of Nicholson's car on September 13, he had seen a gun in the trunk that day.

{¶ 112} Law enforcement did not learn that the photographs had been lost until about three weeks before the jury heard evidence at trial.

### 2. Standard of review

{¶ 113} "The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a criminal defendant from being convicted when the state either fails to preserve materially exculpatory evidence or destroys, in bad faith, potentially useful evidence." *State v. McClain*, 2016-Ohio-838, 60 N.E.3d 783, ¶ 21 (2d Dist.). Evidence is constitutionally material when it "possesses 'an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' " (Brackets added in *Powell*.) *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 74, quoting *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Under *Arizona v. Youngblood*, 488 U.S. 51, 57-58, 109 S.Ct. 333, 102 L.Ed. 281 (1988), in order to obtain relief for the destruction of potentially useful evidence, the defendant must show "bad faith on the part of the police * * *

[in] fail[ing] to preserve" the evidence.  The term "bad faith" " ' "imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of nature of fraud.  It also embraces actual intent to mislead or deceive another." ' " *Powell* at ¶ 81, quoting *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276, 452 N.E.2d 1315 (1983), quoting *Slater v. Motorists Mut. Ins. Co.*, 174 Ohio St. 148, 187 N.E.2d 45 (1962), paragraph two of the syllabus, *overruled on other grounds by Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 644 N.E.2d 397 (1994).

{¶ 114} Because Nicholson did not object, move to dismiss the indictment, or request a mistrial based on the loss of the photographs, he has forfeited all but plain-error review of the issue.  To prevail under the plain-error standard, the defendant must show that an error occurred, that it was obvious, and that it affected his substantial rights.  Crim.R. 52(B); *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002) (an error affects substantial rights only when it affects the outcome of the trial).  "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."  *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

### 3. *The lost photographs were not materially exculpatory*

{¶ 115} Nicholson bears the burden of proving that the overwritten photographs "(1) possess[ed] 'an exculpatory value that was apparent before [they were] destroyed' and (2) [were] 'of such a nature that [he] would be unable to obtain comparable evidence by other reasonably available means,' " *McClain* at ¶ 21, quoting *Trombetta* at 489.  As to the first query, Nicholson contends that "the [s]tate has not established that the exculpatory nature of the photographs was unknown at the time these photographs were forever lost because it did not establish when these photographs were ***permanently*** gone."  (Boldface and emphasis sic.)

But the state is not required to make that showing; the burden of proof falls squarely on Nicholson. *See McClain* at ¶ 23.

**{¶ 116}** Moreover, Nicholson has not adequately explained why it would matter if the photographs proved that his service gun was found in his car on September 13, because that fact is not in dispute. Any photographs taken during the September 13 search would not support Nicholson's claim that his service gun was in the trunk of his car on September 5, when the shootings occurred. And even if Nicholson's service gun was in his car on September 5, the jury could still have reasonably rejected his claim of self-defense, given that he shot each unarmed victim in the back multiple times.

### 4. No evidence of bad faith

**{¶ 117}** "Unless a defendant can show that the state acted in bad faith, the state's failure to preserve potentially useful evidence does not violate a defendant's due process rights." *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, syllabus, following *Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281.

**{¶ 118}** Nicholson argues that the Garfield Heights Police Department's "cavalier attitude" toward evidence in this case equates to bad faith, especially considering that the record contains an order for the state to properly preserve and catalog all physical evidence. As evidence of the officers' bad faith, he points to the following: (1) Lieutenant Vargo's incomplete body-camera footage, (2) omissions in police reports of the events of September 5 and 6, 2018, and (3) the officers' failure to retain Nicholson's service gun as evidence "even after finding [it] in the trunk of the vehicle that was parked merely a few feet from where [M.L. and Giselle] fell." But " '[t]he term "bad faith" generally implies something more than bad judgment or negligence.' " *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 81, quoting *State v. Tate*, 5th Dist. Fairfield No. 07 CA 55, 2008-Ohio-3759, ¶ 13.

{¶ 119} Nicholson argues that this court must necessarily infer bad faith because the missing evidence was related "specifically—and only—to [his] service weapon and the trunk of [his] vehicle" and was "potentially useful" to his self-defense claim. But we have never held that bad faith can be inferred based simply on the state's failure to preserve potentially useful evidence. Nicholson has not presented any evidence of police conduct amounting to bad faith.

{¶ 120} Further, Nicholson did not move to suppress any evidence or to dismiss the case based on the missing photographs; therefore, he has forfeited all but plain error. Here, the overwritten photographs had no inherent evidentiary value. The photographs were taken more than a week after the murders occurred and could not have shed any light on the question whether Nicholson's service gun was in the trunk of his car at the time of the murders.

{¶ 121} Moreover, testimony, crime-scene photographs, and body-camera footage all showed that M.L. and Giselle were shot and killed when they were trying to escape. Based on the location of their bodies when police officers first arrived on the scene, the jury could have reasonably inferred that M.L. and Giselle were shot before they reached Nicholson's car. If so, the jury would have rejected Nicholson's self-defense claim even if he had presented the missing photographs. Accordingly, Nicholson cannot show that the state's destruction of the photographs affected his substantial rights.

### 5. *Ineffective assistance of counsel*

{¶ 122} Defense counsel were not ineffective for failing to file a motion to suppress the fruits of the second search of Nicholson's vehicle or failing to move for dismissal of the counts related to his self-defense claim. The state's evidence established that Nicholson fought with Polanco and M.L. and then shot M.L. and Giselle in their backs as they fled their home. The presentation of additional photographs of the second search of Nicholson's vehicle would not undermine these facts or support Nicholson's self-defense claim.

**{¶ 123}** We therefore reject Nicholson's third proposition of law.

### D. Gruesome body-camera videos and photographs

**{¶ 124}** In his fourth proposition of law, Nicholson argues that the trial court erred in admitting gruesome autopsy photographs of M.L. and Giselle, portions of the crime-scene body-camera footage of Garfield Heights Police Officers Cramer, Jarzembak, and Spencer Sabelli, and photographs depicting blood spatter, pools of blood, spent shell casings, and M.L.'s and Giselle's personal belongings. Defense counsel failed to object to this evidence during trial, with the exception of state's exhibit No. 323A, which was footage from Officer Sabelli's body camera. Therefore, Nicholson has forfeited all but plain error regarding his gruesome-evidence claims. *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 132; *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 69.

**{¶ 125}** The admissibility of crime-scene photographs and video recordings is generally governed by Evid.R. 401 (defining "relevant evidence"), Evid.R. 402 (relevant evidence is generally admissible), and Evid.R. 403 (relevant evidence must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury"). The admission of gruesome photographs is left to the trial court's sound discretion. *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 69. To be admissible, "the probative value of each photograph must outweigh the danger of prejudice to the defendant and, additionally, not be repetitive or cumulative in nature." *State v. Morales*, 32 Ohio St.3d 252, 258, 513 N.E.2d 267 (1987); *see also State v. Thompson*, 33 Ohio St.3d 1, 9, 514 N.E.2d 407 (1987). We have "strongly caution[ed] judicious use" of gruesome photographs in capital cases. *Morales* at 259.

### 1. Body-camera recordings

#### a. State's exhibit No. 323A: Officer Sabelli's body-camera footage

{¶ 126} Defense counsel argued at trial that the video recording from Officer Sabelli's body camera was not probative of the elements of the charged offenses and was "unfairly prejudicial." The trial court overruled that objection, and the video was played in open court. Nicholson now argues that the trial court abused its discretion by admitting the recording. *See State v. Franklin*, 62 Ohio St.3d 118, 126, 580 N.E.2d 1 (1991).

{¶ 127} Officer Sabelli's body-camera footage shows his arrival at the scene, approach to Polanco's house, confirmation of Nicholson's location, initial communication with Polanco, safety check of the backyard, and participation in moving M.L.'s and Giselle's bodies to the front yard.

{¶ 128} The footage also shows Officer Sabelli trying to speak to M.L. and performing cardiopulmonary resuscitation ("CPR") on him for about five minutes. At one point, the video shows Giselle twisting and moaning in pain. Jurors could also hear an officer in the background stating that Nicholson "was beating [Polanco] up and her kids came home," that "he opened fire on them," and that Polanco had "marks all over her." Later, the officer is heard stating that Nicholson had said that he would shoot any officers who responded to the scene.

{¶ 129} The video is mostly black-and-white, but portions are in color. Most of the video is uneventful. The portion depicting Officer Sabelli administering CPR on M.L. is the most dramatic and lasts about five minutes—the longest of the portions of the video specifically challenged by Nicholson. The video shows part of M.L.'s torso up close, including the exit wounds in his chest. Combined with the audio, the footage of the CPR efforts is emotionally taxing to watch because Polanco is audibly distraught in the background.

{¶ 130} To be admissible, body-camera footage must be relevant and have "probative value in assisting the trier of fact to determine the issues or [be]

illustrative of testimony and other evidence, as long as the danger of material prejudice * * * is outweighed by [its] probative value and the [evidence is] not repetitive or cumulative in number," *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768, paragraph seven of the syllabus. The state is entitled to offer evidence showing the cause of death, even if the cause of death is uncontested, to give the jury an "appreciation of the nature and circumstances of the crimes." *State v. Evans*, 63 Ohio St.3d 231, 251, 586 N.E.2d 1042 (1992).

**{¶ 131}** On balance, Officer Sabelli's body-camera footage was relevant and highly probative of the nature and circumstances of the murders. The footage depicted the scene as it was found by the earliest responding officers, including the vital statuses and location of the murder victims. We have previously held that "[t]he number of shots fired, the places where the bullets entered the body, and the resulting wounds are all probative evidence of a purpose to cause death." *Maurer* at 265. Although the most emotionally taxing portion of the video lasts about five minutes, it is neither gruesome nor repetitive. Accordingly, the probative value of the footage substantially outweighs any unfairly prejudicial effect. Thus, we affirm the trial court's decision to admit Officer Sabelli's body-camera video footage.

*b. Admission of two additional body-camera videos was not plain error*

**{¶ 132}** Officers Jarzembak's and Cramer's body-camera videos were probative evidence of where M.L. and Giselle fell after they were shot in relation to the side door of the house where Nicholson stood when he fired the shots. Because Nicholson claimed that he had acted in self-defense, it was necessary for the state to prove where M.L. and Giselle were when Nicholson shot them. These body-camera videos are evidence that the bullets entered M.L.'s and Giselle's backs and show that M.L. and Giselle were moving away from Nicholson when he shot them. Therefore, the videos provided significant probative value to the state's case, including its burden to disprove at least one element of Nicholson's self-defense claim.

{¶ 133} Nicholson contends that because all three officers testified about the crime scene and other evidence was admitted describing the scene, the body-camera videos were prejudicially repetitive and cumulative. We disagree. Although Officers Jarzembak and Cramer were two of the first officers to respond to the scene (Officer Sabelli arrived soon thereafter), their movements were not identical and their body-camera videos depicted different viewpoints of the scene. Officer Cramer was primarily concerned that night with gathering information from Polanco and Nicholson's parents, whereas Officer Jarzembak helped move the victims' bodies away from the house, communicated information to command, and spoke to Polanco's neighbors.

{¶ 134} Because Officers Jarzembak's and Cramer's body-camera videos were not identical and provided critical details of the crime scene, Nicholson has not shown that the trial court erred in admitting them. Moreover, Nicholson has not shown that he was prejudiced by their admission; indeed, it is difficult to see how the exclusion of the body-camera videos would have led to a different outcome in the case, given the substantial evidence brought forth against Nicholson.

### 2. Crime-scene photographs

{¶ 135} Nicholson also challenges the admission of photographs taken by BCI investigators that showed "blood splatter, pools of blood, many spent shell casings, and the personal belongings of Giselle and [M.L.] str[e]wn around in the driveway." The state responds that the probative value of those photographs was significant given Nicholson's self-defense claim, because the photographs show the exact location where M.L. and Giselle were shot and killed.

{¶ 136} BCI investigator Justin Soroka took 144 photographs of the outside-the-house crime-scene area. Of the 144 crime-scene photographs, at least 28 depict the outside of the house and its grounds with no blood present. Blood spots and pools of blood are visible in at least 46 of the photographs. And several

photographs depict evidentiary items that were collected from the outside crime-scene area.

{¶ 137} We stated in a prior capital case that gruesome photographs are those that depict "actual bodies or body parts," because "photos of blood stains or fire damage to property do not have a shock value equivalent to the photograph of a corpse." *State v. DePew*, 38 Ohio St.3d 275, 281, 528 N.E.2d 542 (1988). Here, the photographs of the blood spatter and pooling on the driveway were not gruesome, so as to potentially bar their admission. Indeed, the photographs helped to "illustrate[] the testimony of detectives who described the crime scene" and "g[i]ve the jury an 'appreciation of the nature and circumstances of the crimes,' " *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 97, quoting *Evans*, 63 Ohio St.3d at 251, 586 N.E.2d 1042.

{¶ 138} The trial court did not err in admitting the photographs of M.L.'s and Giselle's clothing and possessions, because those photographs do not qualify as gruesome. Moreover, Nicholson fired 13 shots at M.L. and Giselle, and the state was entitled to provide photographic evidence of the location of each bullet casing and its proximity to the side door of the house. Because that evidence went directly to rebutting Nicholson's self-defense claim, the probative value of each photograph substantially outweighed any possible unfair prejudice to Nicholson. *See State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, 165 N.E.3d 1198, ¶ 103.

{¶ 139} Finally, Nicholson argues that multiple crime-scene photographs should not have been admitted, because the defense did not contest the cause and manner of death. We have criticized the admission of excessive crime-scene and autopsy photographs in a murder trial, because gruesome photographs expose the jurors to horrific images and might serve no useful purpose except to inflame the passions of the jurors. *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 257. And we have observed that "[a] few crime-scene photos showing the body along with the coroner's testimony will often suffice." *Id.*

Although the state presented more than "a few" crime-scene photographs during Nicholson's trial, none of them depict the bodies and thus they are not gruesome.

{¶ 140} However, more than 100 photographs of the outside-the-house crime scene were admitted during the trial phase, and any argument by the state that these photographs were not repetitive or cumulative in nature is unpersuasive. Multiple photographs illustrate different perspectives or different items of evidence, but the jury was practically shown each image twice because the photographer took a set of photographs of the exterior grounds without evidence-identification markers in place and then retook the same images after putting the markers in place.

{¶ 141} In conclusion, while some of the crime-scene photographs were repetitive or cumulative, we hold that their admission could not have affected the outcome of the proceedings.

### 3. Giselle's autopsy photographs

{¶ 142} Nicholson argues that the trial court erred in admitting photographs from Giselle's autopsy during the testimony of Dr. Barr, the deputy medical examiner who conducted the autopsies.

{¶ 143} Dr. Barr testified that when a person is taken from a crime scene by ambulance, the medical personnel may put medical devices on the person's body, such as electrocardiogram and defibrillator pads, and that there may be evidence of intravenous injections on the body. On receipt of a body by the medical examiner's office, photographs are taken of the closed body bag and at multiple steps when the bag is open and when any medical-therapy devices are removed.

{¶ 144} The state presented two autopsy photographs of Giselle's face: one taken after the medical-therapy devices had been removed and another taken after her face had been cleaned. Neither photograph is gruesome, nor are they cumulative. These photographs served to illustrate the procedure employed by the

medical examiner's office when it receives a body for autopsy, and they were properly admitted.

{¶ 145} In addition, the state introduced seven photographs documenting the wounds caused by the bullet that entered Giselle's left shoulder/upper arm. The entrance wound was depicted in two photographs, one of which was a close-up of the wound. That bullet exited Giselle's left arm and reentered her left chest area, and the photographs illustrated the path taken by the bullet. Another photograph of Giselle's left-shoulder area showed all three wounds associated with that bullet, with a rod inserted through Giselle's left-shoulder area and into her left chest to show the path of the bullet. These seven photographs are not especially gruesome, and their probative value is high. The photographs depict the path of the bullet that entered Giselle's left-shoulder area (from left to right and downward), illustrating Dr. Barr's testimony and the severity of the wounds caused by a single bullet.

{¶ 146} Giselle was struck by three other bullets. One photograph showed the entrance wounds caused by all three of those bullets. Two photographs showed the second entrance wound, which was to Giselle's right lower back, with one of those photographs showing all three entrance wounds with attention called to the second entrance wound, and the other being a close-up of that wound. According to Dr. Barr, the close-up photograph of the second entrance wound depicted "the eccentric abrasion pattern * * * with the defect more towards the top part." The state presented two close-up photographs of the third entrance wound, which was to Giselle's mid lower back, with one of those photographs showing all three entrance wounds with attention called to the third entrance wound, and the other being a close-up of that wound. And the fourth entrance wound, which was to Giselle's left buttocks, was illustrated by two additional photographs, one showing all three entrance wounds with attention called to the fourth entrance wound, and the other being a close-up of that wound. The gruesomeness of these photographs is minimal because the wounds depicted in them had been cleaned. Moreover, the

probative value of each photograph is significant, and the photographs are not repetitive.

{¶ 147} The state presented a photograph of Giselle's chest and abdomen, showing "sutures * * * from the exploratory laparotomy that was done in the hospital as a life-saving measure" and an incision showing "where one of the bullets that entered in the back ended up in the front." That photograph also depicted the exit wound to Giselle's chest caused by the bullet that had entered her left-shoulder area. Dr. Barr described another photograph that exhibited the "left lower quadrant of her abdomen * * * [where] one of the bullets that entered into the back * * * was recovered from the anterior abdominal wall." Four additional photographs showed abrasions on Giselle's left arm and elbow, right knee, and left foot, with one of the photographs being a close-up of the right knee.

{¶ 148} Autopsy photographs depicting a victim's injuries "[are] probative of the manner of death and [the defendant's] specific intent to kill." *State v. Shine*, 2018-Ohio-1972, 113 N.E.3d 160, ¶ 87 (8th Dist.), citing *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 93. We have upheld the admission of gruesome photographs when the photographs "supported the coroner's testimony and provided a perspective of the victims' wounds." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 142.

{¶ 149} We hold that the trial court did not err in admitting the photographs of Giselle's autopsy.

### 4. M.L.'s autopsy photographs

{¶ 150} Nicholson also argues that the trial court plainly erred when it admitted 29 photographs from M.L.'s autopsy. Dr. Barr determined that M.L. was struck by eight separate bullets, one of which entered, exited, and then reentered his body. Dr. Barr also observed "several blunt force injuries, abrasions, scratches, [and] lacerations * * * " on M.L.'s body.

{¶ 151} Three of the photographs document the arrival and receipt of M.L.'s body by Dr. Barr's office. Under *DePew*, 38 Ohio St.3d at 281, 528 N.E.2d 542, at least one of these photographs is arguably gruesome because it depicts the front of M.L.'s entire body with multiple gunshot wounds before it was cleaned. However, the photographs were shown to the jury only once during Dr. Barr's direct examination, to illustrate his testimony regarding the autopsy procedure. And the trial court's admission of M.L.'s autopsy photographs could not have affected the jury's verdicts regarding Nicholson's guilt or its recommendation of a death sentence. We hold that in light of the overwhelming evidence of Nicholson's guilt, the trial court did not commit plain error by admitting the photograph.

{¶ 152} The state presented two close-up photographs of M.L.'s head, one showing medical equipment in place and the other showing his head after the equipment was removed. The photographs are neither gruesome nor repetitive. And such photographs are relevant and probative for purposes of providing a one-time illustration of the treatment of a body on receipt by the medical examiner's office.

{¶ 153} Two photographs that combined to show the seven entrance wounds to M.L.'s torso were shown to the jury. These photographs are neither gruesome nor repetitive, and they provided the jury with a macro view of M.L.'s injuries. Therefore, we hold that the trial court properly admitted them into evidence.

{¶ 154} The state presented five photographs of an entrance wound to M.L.'s right upper arm that Dr. Barr labeled as "anatomic diagnosis number I" and other wounds caused by the bullet that caused the entrance wound. Dr. Barr testified that the entrance wound was caused by a bullet that went into M.L.'s right arm while the arm was "in position by his side," "exited his skin on the inside of his arm," and then "reentered into his right chest." Only one of these five autopsy photographs—state's exhibit No. 611—is arguably gruesome. And because all five

42

served to illustrate Dr. Barr's testimony about the cause and manner of M.L.'s death, the court did not err by admitting them. *See Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 142.

{¶ 155} The state also introduced a photograph of M.L.'s upper-chest area showing a small lump where a bullet came to rest inside his body and a photograph of the wound caused when Dr. Barr removed the bullet. These photographs are not gruesome, and the trial court did not err by admitting them. Two other bullets entered M.L.'s body in the right-lower-back area, and those wounds were illustrated at trial by two photographs. The photographs show each wound up close, and they are not gruesome. The state introduced two additional photographs to depict the exit wounds caused by those bullets, which are arguably gruesome because they depict two gaping wounds and bruising and blood, in detail. But the photographs illustrated Dr. Barr's testimony, and we find no plain error in their admission.

{¶ 156} The rest of the photographs from M.L.'s autopsy show the remaining bullet wounds to his body. Dr. Barr described M.L.'s injuries from each bullet, and the corresponding photographs show the entrance wounds. None of these photographs are gruesome or repetitive, and they illustrate Dr. Barr's testimony. We conclude that the trial court did not err in admitting them into evidence.

{¶ 157} For the foregoing reasons, we reject Nicholson's fourth proposition of law.

### E. Denial of request for jury instruction on voluntary manslaughter

{¶ 158} In his fifth proposition of law, Nicholson argues that he was entitled to a jury instruction on voluntary manslaughter because the evidence submitted at trial sufficiently established that Polanco and M.L. had provoked him into "acting under the influence of sudden passion or a fit of rage." He contends that the trial court's refusal to instruct the jury on the elements of voluntary manslaughter

violated his rights to due process and a fair trial under the United States and Ohio Constitutions.

{¶ 159} We reject Nicholson's argument. The trial court did not abuse its discretion when it denied Nicholson's request for a jury instruction on voluntary manslaughter. There was no objective evidence presented on which a jury could have reasonably found that Nicholson had acted under the influence of "sudden passion" or was in a "sudden fit of rage," R.C. 2903.03(A), brought about by serious provocation by the victims.

### 1. Relevant facts

{¶ 160} At trial, defense counsel argued that a voluntary-manslaughter jury instruction was appropriate based on Nicholson's statements to Lieutenant Vargo immediately after the murders. According to defense counsel, Nicholson's statements to Lieutenant Vargo showed that Nicholson had "snapped, he blacked out, he didn't know what the F happened. And * * * his emotions were elevated, * * * he was angry, * * * upset, and me[t] all the elements of manslaughter." The state opposed Nicholson's request, arguing that instructions on voluntary manslaughter and self-defense are incompatible because "voluntary manslaughter requires rage and self-defense requires fear."

{¶ 161} The trial court denied defense counsel's request for the court to instruct the jury on voluntary manslaughter.

### 2. Applicable legal standards

{¶ 162} "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240, citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991). However, a criminal defendant is not automatically entitled to an instruction on a lesser or inferior-degree offense. *Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961,

911 N.E.2d 242, at ¶ 192; *see also Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, at ¶ 134.  Rather, there must be sufficient evidence to permit the jury to reasonably reject the greater offense and find the defendant guilty on the lesser or inferior-degree offense.  *Trimble* at ¶ 192; *Conway* at ¶ 134.  In making this determination, a trial court must evaluate the evidence "in the light most favorable to the defendant, without weighing the persuasiveness of the evidence." *State v. Shane*, 63 Ohio St.3d 630, 637, 590 N.E.2d 272 (1992).  We review a trial court's refusal to give a requested jury instruction for abuse of discretion.  *Adams* at ¶ 240.

{¶ 163} A voluntary-manslaughter conviction requires proof beyond a reasonable doubt that the defendant, "while under the influence of sudden passion or in a sudden fit of rage, either of which [was] brought on by serious provocation occasioned by the victim that [was] reasonably sufficient to incite the person into using deadly force, knowingly cause[d] the death of another."  R.C. 2903.03(A). Construing R.C. 2903.03(A), we have held that "[f]or provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control."  *Shane* at 635.  "If this objective standard is met, the inquiry shifts to a subjective standard, to determine whether the defendant in the particular case 'actually was under the influence of sudden passion or in a sudden fit of rage.' "  *State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998), quoting *Shane* at 634.

### 3. Analysis

{¶ 164} Nicholson was not entitled to a jury instruction on voluntary manslaughter, because the evidence submitted at trial did not demonstrate a provocation "sufficient to arouse the passions of an ordinary person beyond the power of his or her control," *Shane* at 635.  To be sure, "words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations."  *Id.* at 637.

**{¶ 165}** Nicholson asserts that his "emotions" caused by Polanco's deceit and M.L.'s attempts to defend Polanco "compounded on each other throughout the course of the evening" to establish provocation sufficient to incite him into using deadly force. But Nicholson testified that he repeatedly asked Polanco to move her car so that he could leave the residence, thereby attempting to portray himself as the more mature and calmer participant in the altercation. Under these circumstances, the trial court did not abuse its discretion in denying Nicholson's request for a jury instruction on voluntary manslaughter.

**{¶ 166}** Nicholson also points to his testimony that M.L. came to the bedroom door during his argument with Polanco in "attack mode" and then "hit [him] maybe two or three times," which "hurt" and "pissed [him] off," as objective evidence of serious provocation sufficient to have incited him to use deadly force. He further testified: "[W]hen [M.L.] started swinging on me, [Polanco] came up behind me and wrapped her arms around me. And that's when our fight between me and him ensued." But Nicholson's having been punched once or twice by M.L., who was younger and smaller than Nicholson, did not constitute sufficient provocation to justify the use of deadly force. *See State v. Koballa*, 8th Dist. Cuyahoga No. 82013, 2003-Ohio-3535, ¶ 9; *State v. Evans*, 4th Dist. Scioto No. 05CA3002, 2006-Ohio-2564, ¶ 64 ("hitting another person does not constitute sufficient provocation to bring about a sudden passion or fit of rage"); *State v. Howard*, 9th Dist. Summit No. 26897, 2014-Ohio-1334, ¶ 25 ("being grabbed on the arm and experiencing a cut in the process would not arouse the passions of an ordinary man beyond the power of his control such that he would be aroused to use deadly force").

**{¶ 167}** Moreover, we have found questionable the argument that the sufficient-provocation element can be satisfied by the defendant's having learned during a telephone call of a romantic partner's infidelity, particularly when there was an adequate cooling-down period. *See State v. Huertas*, 51 Ohio St.3d 22, 32,

46

553 N.E.2d 1058 (1990). To be sure, a voluntary-manslaughter instruction is not warranted when the defendant had sufficient opportunity to cool down following a deception by a romantic partner. And here, Nicholson testified that when the fight moved to the kitchen, there was a moment when M.L., Polanco, and him "all kind of stood there, [and] caught [their] breath."

{¶ 168} Thus, we conclude that the facts did not warrant a jury instruction on voluntary manslaughter and that the trial court did not abuse its discretion in failing to provide one. We reject Nicholson's fifth proposition of law.

### F. Inadequate jury instruction on self-defense

{¶ 169} In his sixth proposition of law, Nicholson asserts that the trial court failed to adequately instruct the jury that an initial aggressor's right to use force in self-defense may be revived if the initial aggressor withdraws from the conflict in good faith. Because defense counsel did not object to the trial court's self-defense jury instruction, Nicholson has forfeited all but plain-error review of this claim. *See State v. Hartman*, 93 Ohio St.3d 274, 292, 754 N.E.2d 1150 (2001); Crim.R. 52(B).

{¶ 170} At the close of the trial phase, the court instructed the jury:

The defendant is allowed to use deadly force in self-defense. If you find that the evidence was presented that tends to support the finding that the defendant used deadly force in self-defense, the [s]tate must prove beyond a reasonable doubt that the defendant did not use deadly force in self-defense.

Self-defense means that, (A), the defendant was not at fault in creating the situation giving rise to the deaths of [M.L.] and Giselle Lopez.

And, (B), the defendant had reasonable grounds to believe and an honest belief, *even if mistaken*, that he was in imminent or immediate danger of death or great bodily harm.

47

And, (C), the defendant did not violate any duty to retreat to avoid the danger.

And, (D), the defendant used reasonable force.

Deadly force means any force that carries with it a substantial risk that it will proximately result in the death of a person.

Substantial risk means a strong possibility, as contrasted with a remote or even a significant possibility, that a certain result may occur or that certain circumstances may exist.

Duty to retreat. The defendant had no duty to retreat unless he was at fault in creating the situation giving rise to the deaths of [M.L.] and Giselle Lopez.

In deciding whether the defendant had reasonable grounds to believe and an honest belief that he was in imminent or immediate danger of death or great bodily harm, you must put yourself in the position of the defendant with his character, his knowledge, or lack of knowledge, and under the circumstances and condition that surrounded him at that time.

*You must consider the conduct of* [*M.L.*] *and Giselle Lopez in deciding—and decide whether their acts and words caused the defendant to reasonably and honestly believe that he was in danger of death or great bodily harm.*

*If the defendant used more force than reasonably necessary and if the force used is greatly disproportionate to the apparent danger, then the defense of self-defense is not available.*

If you find that the [s]tate proved beyond a reasonable doubt all the essential elements of aggravated murder or any of the lesser included offenses and that the [s]tate proved beyond a reasonable

doubt that the self-defense does not apply, you must find the defendant guilty according to your findings.

If you find that the [s]tate failed to prove beyond a reasonable doubt any one of the elements of aggravated murder or any of the lesser included offenses, that being murder and felonious assault, or if you find that the [s]tate failed to prove beyond a reasonable doubt that self-defense does not apply, you must find the defendant not guilty according to your findings.

(Emphasis added.)

{¶ 171} Nicholson contends that the trial court's instructions "implied[] * * * the [s]tate could satisfy its burden of proof merely by disproving one of the four common law self-defense elements enumerated by the trial court." Nicholson fails to identify an error in this respect. In fact, in his merit brief, Nicholson acknowledges that "Ohio's trial and appellate courts have interpreted the self-defense statute, R.C. 2901.05(B)(1), as placing the burden on the prosecution to disprove at least one of the common law elements of self-defense beyond a reasonable doubt."

{¶ 172} Nicholson also contends that the court's instructions were plainly erroneous because, in his view, they were "extremely vague and broad" as to the duty-to-retreat element of self-defense. He maintains that the court should have instructed the jury that "[t]he right to use self-defense is restored to the initial aggressor when the initial aggressor withdraws from the conflict in good faith and/or communicates (expressly or impliedly) to the other person his or her intention to withdraw, yet the other person nonetheless continues to use (or threatens the use of) unlawful physical force."

{¶ 173} The trial court's failure to provide this instruction to the jury does not amount to error, much less plain error under Crim.R. 52(B). The evidence does

not support the conclusion that Nicholson withdrew from the conflict in good faith. Nor is there any evidence that Nicholson communicated to anyone any intention to withdraw. Rather, the record shows that Nicholson withdrew only to retrieve his personal gun. Thus, an additional instruction on the revival of the right to use force in self-defense for an initial aggressor was not warranted. For that same reason, Nicholson's counsel were not ineffective for failing to request the instruction.

{¶ 174} Accordingly, we reject Nicholson's sixth proposition of law.

### G. Victim-impact evidence

{¶ 175} In his seventh proposition of law, Nicholson argues that the trial court erroneously admitted victim-impact testimony during the trial phase through multiple witnesses and that the inadmissible evidence had a prejudicial carryover effect in the mitigation phase. For the following reasons, we disagree that the challenged testimony was improper victim-impact evidence.

### 1. Background

#### a. Henry Billingslea's testimony

{¶ 176} After a pretrial hearing, the trial court granted Nicholson's motion in limine to "prohibit victim-impact evidence." During the trial phase, the state presented the testimony of 18-year-old Henry Billingslea, who was a close friend of M.L. throughout high school. Defense counsel objected on the basis that Billingslea's testimony was impermissible victim-impact evidence, but the trial court overruled the objection.

{¶ 177} Billingslea was a freshman at Ohio University at the time of trial. He testified that he met M.L. when they were freshmen at Garfield Heights High School and that most days they would "[w]ork out, go to school, leave school, go eat, [and] play video games." Over a defense objection, Billingslea testified that M.L. "was nice to everybody [and] [r]espectful to all his teachers, mom, dad, everybody. He never had a problem with anybody. He was the nicest kid I ever

met." Billingslea testified that Polanco had been protective of M.L. and that Polanco and M.L. had loved each other like "[a]ny mom and son."

{¶ 178} Billingslea said that M.L. had "got along well" with Giselle, who he described as "smart [and] quiet." Giselle sometimes gave Billingslea and M.L. a ride home from school or the boys' baseball practice. Billingslea testified that M.L. and Giselle's relationship had been "[g]ood" and "[b]etter than most brothers and sisters * * * [because] [t]hey didn't argue or nothing. She was nice to him; he was nice to her."

{¶ 179} Billingslea, who had sometimes picked M.L. up to go places or had dropped him off at home, met Nicholson after Nicholson moved into the house. When asked to describe the nature of his interactions with Nicholson, Billingslea testified that they were "[b]rief, [as in] just [a] head nod." Billingslea reported that for the first year or two after Nicholson moved in with Polanco, M.L. and Nicholson interacted with each other very little and eventually acted "like they didn't even live together." At first, M.L. and Nicholson would say "hi" and "bye" to each other, but after a couple years, even those communications stopped. The last time Billingslea and M.L. interacted with each other was around 8:00 p.m. on September 4, 2018; while M.L. played video games in his room, he and Billingslea had a video chat on FaceTime.

{¶ 180} Over a defense objection, Billingslea testified that he had gone to M.L.'s funeral and that "the whole school almost" had attended. And Billingslea also testified over objection that M.L. had been a private person who did not divulge many details about his life. To illustrate, Billingslea explained that he learned only after M.L. died that M.L. had had a girlfriend. A couple days after M.L. and Giselle died, Billingslea went to their house and found it in disarray. While there, Billingslea saw a hole in the wall in the family room.

### b. Kristin Bailey's testimony

**{¶ 181}** Kristin Bailey testified about Giselle, who had been Bailey's best friend. Bailey and Giselle met during their freshman year at Garfield Heights High School, and they remained close friends through their graduation in 2017. Bailey thought of Giselle "like a sister." Over a defense objection, Bailey testified that Giselle was "very sweet, caring, loving, always laughing. She [was] just so kind— so kindhearted. Everybody loved her. And she was so loyal and trustworthy as well." Bailey testified that she and Giselle were admitted into the National Honor Society during their junior year.

**{¶ 182}** Bailey said that beginning in 2016, she started visiting Giselle's house "[a] couple times, every couple weeks." She had occasionally seen Giselle and Nicholson interact, and she testified that they "typically did not really speak to each other" aside from small talk. Bailey said that she and Giselle had discussed Nicholson. Bailey also testified that she had seen "holes that were patched, re-plastered on various walls" in the kitchen and living room of the house.

### c. Other alleged victim-impact testimony

**{¶ 183}** Citing excerpts of the testimony of multiple other state's witnesses, Nicholson contends that the trial phase was replete with improper victim-impact evidence that prejudiced his defense. Except where noted below, Nicholson failed to contemporaneously object to the testimony and has forfeited all but plain-error review regarding this claim. *See State v. Smith*, 89 Ohio St.3d 323, 332, 731 N.E.2d 645 (2000); Crim.R. 52(B).

**{¶ 184}** For example, Polanco testified during direct examination about Giselle's last words and then broke down and was unable to compose herself. The trial court noted that she had had difficulty breathing following her testimony and was taken to a hospital. The trial court decided to postpone the rest of Polanco's testimony; the defense did not object. The trial court explained to the jury that

Polanco had been excused for the day and would conclude her testimony later. She finished testifying a few days later.

**{¶ 185}** During his testimony, Lieutenant Petrick became emotional when describing a bullet that had struck Giselle's backpack and a textbook inside it. While he was describing the backpack, he blurted out, "You know, I have a daughter that's in nursing school right now." Defense counsel argued that Lieutenant Petrick had "bec[o]me emotional" and had brought up the irrelevant information about his daughter "in order to get the jurors to sympathize with what's going on." The trial court instructed the jury "to disregard the last statement by the detective." When asked what he had found in the backpack, Lieutenant Petrick testified that he had found a book that had "a nice dent, right in [it]." The trial court sustained a defense objection to that testimony.

**{¶ 186}** At sidebar, defense counsel objected to this line of questioning, arguing that Lieutenant Petrick had performed no "analysis or testing" and could not testify as to the condition of the contents of the backpack before the incident. The trial court sustained that objection and another objection to the use of the word "defect" in describing the backpack's contents.

**{¶ 187}** Other witnesses testified during the trial phase about M.L. and Giselle. Multiple witnesses testified that M.L. and Giselle had been "good kids" or "respectful" or "polite." One of Polanco's neighbors, Victor Sanuk, testified that M.L. and Giselle had been

> [v]ery polite, very friendly. * * * [T]hey were very well disciplined. * * * When they came home from school—I guess they * * * knew to stay home. Hardly ever would see them go out and party or anything like that.

It was a situation where they [would] go home, do their schoolwork. When they got old enough to work, they would go to their employment, come home.

I believe that they had like a curfew, they had to be home at a certain time, because you [would] never see them come home late.

{¶ 188} Marshall described Giselle as having been an "intelligent young lady" who had "made dean's list [and been at the] top of her class" when she graduated from high school. He said that she had started taking college classes. Carlos Nieves, a friend of Roberto Lopez (Polanco's oldest child), testified that Giselle had been "always by her mom's side * * *."

{¶ 189} Multiple state's witnesses provided details about M.L.'s character and life. Another witness testified that M.L. and Giselle had been "good kids [who] * * * were always well behaved." During its trial-phase closing argument, the state continued this theme, stating that M.L. and Giselle had been "good kids" who "went to school [and] weren't running around."

### 2. State's position

{¶ 190} The state contends that "most, if not all" of the challenged evidence was not true victim-impact evidence. The state argues that Billingslea's testimony was not improper, because it was relevant to the jury's understanding of the relationship between M.L. and Nicholson, which was, in turn, relevant to Nicholson's decision to murder M.L. In the state's view, Billingslea's testimony that he had been best friends with M.L. and had known Polanco and Giselle well provided necessary context regarding his "understanding of [M.L.'s] poor relationship with Nicholson." Without his testimony, the state contends, "the trier of fact would have been in a position of potentially thinking that M.L. was distant from everyone he lived with, instead of just Nicholson."

{¶ 191} Regarding Bailey's testimony, the state likewise argues it was not victim-impact evidence, because it was relevant to establishing the close relationship between her and Giselle. The state contends that Bailey's testimony about her relationship with Giselle was necessary to "validate and qualify [her] testimony about Giselle's relationship with Nicholson."

{¶ 192} The state argues that nothing in the record suggests that any juror became outwardly emotional at any point during the trial. The state also notes that although Polanco and Lieutenant Petrick displayed emotion when they testified, the trial court took immediate action to ameliorate any prejudice to Nicholson. First, when Polanco became overwhelmed with emotion while recounting the events leading up to the deaths of M.L. and Giselle, the trial court called a recess and ultimately excused Polanco for the rest of that day. The state emphasizes that defense counsel did not object to the trial court's handling of this testimony. And second, regarding Lieutenant Petrick's inappropriate, emotionally laden statement about his own daughter being in nursing school, the court instructed the jury to "disregard the last statement by the detective." Also, the trial court sustained defense counsel's objection to Lieutenant Petrick's testimony that he had found a book in Giselle's backpack that had "a nice dent, right in [it]." At sidebar, the trial court sustained defense counsel's objection to the state's line of questioning because Lieutenant Petrick had performed no "analysis or testing" and could not testify regarding the condition of the backpack's contents before the incident. The trial court sustained another defense objection to the use of the word "defect" in describing the backpack's contents. The state contends that no prejudice resulted to Nicholson as a result of Polanco's and Petrick's emotional outbursts.

### 3. Analysis

#### a. Applicable law

{¶ 193} "Victim-impact evidence includes evidence relating to the victim's personal characteristics and the impact that the crimes had on the victim's family."

*State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 113. In a capital trial, the court may admit victim-impact evidence during the trial phase "only when the evidence [is] relevant to the facts attendant to the offense." *Id.*; *see also* Evid.R. 401.

**{¶ 194}** "Testimony is overly emotional when it is likely to inflame the passions of the jurors and elicit a purely emotional response that would inhibit the jurors from making an objective and rational determination regarding the defendant's guilt and/or the appropriate punishment." *Graham* at ¶ 123. Factors relevant in making that determination include (1) "the length of the victim-impact testimony," (2) "whether witnesses, jurors, and audience members showed physical signs of emotion during the testimony," (3) "the detail and depth of the victim-impact testimony with regard to the murder victim[s]," and (4) "whether the victim-impact witness used emotionally charged language." *Id*. at ¶ 126. This is not an exhaustive list. *Id*.

*b. Alleged victim-impact evidence during the trial phase*

**{¶ 195}** As discussed in our consideration of Nicholson's first proposition of law, a primary dispute in this appeal is whether the evidence showed that Nicholson's relationship with M.L. and Giselle was strained. Billingslea and Bailey each provided probative evidence regarding the relationships between Nicholson and M.L. and Giselle leading up to M.L.'s and Giselle's deaths, including how long they had known each victim; whether they had been to Polanco's house; what, if anything, they had seen at Polanco's house; and whether they had witnessed any domestic abuse or tension between Nicholson and the victims. Moreover, neither witness testified about the penalty to be imposed, and the record does not indicate that either witness became emotional while testifying. *See State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 79. Thus, we reject the contention that the testimonies of Billingslea or Bailey were inadmissible victim-impact evidence. *See id*. at ¶ 80.

{¶ 196} We also reject Nicholson's argument concerning the emotional testimonies of Polanco and Lieutenant Petrick. Defense counsel did not object to the trial court's decision to stop Polanco's direct examination when she became upset or to its allowing her to complete her testimony at a later date. In a prior capital case, we found no plain error when the victim's son had become distraught when trying to testify about the impact that the victim's death had on him. *State v. Reynolds*, 80 Ohio St.3d 670, 678-679, 687 N.E.2d 1358 (1998). And we found no reversible error in that case even though the prosecutor had "incorporated the victim-impact testimony into his closing argument." *Id*. at 678. Here, the record does not show that any juror was emotionally affected by Polanco's distress during her testimony. In addition, the trial court instructed the jury to disregard Lieutenant Petrick's testimony about his own daughter. We reject Nicholson's contention that he was deprived of a fair trial because of either of the emotional displays.

{¶ 197} Nicholson emphasizes that several witnesses testified that M.L. and Giselle had been "good kids" or "respectful" or "polite." Under *Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, at ¶ 126, one of the factors for determining whether testimony was impermissible victim-impact evidence is whether it was lengthy. But none of the testimony cited by Nicholson was lengthy. The statements that Nicholson challenges as being inadmissible victim-impact evidence were brief, served to establish the existence of the victims, and provided the jury with a backdrop against which to view the relationships between Nicholson and each of the victims. None of this challenged testimony was overly emotional or directed at the penalty to be imposed, and it thus does not fit within the definition of victim-impact evidence.

{¶ 198} None of the other factors articulated in *Graham* help Nicholson either. He does not claim that any witnesses other than Polanco or Lieutenant Petrick used "emotionally charged language," *id.*, and he cannot point to record

evidence showing that any "witnesses, jurors, [or] audience members showed physical signs of emotion during the testimony," *id.*

{¶ 199} We also reject Nicholson's argument that the state, in its opening statement and closing arguments, highlighted improper victim-impact evidence with the goal of swaying the jury. The trial court instructed the jury that counsels' opening statements and closing arguments are not evidence. To the extent that the state may have referred to personal characteristics of M.L. and Giselle during its opening statement or closing arguments, the court's instructions cured any error. *See State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001) (we presume that the jury followed the court's curative instructions, including instructions to disregard testimony).

### c. Carryover effect on mitigation phase

{¶ 200} Nicholson asserts that the admission of the allegedly improper victim-impact evidence during the trial phase prejudiced him during the mitigation phase. But even assuming that this evidence was inadmissible, we cannot conclude that Nicholson's sentence would clearly have been different but for the admission of the evidence. *See State v. Whitaker*, 169 Ohio St.3d 647, 2022-Ohio-2840, 207 N.E.3d 677, ¶ 106-110.

### 4. Conclusion

{¶ 201} In sum, Nicholson has not demonstrated that the trial court erred in admitting any of the evidence challenged under this proposition of law. The challenged testimony was relevant evidence regarding Nicholson's relationships with M.L. and Giselle and was not overly emotional or improperly directed at the penalty to be imposed.

{¶ 202} For these reasons, we reject Nicholson's seventh proposition of law.

### H. Inadequate voir dire

{¶ 203} Nicholson's eighth proposition of law raises several challenges to the trial court's voir dire procedure, which he argues was constitutionally inadequate.

#### 1. *Denial of alternating questioning*

{¶ 204} First, Nicholson contends that his counsel were always last (after the trial court and the state) to question potential jurors. He argues that this procedure denied him a "fair and impartial jury" because pro-death-penalty jurors had been rehabilitated by the time his counsel had a chance to question them and were so "locked in" to their positions following the rehabilitation that his counsel's voir dire efforts were futile.

{¶ 205} The few courts that have confronted this issue have rejected the claim that defendants have a right to alternating voir dire. *See, e.g.*, *State v. Joseph*, 3d Dist. Allen No. 1-91-11, 1993 WL 531858, *40 (Dec. 23, 1993), *aff'd*, 73 Ohio St.3d 450, 653 N.E.2d 285 (1995); *State v. Treesh*, 11th Dist. Lake No. 95-L-057, 1998 Ohio App. LEXIS 4886, *145 (Oct. 16, 1988). We agree with that conclusion and reject Nicholson's argument.

#### 2. *"Follow the law" questions*

{¶ 206} Nicholson also argues that the trial court erroneously relied on prospective jurors' responses to general follow-the-law questions to retain potential jurors who should have been excluded for cause under *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). He identifies multiple prospective jurors who he says were improperly qualified by general and "superficial" follow-the-law questions during death-qualification voir dire. The state counters that Nicholson's argument "is based on a misreading of *Morgan*" and that he fails to explain how the follow-the-law questions prejudiced him.

{¶ 207} When deciding a motion to exclude a potential juror for cause, "[t]he ultimate question is whether the 'juror sw[ore] that he could set aside any

opinion he might hold and decide the case on the evidence, and [whether] the juror's protestation of impartiality [should be] believed.' " (Brackets added in *White*.) *White v. Mitchell*, 431 F.3d 517, 538 (6th Cir.2005), quoting *Patton v. Yount*, 467 U.S. 1025, 1037, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *see also State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 140. In considering jurors' believability, we defer to the trial judge who saw and heard them. *Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 83. To prevail, Nicholson must show that the trial court abused its discretion. *See State v. Williams*, 79 Ohio St.3d 1, 8, 679 N.E.2d 646 (1997).

{¶ 208} As a threshold matter, Nicholson misconstrues *Morgan*. That case does not stand for the proposition that it is improper to use "follow the law" questions to explore whether a prospective juror is able to serve impartially. However, it is significant that the voir dire procedure analyzed in *Morgan* was unlike the procedure for Nicholson's voir dire. In *Morgan*, the trial court had been the only questioner of the prospective jurors, and it denied Morgan's request that the court ask them: "If you found * * * Morgan guilty, would you automatically vote to impose the death penalty no matter what the facts are?" *Id.* at 723. Thus, the issue presented in *Morgan* was limited to whether a trial court must allow a capital defendant to question prospective jurors about whether they would automatically impose the death penalty following a guilty verdict. *Id*. at 734-736. And we hold that *Morgan* does not prohibit the use of so-called "follow the law" questions during voir dire. *See id*.

{¶ 209} Here, for instance, prospective juror No. 16 circled "7" in response to question No. 35 on the juror questionnaire, which asked prospective jurors to rate their "feelings about the death penalty" on a scale of 1 to 10, with "10" meaning "strongly support." Prospective juror No. 16 also wrote on the questionnaire: "I support the death penalty for premeditated murder." On the next question, he checked the line indicating, "I have some doubts or reservations about the death

penalty, but I would not vote **against** the death penalty in every case. **I would** seriously weigh and consider the aggravating and mitigating factors to determine the appropriate penalty." (Boldface sic.) And in response to a question on the juror questionnaire regarding whether he held "any religious, moral feelings or philosophical beliefs that would affect [his] ability to vote for the death penalty as a judgment in this case," prospective juror No. 16 checked "No." But he wrote on the questionnaire: "If someone commits murder they should be prepared to give up their own life." During voir dire, prospective juror No. 16 confirmed that that statement accurately captured his feelings regarding aggravated murder and the death penalty.

{¶ 210} When asked about his general feelings about the death penalty, prospective juror No. 16 responded that it is "necessary in some cases." He explained that "some cases" meant "[m]urder cases, or something very violent." But he unequivocally declined to state that he supported the death penalty in all murder cases, instead stating that it "would depend on all the mitigating factors." When the state asked prospective juror No. 16 whether he would be able to "consider [mitigating] evidence in the second phase," he responded, "Certainly." He also stated that he would be able to consider Nicholson's history, character, and background during the mitigation phase, if it came to that. When the state asked prospective juror No. 16 whether he had "any reservations or hesitations about any part of that process," he responded, "Not really."

{¶ 211} Defense counsel also focused on prospective juror No. 16's statement on the juror questionnaire that he supported the death penalty for premeditated murder. But prospective juror No. 16 explained that he did not "believe you have to [impose the death penalty for premeditated murder], but *it depends on hashing out all the evidence*." (Emphasis added.) He also indicated that he would give no weight to the victims' ages, and he consistently stated that he

would consider mitigating evidence. Nicholson has not identified any error with respect to the voir dire of prospective juror No. 16.

{¶ 212} Nicholson also points to prospective juror No. 43's voir dire as an alleged example of how the trial court and the prosecutor rehabilitated a prospective juror through "follow the law" questions. In response to a question on the juror questionnaire asking the prospective jurors to rate their "feelings about the death penalty" on a scale of 1 to 10, prospective juror No. 43 underlined "10." But in the space underneath that question, she wrote, "If someone asked me on the street, I'd say I strongly support it. Asking me here and the reality of making that kind of a decision, I'm not sure where I would place myself on the above scale. I'm just a human too. I believe in the death penalty because I believe the bible is from God. * * * I have some doubts or reservations about the death penalty but I favor the death penalty and would not always vote for it in every case of aggravated murder."

{¶ 213} Here, again, Nicholson fails to demonstrate any error regarding voir dire. Prospective juror No. 43 did not give automatic-death-penalty answers in her questionnaire. The law does not prohibit asking prospective jurors whether they can follow the law under these circumstances.

{¶ 214} Nicholson has not pointed to any follow-the-law questions that were asked in this case that would be disallowed under *Morgan*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492. We conclude that the trial court did not abuse its discretion in permitting the questions. We therefore reject Nicholson's argument to the contrary.

### 3. Denial of motion for mistrial

{¶ 215} Next, Nicholson contends that the prospective jurors were confused by the death-penalty process and failed to understand core terms that apply to capital cases and that the trial court erred when it denied his motion for a mistrial following prospective juror No. 53's individual voir dire. The state correctly argues that there is no requirement that jurors be provided with definitions of key terms at

the beginning of a capital trial, and in any event, Nicholson was not prejudiced by any potential juror confusion in this regard.

{¶ 216} "[P]rospective jurors often have difficulty articulating their views during voir dire." *Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, 165 N.E.3d 1198, at ¶ 67. Most jurors are "unfamiliar[] with courtroom proceedings," and a typical venire will "run[] the spectrum in terms of education and experience." *White*, 431 F.3d at 537. Moreover, throughout a trial, the court is tasked with explaining legal concepts and relevant terminology to the jury, and the parties may ask the court to provide further jury instructions. *See* Crim.R. 30.

{¶ 217} Nicholson fails to identify any error in the voir dire process in this case. The prospective jurors filled out extensive questionnaires, which counsel could rely on when conducting individual voir dire. The trial court also provided the venire with initial jury instructions and definitions before individual voir dire. The instructions defined key terms like "indictment," "specification," "trial phase," "aggravating circumstances," and "mitigating factors." Further, the trial court permitted individual, sequestered voir dire with each prospective juror, followed by a general voir dire examination in open court. The individual voir dire provided ample opportunity for prospective jurors to ask for additional explanation of any concepts or to clear up any confusion.

{¶ 218} We hold that the trial court did not abuse its discretion by denying Nicholson's motion for a mistrial based on juror confusion.

### 4. Inadvertent misinformation given to the jury pool

{¶ 219} Nicholson argues that the state and the trial court prejudiced him by misstating how many counts of aggravated murder the indictment contained.

{¶ 220} Nicholson was indicted on two counts of aggravated murder and two counts of murder (one each for both M.L. and Giselle). However, at multiple points during voir dire, both the trial court and the prosecutors misinformed prospective jurors that Nicholson had been charged with four counts of aggravated

murder. It is not obvious how this misinformation could have prejudiced Nicholson, and he makes little attempt to explain how he was prejudiced.

{¶ 221} We reject Nicholson's eighth proposition of law and hold that he had a constitutionally adequate voir dire.

## I. Discovery violation

{¶ 222} In his ninth proposition of law, Nicholson contends that the trial court deprived him of a fair trial when it allowed two witnesses who were not timely disclosed to the defense, Santos and Nieves, to testify about the discovery of Nicholson's service gun in the trunk of his car on September 13, 2018. Nicholson submits that the testimony unfairly undermined his credibility and his self-defense claim. He also argues that defense counsel were ineffective "for failing to properly maintain[] objections to these two witnesses." The state counters that even if the testimony were inadmissible (a point the state does not concede), Nicholson cannot show prejudice.

### 1. Relevant background

{¶ 223} The state filed its Crim.R. 16(I) witness list on September 5, 2019, and filed its supplemental witnesses list on September 13. Neither list included Santos or Nieves. On September 24, the state filed a second supplemental witness list that included Santos's name but not her contact information. It also filed a supplemental discovery response that, among other things, provided defense counsel with Santos's witness statement. The state did not disclose Nieves as a potential witness until September 26; the record does not indicate whether Nieves provided a statement to police before he testified.

{¶ 224} Immediately after the state's opening statement, at sidebar, defense counsel objected to the state's late disclosure of the witnesses who would testify to the location of Nicholson's service gun on September 13, 2018. The trial court instructed defense counsel to raise any objections to the witnesses at the time of their testimony.

**{¶ 225}** At the end of the same day, defense counsel asked the court to disallow the testimonies of Santos and Nieves because the state had given notice of its intent to call Santos only "within the past few days" and the defense had not had an opportunity to have its investigator speak to her. The trial court denied Nicholson's request to disallow the testimony. Defense counsel's investigator ultimately interviewed Santos, and the state had provided defense counsel with Santos's statement. Santos and Nieves testified without further objection.

### 2. Standard of review

**{¶ 226}** As a preliminary matter, the state argues that Nicholson did not properly object to the testimony of either witness on Crim.R. 16 grounds and that he has thus forfeited all but plain-error review of this claim. The trial transcript, however, shows that defense counsel expressly objected to the testimony of both witnesses based on an alleged discovery violation and requested that "*they* not be allowed to testify at this point in time." (Emphasis added.) However, the day before Santos was to testify, defense counsel had their defense investigator interview Santos, and defense counsel did not object again before she testified. Likewise, defense counsel did not object on discovery grounds when Nieves testified.

**{¶ 227}** By not renewing his objections to the testimonies of Santos and Nieves on discovery grounds when they took the stand, Nicholson forfeited all but plain-error review of the issue. *See State v. Stembridge*, 9th Dist. Summit No. 23812, 2008-Ohio-1054, ¶ 12 ("Because defense counsel did not bring the alleged discovery violation to the trial court's attention when [the challenged witness] took the stand to testify, Defendant has forfeited any error, unless allowing [the witness] to testify under the circumstances of this case rises to the level of plain error"); *see also State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 47-48; Crim.R. 52(B).

### 3. Trial court did not plainly err in allowing the testimony

{¶ 228} Nicholson gives three reasons why the trial court erred in allowing Santos and Nieves to testify. First, he argues that "[g]iven [Polanco's] inconsistent statements regarding the location of the service weapon and the apparent bias of [Polanco] and Roberto" regarding when it was placed into the trunk of his car, Santos's and Nieves's testimony "was critical" to the state's "intended purpose of directly countering * * * [his] self-defense claim and generally discrediting his description of the events." Second, he notes that there was no body-camera footage of the vehicle searches and that photographs from the second search of his vehicle were overwritten before defense counsel could see them. Third, he argues that police returned his service gun to his employer without first submitting it for scientific analysis or giving the defense an opportunity to view or test it.

{¶ 229} Although Nicholson accurately describes gaps in the investigation, he concedes in his reply brief that "earlier knowledge of the testimony the [s]tate intended to elicit from [Santos and Nieves] (as well as [Polanco] and Lopez) regarding the location of the service weapon probably would not have changed Mr. Nicholson's theory of defense."

{¶ 230} In light of this concession, and notwithstanding the gaps in the investigation, Nicholson has not identified any error in the admission of the testimony or adequately explained how the belated disclosures affected the outcome of his trial.

{¶ 231} We reject Nicholson's ninth proposition of law.

### J. Readmission of trial-phase evidence

{¶ 232} In his tenth proposition of law, Nicholson argues that the trial court abused its discretion when it readmitted "nearly all [the] culpability phase evidence during the mitigation phase" of his trial. To prevail under this proposition, Nicholson must show that the trial court abused its discretion by readmitting the

evidence. *See Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 241.

### 1. Relevant facts

**{¶ 233}** Before the start of the mitigation phase, the trial court readmitted all the evidence that was admitted in the trial phase, except for the following: photographs of Polanco taken at the hospital following the offenses, a cellphone-analysis report, Polanco's hospital records, and some other physical exhibits.

**{¶ 234}** The trial court then instructed the jury:

> Some of the evidence and testimony that you considered in the trial phase of this case may not be considered in the sentencing phase. For purposes of this proceeding you are to consider only that evidence admitted in the trial phase that is relevant to the aggravating circumstances of which the defendant has been found guilty and to any of the mitigating factors. You will also consider all the evidence admitted during the sentencing phase.

The court further instructed: "When you consider the nature and circumstances of the offense, you may only consider them if they have any mitigating value. You may not consider the nature and circumstances of the crime as an aggravating circumstance." Just before releasing the jury for its deliberations, the court told the jury that "[a]ll the evidence that's been admitted will be back with you. So if there's some exhibits that may be referred to but you don't have, it's not an oversight. Either they weren't offered or they were not admitted." Regarding the aggravating circumstance of engaging in a course of conduct to murder or attempt to murder two or more people, the court instructed the jury that "any link that ties the two homicides together" is relevant.

### 2. Analysis

{¶ 235} R.C. 2929.03(D)(1) provides that during the mitigation phase of a capital proceeding, the jury shall consider, among other things, "any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * * [and] shall hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing." Nicholson argues that pursuant to R.C. 2929.03(D)(1), "the [s]tate *could reintroduce only the minimal evidence* proving the aggravated circumstances that moved this case into the mitigation phase: for Counts One and Two, the course of conduct specification under R.C. 2929.04(A)(5)." (Emphasis added.) *But see DePew*, 38 Ohio St.3d at 282-283, 528 N.E.2d 542 (holding that R.C. 2929.03(D)(1) does not limit the reintroduction during the mitigation phase of evidence that is relevant to the aggravating circumstances).

{¶ 236} Citing *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, Nicholson argues that the trial court erroneously allowed the state to admit "nature and circumstances" evidence, which he says is "only admissible to the extent the defense offers the evidence" during the mitigation phase. Nicholson's reliance on *Belton* is misplaced. In *Belton*, we observed that R.C. 2929.04(B) and (C)—not R.C. 2929.03(D)—prohibit referring to "the nature and circumstances of the offense as a factor to be considered in mitigation unless and until offered by defendant." (Emphasis deleted.) *Belton* at ¶ 92. And as we recently explained: "In *DePew*, we * * * observed that not only is repetition of trial-phase evidence for the mitigation phase required by the statute but it is also logical given 'the prosecution's obligation to demonstrate, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation.' " *State v. McAlpin*,

169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, ¶ 142, quoting *DePew* at 283.

{¶ 237} Nicholson also claims that the trial court should not have readmitted videos and photographs of M.L. and Giselle, crime-scene videos and photographs, Polanco's text messages with Nicholson and Giselle (state's exhibit Nos. 341B-BB, 341GG, and 341OO), prior-acts-related photographs and metadata (state's exhibit Nos. 341ZZ through JJJ), text messages between Nicholson and his mother (state's exhibit Nos. 410A, 410B, and 410C), Nicholson's May 14, 2019 phone call from jail (state's exhibit Nos. 408 and 423), cellphone-extraction reports (state's exhibit Nos. 424 and 425) and related data (state's exhibit Nos. 552, 578, and 579), utility bills (state's exhibit Nos. 426 and 427), "and the majority of the testimonial evidence."

{¶ 238} Citing *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 132-133, the state responds by asserting that it is not per se error for a trial court to readmit much or all of the trial-phase evidence in a capital case. But *Ketterer* does not have the broad import that the state suggests. Ketterer tried his aggravated-murder case to a three-judge panel, and we held that the panel did not commit plain error when it allowed the state to reintroduce at the mitigation phase all of the trial-phase evidence. *Id.* at ¶ 134, quoting *State v. Davis*, 63 Ohio St.3d 44, 48, 584 N.E.2d 1192 (1992) (noting that "a panel of judges is presumed to 'consider only relevant, competent and admissible evidence in its deliberations' "). Because Nicholson had a jury trial, *Ketterer* is inapplicable here.

{¶ 239} The trial court readmitted only the evidence that it deemed relevant to the aggravating circumstances. In particular, the body-camera videos and crime-scene photographs were relevant to the course-of-conduct aggravating circumstance, as explained above in our analysis of Nicholson's fourth proposition of law. *See also Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 355. Therefore, the trial court's readmission of the crime-scene photographs and

body-camera footage of the scene was not an abuse of discretion. *See State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 90 (finding "no error in the trial court's admission of the photographs and demonstrative exhibits depicting the weapon used [because] * * * [t]hese items bore some relevance to the nature and circumstances surrounding the R.C. 2929.04(A)(5) course-of-conduct specification of which the jury found [the defendant] guilty").

**{¶ 240}** The trial court also readmitted several text messages of Polanco, Nicholson, and Giselle and between Nicholson and his mother. State's exhibit Nos. 341B-BB, 341GG, and 341OO were admitted during the trial phase to show Nicholson's motive, intent, and lack of mistake. The text messages bore some relevance to the course-of-conduct specification, in that the messages refer to M.L. and serve as evidence of Nicholson's strained relationship with M.L. and Giselle. And the text messages between Nicholson and his mother were arguably relevant during the mitigation phase in that they tended to show the unconditional love between Nicholson and his mother. Thus, we hold that it was not error for the trial court to readmit state's exhibit Nos. 341B-BB, 341GG, 341OO, 410A, 410B, and 410C.

**{¶ 241}** Nicholson also maintains that the trial court abused its discretion in readmitting the "photographs and metadata" extracted from Polanco's cellphone. State's exhibit No. 341JJJ is a photograph of the bruise that Nicholson caused when he attacked Giselle after a disagreement about laundry. That photograph was relevant to the course-of-conduct aggravating circumstance, and thus it was not error for the court to readmit it for the mitigation phase.

**{¶ 242}** As to state's exhibit Nos. 341ZZ through 341FFF, Polanco testified that the photographs depicted injuries inflicted by Nicholson. The metadata for the photographs was used at trial to establish the dates on which the photographs were taken. These photographs and metadata were irrelevant to the mitigation phase, because the jury had acquitted Nicholson of the attempted murder of Polanco.

Therefore, the trial court should not have readmitted state's exhibit Nos. 341ZZ through 341FFF. However, we hold that the "error was harmless in light of the remaining evidence adduced during the mitigation phase," *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 75.

{¶ 243} Nicholson further argues that the trial court erred when in readmitted two utility bills that the state had presented during the trial phase. We agree that the utility bills should not have been readmitted, because they bore no relevance to Nicholson's conduct in killing M.L. and Giselle. But Nicholson has not shown that he was prejudiced by the readmission of that evidence.

{¶ 244} Nicholson also argues that the trial court erred when it readmitted a recording of a May 14, 2019 jail phone call between Nicholson and his older brother, Robert Nicholson Jr. During the call, Robert stated that Nicholson was one of the "most calculating" people he knew. According to Nicholson, what Robert meant by that statement was that "everything that I do has a reason."

{¶ 245} This recording had no relevance to the course-of-conduct aggravating circumstance, and the trial court erred in readmitting it for the mitigation phase. However, the trial court "explicitly instructed the jury on what it could and could not consider as aggravating circumstances and also instructed the jury that it must not consider the nature and circumstances of the murders unless they were mitigating," *McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, at ¶ 207. Given the court's instructions, there is no realistic chance that the readmission of the May 14, 2019 jail phone call affected the outcome of Nicholson's sentencing. Therefore, we reject Nicholson's tenth proposition of law.

### K. Erroneous weighing

#### 1. Aggravating circumstances

{¶ 246} In his 11th proposition of law, Nicholson argues that both the jury and the trial court improperly weighed the aggravating circumstances against the mitigating factors and thereby erroneously discounted his mitigation evidence.

**{¶ 247}** Despite his being convicted of two counts of aggravated murder and two course-of-conduct aggravating circumstances, Nicholson urges this court to afford significantly less weight to the aggravating circumstance because "once [he] decided to kill, the sheer proximity of M.L. to Giselle alone facilitated the two deaths." While it is possible that Nicholson aimed his gun only at M.L., there is no evidence in the record to establish that fact. And to suggest in the absence of such evidence that Giselle's death was purely a matter of her being in the wrong place at the wrong time is unconvincing. Nicholson was employed as a security guard by Paragon Systems on the date of the offenses and was well-trained on how to use firearms.

**{¶ 248}** Accordingly, we reject Nicholson's argument that the course-of-conduct aggravating circumstance should be given less weight.

### 2. *Weight of mitigation evidence*

**{¶ 249}** Nicholson argues that the jury and the trial court gave his mitigating evidence substantially less weight than it should have. He complains that the trial court erroneously gave little or no weight to his lack of prior criminal convictions under R.C. 2929.04(B)(5). He argues that any evidence of prior threats or violence toward Polanco or others should not have been considered, because he was never charged with a crime regarding those matters. However, the lack of a significant history of prior criminal convictions is only one of the mitigating factors the court must weigh against the aggravating circumstances. And this court's independent sentence review will cure any error in the trial court's weighing process.

**{¶ 250}** Accordingly, we reject Nicholson's 11th proposition of law.

### L. Proportionality review

**{¶ 251}** In his 12th proposition of law, Nicholson argues that his death sentences are excessive and disproportionate to the penalty imposed in similar cases and therefore violate the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, 9, and 16 of the Ohio Constitution.

Nicholson's argument relies on the reasoning set forth in the concurring opinion in *Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, at ¶ 220-229 (Donnelly, J., concurring). A concurring opinion does not represent a judgment of the court, and the reasons advanced in support of finding Graham's death sentence inappropriate in that concurring opinion do not exist here. Thus, we find no merit to Nicholson's 12th proposition of law.

### M. Failure to instruct on specific mitigating factors

{¶ 252} In his 13th proposition of law, Nicholson argues that the trial court erred during the mitigation phase when it failed to instruct the jury on the statutory and nonstatutory mitigating factors that Nicholson raised during both phases of the trial. Although the trial court granted Nicholson's pretrial motion requesting jury instructions on specific mitigating factors, Nicholson contends that the court erred by failing to give the instructions during the mitigation phase.

{¶ 253} Defense counsel failed to identify at trial any specific mitigating factors under R.C. 2929.04(B)(1) through (6) that were established by Nicholson's evidence. Indeed, Nicholson seems to concede that defense counsel relied exclusively on the catchall mitigation factor under R.C. 2929.04(B)(7) to argue for a life sentence. He contends that "[s]imply arguing it under the R.C. 2929.04(B)(7) catchall does not cure the error" and that the trial court plainly erred when it did not instruct the jury on multiple mitigating factors within R.C.2929.04(B)(1) through (6). Because defense counsel did not object to the instructions given to the jury or request any specific instructions based on Nicholson's mitigating evidence, Nicholson has forfeited this claim, absent plain error. *See Smith*, 89 Ohio St.3d at 332, 731 N.E.2d 645; Crim.R. 52(B).

{¶ 254} During the mitigation phase, the trial court instructed the jury that mitigating factors "weigh in favor of" a life sentence and diminish the appropriateness of a death sentence. The court stated:

Mitigating factors include, but are not limited to, the nature and circumstances of the offense, the history, character, and background of the defendant, and any other factors that weigh in favor of a sentence other than death.

This means you are not limited to the specific mitigating factors that have been described to you. You should consider any other mitigating factors that weigh in favor of a sentence other than death.

Any one of these mitigating factors standing alone is sufficient to support a sentence of life imprisonment if the aggravating circumstances are not sufficient to outweigh the mitigating factors beyond a reasonable doubt.

{¶ 255} The jury instructions correctly stated the law, and without a defense objection or a request for specific instructions, the trial court was under no obligation to include specific references to the factors under R.C. 2929.04(B)(1) through (6). "[W]here the defendant does not raise a particular mitigating factor, that factor need not be considered in the opinions of the trial court and the appellate court or in the process of weighing mitigating factors against the aggravating circumstances." *DePew*, 38 Ohio St.3d at 289, 528 N.E.2d 542.

{¶ 256} Nicholson has not established that any error occurred when the trial court instructed the jurors during the mitigation phase, much less plain error under Crim.R. 52(B). Accordingly, we reject Nicholson's 13th proposition of law.

**N. Challenges to the trial court's sentencing opinion**

{¶ 257} In his 14th proposition of law, Nicholson argues that in its sentencing opinion, the trial court violated the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, and 16 of the Ohio Constitution by affording insufficient or no weight to his mitigating evidence. He

further contends that the trial court "misapplie[d] the weighing process" in its sentencing opinion.

{¶ 258} Under R.C. 2929.03(F), a trial court must state in a separate opinion

> specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors.

{¶ 259} In crafting a written opinion under this statute, a trial court retains wide discretion over whether and how much weight to give a defendant's mitigating evidence. *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, ¶ 90. To demonstrate error, Nicholson must show that the trial court's "attitude was unreasonable, arbitrary, or unconscionable." *Id.*; *see also Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 437 ("The assessment and weight to be given to mitigating evidence are matters for the trial court's determination").

{¶ 260} Nicholson contends that the jury's verdict finding him guilty of murdering M.L. and Giselle with prior calculation and design and as part of a course of conduct under R.C. 2929.04(A)(5) was not supported by sufficient evidence or was against the manifest weight of the evidence. We have already rejected these arguments in our ruling on Nicholson's first proposition of law.

{¶ 261} Nicholson also maintains that the trial court improperly assigned weight to (1) the nature and circumstances of the offense, (2) his history, character, and background, (3) his mental-health diagnoses, (4) his lack of significant criminal history, and (5) his future dangerousness or lack thereof.

**{¶ 262}** The United States Supreme Court has held that a sentencing court "may not give [mitigating evidence] no weight by excluding such evidence from [its] consideration." *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). But the Eighth Amendment does not "require the sentencer to reach any particular conclusion about the weight of that evidence." *State v. Davis*, 139 Ohio St.3d 122, 2014-Ohio-1615, 9 N.E.3d 1031, ¶ 60.

**{¶ 263}** Nicholson also contends that the trial court failed to discuss, and therefore failed to assign appropriate weight to, his mental-health diagnoses, his lack of significant criminal history, and his lack of future dangerousness. However, "a trial court is not required to individually discuss each mitigating factor in its sentencing opinion." *Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, at ¶ 136.

**{¶ 264}** The trial court appropriately considered all the mitigating evidence that Nicholson presented, and it assigned weight to each factor. Nicholson has not demonstrated that the trial court abused its discretion in its written sentencing opinion. We find no merit to Nicholson's 14th proposition of law.

## O. Prosecutorial misconduct

**{¶ 265}** In his 15th proposition of law, Nicholson cites several instances of alleged prosecutorial misconduct during both phases of his trial. Nicholson argues that the prosecutor knowingly elicited false testimony, "testified" on behalf of multiple witnesses, knowingly asserted facts that were not in evidence, and improperly treated a state's witness as a hostile witness during the trial phase. Regarding the mitigation phase, Nicholson asserts that the prosecutor elicited prejudicial testimony from Nicholson's witnesses, erroneously represented the mitigating factor in R.C. 2929.04(B)(5) ("the offender's lack of a significant history of prior criminal convictions"), and made "improper closing argument remarks."

### 1. Legal standards

**{¶ 266}** We review prosecutorial-misconduct allegations by considering "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The test is whether the conduct was improper and, if so, whether it prejudicially affected the defendant's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). A judgment will not be reversed when it is clear beyond a reasonable doubt that absent the prosecutor's remarks, the jury would have found the defendant guilty. *Id.* at 15. Moreover, prosecutorial misconduct must be considered within the context of the entire trial. *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.3d 203 (1993).

### 2. Trial-phase allegations

**{¶ 267}** Nicholson complains about six alleged instances of prosecutorial misconduct during the trial phase.

#### a. Knowingly eliciting false testimony

**{¶ 268}** Nicholson argues that the prosecutor elicited false testimony from Detective Biegacki regarding whether, before the shootings, Nicholson asked Polanco to move her car so he could leave.

**{¶ 269}** Polanco was asked on cross-examination whether Nicholson asked her to move her car "multiple times" so that he could leave the premises, before he obtained his personal gun. She testified that Nicholson asked her to move her car so he could leave. She said that she told Detective Biegacki the same thing in July 2019. However, during redirect examination of Detective Biegacki, he testified that he first heard of Nicholson's having asked Polanco to move her car on the night of the murders during his cross-examination that day. During recross-examination, over the state's objection, defense counsel impeached Detective Biegacki with

proof that he was present at an interview with Polanco on July 17, 2019, when she told him that Nicholson had tried to leave but that she failed to move the cars to let him drive away.

{¶ 270} Nicholson argues that the prosecutor "objected and lied to the trial court to try to prevent the truth from coming to light." He adds that the prosecutor "purported to 'remember' that defense counsel—not [Polanco]—was solely responsible for suggesting that Mr. Nicholson asked [Polanco] multiple times to move her vehicle before the incident occurred." Finally, Nicholson contends that when defense counsel impeached Detective Biegacki, the prosecutor "claimed she did not remember that."

{¶ 271} The state does not dispute Nicholson's factual assertions, but, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), it argues that "[b]ecause of the [s]tate's immediate action, [Detective Biegacki] was impeached immediately, removing any concern [that the issue could have had on] 'the fairness of the trial.' " Nicholson concedes that Detective Biegacki's "timely impeachment" alleviated any prejudice caused by his inaccurate testimony but maintains that "prosecutorial misconduct permeated" the trial.

{¶ 272} To prevail on this claim, Nicholson must "show that '(1) [Detective Biegacki's] statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false,' " *State v. Iacona*, 93 Ohio St.3d 83, 97, 752 N.E.2d 937 (2001) (lead opinion), quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir.1989). Further, the right to due process is violated only when there is a "reasonable likelihood that the false testimony could * * * affect the judgment of the jury." *Lochmondy* at 822.

{¶ 273} Nicholson has not made those showings here. There is no evidence that Detective Biegacki intentionally lied about knowing whether Nicholson asked to leave the house on the night of the shooting. Moreover, Nicholson cannot demonstrate that the statement was material; his self-defense claim was undermined

by the physical evidence showing that he shot M.L. and Giselle in their backs as they ran from him. Thus, whether Nicholson attempted to leave the house before the shootings is irrelevant to any issue here. We reject his argument that the prosecutor committed misconduct in this instance.

### b. Improper use of leading questions

**{¶ 274}** Nicholson contends that the prosecutor "essentially testified" for multiple witnesses by improperly asking leading questions on direct examination. He contends that the prosecutor's improper use of "yes" or "no" questions occurred so frequently as to deny him due process. But Nicholson cites no authority indicating that the use of a yes-or-no-question format on direct examination is per se improper, and this court declines to adopt such a rule now. Certainly, "[w]hether a question may be answered 'yes' or 'no' is not the correct criteria for determining whether they were leading questions." *State v. Oteng*, 10th Dist. Franklin No. 14AP-466, 2015-Ohio-1231, ¶ 43. Rather, "[a] leading question is 'one that suggests to the witness the answer desired by the examiner.' " *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 149, quoting 1 McCormick, *Evidence*, Section 6, at 19 (5th Ed.1999).

**{¶ 275}** A trial court has discretion to permit leading questions on direct examination. *Id.*; *see also Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 266. However, a prosecutor commits misconduct when leading questions pervade the trial in the face of a sustained objection. *See Diar* at ¶ 205.

**{¶ 276}** Nicholson avers that the most prejudicial examples of the state's improper leading questions happened during Polanco's testimony, even after the trial court told the prosecutor to "back off a little bit." Although Nicholson contends that the prosecutor improperly used leading questions to "testify" on Polanco's behalf about Nicholson's prior threats to kill her and her children, he identifies only a few questions he believes were improper. In one instance, after establishing that Polanco had "contacted a domestic violence hotline," the

prosecutor asked, "Did there come a time on December 28, 2015, that Roberto moved away?"  Polanco answered, "Yes."  While the prosecutor's question improperly interjected a specific date to which Polanco had not testified, Nicholson fails to show how this testimony prejudiced him.

{¶ 277} Nicholson contends that the state improperly led Polanco when it asked, "At any point in time did he blame your children for the water bills?"  But Nicholson is incorrect; the question merely asked whether a circumstance had existed.  It did not suggest a particular answer and thus was not leading.

{¶ 278} Nicholson asserts that the "most egregious" example of improper leading of a witness occurred during the following exchange:

[ASSISTANT PROSECUTOR]:  Now, * * * [o]n March 18th of 2018, there was a situation at your house?

[POLANCO]:  Yes.

[ASSISTANT PROSECUTOR]:  Let's talk about that. Were you working that day?

[POLANCO]:  No.

[ASSISTANT PROSESCUTOR]:  Was Giselle home that day?

[POLANCO]:  She was off work.

[ASSISTANT PROSECUTOR]:  Was there an altercation between Giselle and * * * Nicholson?

[POLANCO]:  Yes.

[ASSISTANT PROSECUTOR]:  All right, can you please tell us what happened on March 21, 2018?

[DEFENSE COUNSEL]:  Objection.

THE COURT:  Overruled.

[POLANCO]: Me and my kids were out [at the] grocery store. Giselle ha[d] a day off. She left the machine washing her clothes. And—

[ASSISTANT PROSECUTOR]: Had she put them in the dryer?

[POLANCO]: Yes, she put them in the dryer and then we left. When we came back, * * * Nicholson already had took her clothes out of the washer—out of the dryer. It wasn't dry all the way through, and he put his own in the dryer.

None of the prosecutor's questions in this exchange were impermissibly leading. For instance, the two directive but nonsuggestive questions interjecting dates were not leading. Moreover, defense counsel objected to only one of the questions, and the trial court was within its discretion to allow that question. Nicholson also fails to demonstrate any prejudice flowing from the trial court's decision overruling the objection.

{¶ 279} Nicholson points to another passage he alleges includes improper leading questions, during which no objection was raised to the prosecutor's questions. The prosecutor asked Polanco about the moments before the shootings:

[ASSISTANT PROSECUTOR]: Okay. And what did you tell [M.L.] to do?

[POLANCO]: I told him—because I heard Giselle was pulling in the driveway. I told him to call Giselle and tell her not to come inside.

[ASSISTANT PROSECUTOR]: Okay. Did Giselle come inside?

[POLANCO]: No. She didn't have a chance.

> [ASSISTANT PROSECUTOR]: Okay. And so at that point, when you told [M.L.] to leave the house, where was * * * Nicholson?

Nicholson contends that the last question in that sequence was "problematic" because Polanco did not testify that she had told M.L. to leave. However, Polanco had in fact testified that M.L. "called the police. When M.L. called the police * * * [she] told [M.L.]: Let's go." Thus, no error occurred.

{¶ 280} Nicholson's claim that the prosecutor persisted in leading Polanco, even after the trial court sustained his objection, is inaccurate: each defense objection contained in the quoted passages was properly overruled. Thus, this prosecutorial-misconduct claim lacks merit.

### c. Assertions not supported by the evidence

{¶ 281} Nicholson argues that the state committed misconduct during its opening statement by making four statements he alleges the state "knew" would not be supported by evidence adduced at trial. However, defense counsel did not object to the prosecutor's opening statement and has thus forfeited all but plain error regarding this claim. *See* Crim.R. 52(B); *Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 139.

{¶ 282} Nicholson fails to show plain error. Opening statements serve to inform the jury about the nature of the case and to outline the facts that each party *intends to prove*. *See Maggio v. Cleveland*, 151 Ohio St. 136, 84 N.E.2d 912 (1949), paragraph one of the syllabus. And unless it appears that counsel "deliberately attempt[ed] to influence and sway the jury by a recital of matters foreign to the case," remarks made during opening statements cannot form the basis of a misconduct claim. *Id*. at paragraph two of the syllabus.

{¶ 283} The trial court instructed the jurors that "[o]pening statements are not evidence. Opening statements are what the attorneys believe that the evidence

will establish, so please keep that in mind," and that "[w]henever reference is made to evidence, we're referring to the testimony of the witnesses from the witness stand and any documents or other tangible objects which may be admitted as exhibits." Moreover, each of the statements Nicholson complains about was supported by the evidence.

{¶ 284} First, the state told the jury that "Nicholson had a habit of extending his hands. * * * And when that would happen, [Polanco's] children would try to intercede to protect their mother." Nicholson alleges that this statement presented information that the prosecutor knew the evidence would not prove. The prosecutor's description of Nicholson's pre-offense conduct toward Polanco as a "habit" does not suggest that the prosecutor intended to mislead the jury. To the contrary, the state presented evidence that Nicholson physically assaulted both Polanco and Giselle on occasions prior to the charged offenses.

{¶ 285} The record also supports the prosecutor's statement that M.L. and Giselle had tried to intercede in Nicholson's mistreatment of Polanco. Polanco testified that Giselle was so alarmed about Polanco's safety on one prior occasion that Giselle tried to intercede even though Nicholson threatened to shoot Giselle through the bedroom door. Evidence also showed that M.L. interceded on behalf of Giselle and Polanco in March 2018, when Nicholson was angry about Giselle's laundry. Finally, the evidence showed that it was M.L.'s attempt to protect his mother from Nicholson on September 5, 2018, that led to his and his sister's deaths. Thus, the prosecutor's comment that M.L. and Giselle "would try to intercede to protect their mother" was supported by the evidence. No misconduct occurred.

{¶ 286} Second, Nicholson claims that the prosecutor's assertion that Polanco had told her realtor that the realtor could view the house only when Nicholson was not present was knowingly false. The prosecutor's opening statement indicated that Polanco decided around July 2018 that she wanted Nicholson to move out of the house. The prosecutor added that in September 2018,

Nicholson was still there and had said he was not leaving. Polanco wanted to sell her house, but the realtor would not engage without coming to the house first. But Polanco did not want the realtor to come to the house while Nicholson was there because "things [would] go south."

{¶ 287} The state presented evidence to support these assertions. The realtor, Nanci Crystal, testified that she received a voicemail message from Polanco in July 2018 expressing her interest in selling the house. Crystal testified that she later spoke to Polanco by phone but that she had preferred to meet Polanco in person.

{¶ 288} The state presented ample evidence that Nicholson knew that Polanco wanted him to move out and that he was unwilling to do so. Supporting evidence included text messages from Nicholson to Polanco describing how he felt about moving out. Polanco also testified that she had tried to talk to Nicholson about moving out but that he "got really angry" and told her he would not leave "because that was his house." And he told Polanco that if she ever left with M.L. and Giselle, she "w[ould] regret it." In short, the state presented evidence to support its assertion that Polanco had worried that things would "go south" if a realtor came to the house when Nicholson was there.

{¶ 289} Third, Nicholson contends that the state improperly claimed that he told Polanco in the moments after the shootings that she would "need to watch [her] kids die, and suffer what [she] made [him] suffer." But even assuming that the prosecutor's statement was improper, Nicholson must show that the statement prejudicially affected his substantial rights. *See Smith*, 14 Ohio St.3d at 14, 470 N.E.2d 883. We decline to hold that this isolated comment during the prosecutor's opening statement prejudiced Nicholson's substantial rights. No plain error occurred.

{¶ 290} Last, Nicholson challenges portions of the prosecutor's opening statement regarding Marshall's (Polanco's ex-boyfriend's) role in the events of

September 5, 2018, alleging that those remarks were not supported by the facts. The prosecutor asserted that after Polanco told Nicholson that Marshall had texted her, Nicholson got "really mad." The prosecutor stated: "The evidence will show that once [Nicholson] hung up the phone with [Marshall], [Nicholson] started smacking her around. He started choking her. He started screaming vulgarities at her."

**{¶ 291}** Nicholson argues that the evidence did not show that he "smack[ed] Polanco] around" in the bedroom. But Polanco testified that Nicholson "grabb[ed] [her] from [her] neck, throwing [her] in the bed," and that "[h]e was strangulating [her]." The prosecutor's statement was not error; the evidence did show that Nicholson assaulted Polanco on September 5, 2018.

**{¶ 292}** Based on the foregoing, we reject this aspect of Nicholson's 15th proposition of law.

*d. Angel Nicholson's testimony*

**{¶ 293}** Nicholson contends that on direct examination, the state treated his mother, Angel Nicholson, as a hostile witness without having established a proper foundation for doing so and then improperly impeached her testimony on redirect examination. He also argues that the prosecutor erroneously attributed to Nicholson his mother's comment that Nicholson had been living in a "hellhole."

**{¶ 294}** Angel testified for the state during the trial phase. During Angel's direct examination, the prosecutor asked whether Nicholson had asked her to help him look for apartments. Before Angel answered, the prosecutor interjected: "Are you looking at me [or defense counsel] over there?" Defense counsel did not object, and Angel responded that she was "just peering the room." During further questioning, the following exchange occurred:

[ASSISTANT PROSECUTOR]: Okay. Who tried to set [Nicholson] up?

[ANGEL]: [Polanco].

[ASSISTANT PROSECUTOR]: Okay. So let's talk about that—why are we looking—I'm right here.

[DEFENSE COUNSEL]: Objection. I don't know why the prosecutor is doing this.

[ANGEL]: Ma'am, as I stated here earlier, I'm looking at you. I'm trying to. I'm trying to peer through my glasses and focus. These are not my normal glasses.

\* \* \*

[ASSISTANT PROSECUTOR]: No. You don't need to apologize. I'm just wondering if we're looking, you know—

[ANGEL]: No, no. I'm trying to follow you. Sorry.

{¶ 295} At a subsequent sidebar, defense counsel asserted that the prosecutor's handling of Angel's direct examination was "hostile \* \* \*, and [that the prosecutor was] in attack mode and leading a number of her questions." Defense counsel argued that this was improper because the state had called Angel in its case-in-chief: "If she wants her as their witness, then she's got to treat her as their witness. Don't beat her up." The trial court overruled the objection but warned the prosecutor against leading Angel excessively. Because Angel was "affiliated with [Nicholson]," however, the trial court offered the state "some leeway on \* \* \* asking leading questions, but not entirely."

{¶ 296} On redirect examination, the prosecutor tried to impeach Angel by asking whether she could remember several statements Nicholson made when he was talking on the phone with her and Lieutenant Vargo following the shootings. However, Angel could not recall any specific statements. The following exchange then occurred:

[ASSISTANT PROSECUTOR]: All right. Do you remember when he said: When you do so much for a woman, I gave [Polanco] my all. How * * * do you love me? How can you continually allow me to be spit on, disrespected, downgraded? I pay the bills here. As a man, you're like, * * * where's my respect?

Do you remember him saying that?

[ANGEL]: I don't recall that, ma'am.

[ASSISTANT PROSECUTOR]: Okay. So at no time, [Angel], during the course of the conversation that was the three-way between you, Lieutenant Vargo, and [Nicholson]—

[ANGEL]: Yes, ma'am.

[ASSISTANT PROSECUTOR]: [Did Nicholson] tell you or Lieutenant Vargo that—

Eventually, the trial court sustained defense counsel's objection to this line of questioning and ordered the state to cease questioning the witness because it was "impeaching her now."

{¶ 297} The prosecutor's questioning of Angel was not misconduct. As one of the prosecutors pointed out, "there is no rule saying that you can't be unfriendly or stern towards your own witness." Moreover, the trial court sustained defense counsel's objection to the prosecutor's attempt to impeach Angel on redirect examination and admonished the prosecutor to let Angel answer fully and to limit the use of leading questions. Nicholson fails to persuasively argue that the testimony prejudiced him.

{¶ 298} Nicholson also argues that the state improperly asked Angel, "So during the course of your conversations with the police officer, you indicate[d] to the police officers: *That is a hellhole in there that he was living in*. He doesn't want to hurt anybody else." (Emphasis added.)

{¶ 299} Officer Jarzembak's body camera recorded a heated interaction between Angel and Officer Cramer, during which Officer Cramer said to Angel: "People's lives are still in danger because there's an unknown factor going on here. We don't know what he's thinking." Angel told Officer Cramer that she "kn[ew] what he [was] thinking * * * that's a hellhole that he was in." The prosecutor asked Angel whether Nicholson had wanted "to move out of the hellhole he was in." Whether the "hellhole" comment was something that Nicholson said to his mother is irrelevant; the jurors viewed body-camera footage on which Angel could be heard making that statement. Nicholson has not identified any misconduct in this instance, and we reject this aspect of his prosecutorial-misconduct claim.

*e. Statement that gunshots could be heard in 9-1-1 recording*

{¶ 300} Nicholson also argues that the prosecutor impermissibly played a 9-1-1 recording during its closing argument and stated that gunshots could be heard toward the end of the recording. He also contends that the state should have presented an audio expert to identify the sound at the end of the recording. Defense counsel did not object to this portion of the state's closing argument at trial.

{¶ 301} Defense counsel not only failed to object but stated during closing argument that the sound in the recording was "subject to interpretation." Playing a recording that was admitted into evidence is not prosecutorial misconduct, especially when the parties agreed that the jury could decide what the sounds in the recording were.

*3. Allegations of mitigation-phase misconduct*

{¶ 302} Nicholson contends that the state engaged in misconduct when it (1) improperly cross-examined one of Nicholson's witnesses, (2) referred to "unsubstantiated claims" by Lauren Thomas, Nicholson's former girlfriend, (3) referred to his prior abusive conduct against Polanco, (4) mischaracterized the mitigating factor under R.C. 2929.04(B)(5) (lack of a significant history of criminal convictions), and (5) made improper assertions during closing arguments. Most of

the conduct challenged in this claim was either successfully objected to or occurred without objection. Nicholson has forfeited these claims, absent plain error, except as noted below. *See State v. Johnson*, 46 Ohio St.3d 96, 102, 545 N.E.2d 636 (1989).

### a. Cross-examination of Donna Kain

{¶ 303} First, Nicholson alleges that the prosecutor's cross-examination of Nicholson's maternal aunt, Donna Kain, constituted misconduct. Nicholson argues that three parts of the cross-examination were inflammatory and prejudicial.

{¶ 304} The prosecutor had the following exchange with Kain:

[ASSISTANT PROSECUTOR]: All right. You've indicated to this jury that your brother-in-law [Nicholson's father, Robert Nicholson Sr.] is * * * the worst human being that God created, right?

[KAIN]: I wouldn't say the worst human being God created, but he's not the nicest person you ever want to meet.

[ASSISTANT PROSECUTOR]: Okay. But he is so bad that he created this. That's what you want the jury to believe?

A defense objection to this questioning was sustained.

{¶ 305} Next, Nicholson complains that the prosecutor asked Kain why she never reported the abuse of Nicholson by his father. Specifically, during Kain's cross-examination, the prosecutor stated: "You consider yourself to be a loving, caring individual, but did you ever call 696-KIDS that your nephews were being beaten, your sister was being thrown out of a window?" Defense counsel failed to object, and Kain responded, "No," but said that she had told her and Angel's father, who was a police officer, about [Nicholson's father's] physical abuse. Defense counsel did not object.

{¶ 306} A prosecutor has greater leeway during cross-examination to explore issues raised during direct examination, as long as she has "a good-faith belief that a factual predicate for the question exists." *State v. Gillard*, 40 Ohio St.3d 226, 533 N.E.2d 272 (1988), paragraph two of the syllabus, *abrogated on other grounds by State v. McGuire*, 80 Ohio St.3d 390, 402, 686 N.E.2d 1112 (1997). Nicholson's mitigation strategy focused on the extraordinary physical and emotional abuse he had suffered at the hands of his parents. Thus, the prosecutor's cross-examination questioning regarding why Kain never contacted the state agency responsible for investigating claims of child abuse was not improper.

{¶ 307} The prosecutor then asked Kain about the allegations that Nicholson's father had been physically abusive. The prosecutor tried to discredit Kain's testimony by asking her to admit that Angel had worked every day and stayed married to Robert Sr. and that they had been coming to court together since the trial started. Kain agreed that Angel and Robert Sr. were both responsible for their children. She opined that Angel and Robert Sr. had "completely failed" their sons "[b]y keeping the domestic, by fighting and arguing and choking and running down the street with rifles and guns, they failed them. I can say they failed them. I'm a witness." The following exchange then occurred:

> [ASSISTANT PROSECUTOR]: Ma'am, you weren't there, were you?
> [KAIN]: Oh, believe me. I would come to the home—
> [ASSISTANT PROSECUTOR]: The question is—
> THE COURT: Let her finish.

Nicholson contends that this exchange exemplifies the prosecutor's use of "loaded questions" containing "multiple negative inferences." But he has not established that the prosecutor's questioning of Kain was improper.

{¶ 308} Finally, Nicholson contends that the following questions were "the most egregious":

> [ASSISTANT PROSECUTOR]: So, Mrs. Kain, you would agree with me that a woman who loves her children stays with her abuser?
>
> [KAIN]: Yeah.
>
> [ASSISTANT PROSECUTOR]: Even to the point that her kids get killed because she stayed with her abuser, right?

The trial court sustained a defense objection, and Kain then said: "I'm not going to answer that. That is not fair. That is mean. That is not fair." She elaborated:

> I feel for that mother. I feel for that mother. I feel for that mother. My heart goes out to that mother. That is so unfair for you to say something like that. That mother buried two of her children. How dare you say something like that? That is not correct. That is so—that is so disrespectful.

{¶ 309} For relief to be granted, the misconduct must have " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden*, 477 U.S. at 181, 106 S.Ct. 2464, 91 L.Ed.2d 144, quoting *Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868, 40 L.Ed.2d 431. Here, although the prosecutor's treatment of Kain was harsh, the prosecutor's conduct did not rise to the level of a denial of due process, especially since the trial court immediately sustained defense counsel's objection.

### b. References to prior conduct

**{¶ 310}** Nicholson also argues that the state committed prejudicial misconduct when it referred during the mitigation phase to allegations of Nicholson's prior abusive behavior.

**{¶ 311}** First, Nicholson objects to the prosecutor's cross-examination of Dr. John Fabian, a forensic and clinical psychologist called by the defense. Dr. Fabian's report on Nicholson contained summaries of historical documents he had reviewed for his evaluation of Nicholson. The following statement from Dr. Fabian was included in his report: "I saw an interview with Lauren Thomas and a written statement from 11/29/2018 with Detective Biegacki. She advised that * * * Nicholson did threaten her [with] the gun in the past, and told her he would kill her. She also stated that during an argument in the past that he punched holes in the walls of their apartment." During the state's cross-examination of Dr. Fabian, the prosecutor inquired whether he had asked Nicholson "any questions regarding [Nicholson's] attitude towards women." And within this line of questioning, Dr. Fabian stated that Thomas had "said that [Nicholson] threatened her, I think with a gun, in the past. So there was, you know—or he had punched holes in the walls. So [Nicholson] had certainly problems with his temper."

**{¶ 312}** Nicholson argues that it was improper and prejudicial for the prosecutor to use Dr. Fabian's report as evidence of Nicholson's character. He maintains that the state was permitted to present evidence during the mitigation phase of only "the nature and circumstances of the events that took place on September 5, 2018." But this was fair cross-examination because the defense had placed Dr. Fabian's conclusions and his report into evidence. *See State v. Greer*, 39 Ohio St.3d 236, 253, 530 N.E.2d 382 (1988) ("once lawfully inserted into the sentencing considerations, such information is subject to fair comment by both parties"). Therefore, we reject this claim of prosecutorial misconduct.

*c. Misrepresentations regarding R.C. 2929.04(B)(5)*

**{¶ 313}** Nicholson argues that the prosecutor improperly described the R.C. 2929.04(B)(5) mitigating factor, which is "[t]he offender's lack of a significant history of prior criminal convictions and delinquency adjudications." The state argued during mitigation-phase closing arguments that the jury should not assign any mitigating weight to Nicholson's lack of criminal history because "[h]e should have been in prison the first time that he pointed a gun at Lauren Thomas or that he laid a hand on * * * Polanco."

**{¶ 314}** We have consistently granted prosecutors wide latitude during closing arguments. Contrary to Nicholson's suggestion, the state did not run afoul of the Constitution when it argued that the jury should not assign significant weight to Nicholson's lack of a criminal history. *See Greer* at 253 ("It is ludicrous to assert * * * that the jury is to be carefully fed only that information which reflects positively upon [an] appellant. As they share in the trial court's function, the jurors require access to the wide range of information which the function requires"). Accordingly, no misconduct occurred.

*d. Remarks about mitigating factors not raised by the defense*

**{¶ 315}** Nicholson also contends that the prosecutor made improper mitigation-phase closing arguments about mitigating factors that Nicholson did not raise. Nicholson points to the prosecutor's statement that "[m]itigation is usually not something that you have to do. It's a fact about who you are. You were born with this disorder; you were born into this situation; your IQ is at this level." Contrary to Nicholson's claims, the prosecutor did not state that these mitigating factors pertained to Nicholson; they were merely examples of mitigating factors. Therefore, no prosecutorial misconduct occurred.

*e. Cumulative misconduct*

**{¶ 316}** Finally, Nicholson urges this court to consider the cumulative impact of the alleged prosecutorial misconduct. However, Nicholson has not

identified any prosecutorial misconduct that deprived him of a fair trial. Thus, we reject Nicholson's 15th proposition of law.

### P. Ineffective assistance of counsel during the trial phase

{¶ 317} In his 16th proposition of law, Nicholson asserts that defense counsel provided ineffective assistance during the trial phase. This proposition includes multiple instances of alleged ineffective assistance, which we address in the order in which they appear in the trial-phase record.

{¶ 318} To establish ineffective assistance, Nicholson must show (1) that defense counsel's performance was deficient, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's deficient performance prejudiced him, i.e., that there is a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142-143, 538 N.E.2d 373 (1989); *see also State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 78. "A reasonable probability is a probability sufficient to undermine [the court's] confidence in the outcome." *Strickland* at 694; *see also Bradley* at 142.

### 1. Failure to exercise a peremptory challenge

{¶ 319} Nicholson argues that defense counsel should have used peremptory challenges to excuse prospective juror Nos. 16 and 43. He contends that both jurors expressed extreme pro-death-penalty views on their questionnaires, which he says disqualified them from this case. Further, Nicholson maintains that after defense counsel unsuccessfully challenged prospective juror No. 16 for cause, counsel failed to conduct any "meaningful inquiry" of the prospective jurors during general voir dire. Prospective juror No. 16 ultimately sat on Nicholson's jury as juror No. 5.

{¶ 320} Defense counsel used all six peremptory challenges available to Nicholson. And because counsel occupies the best position by which to "observe

the jurors first hand," "[d]ecisions on the exercise of peremptory challenges are a part of trial strategy." *Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 99. Nicholson cannot establish that his counsel's performance was deficient.

### 2. Failure to introduce certain legal concepts

{¶ 321} Nicholson complains that defense counsel abdicated their duty to present to the jury the legal concepts of self-defense, prior calculation and design, and voluntary manslaughter during voir dire, their opening statement, and closing arguments. He argues that "no reasonable capital counsel would omit these critical concepts in their opening statements," voir dire, or closing arguments, "especially where, as was the case here, defense counsel knew" that the state was going to present substantial evidence on the issues in its case-in-chief.

{¶ 322} The record demonstrates that defense counsel's voir dire was articulate and that counsel were aware of the potential for juror confusion on the concepts of mitigation, aggravating circumstances, and the process for weighing the two. Given the overwhelming evidence that Nicholson did not act in self-defense and that he purposely killed M.L. and Giselle with prior calculation and design, defense counsel's performance during voir dire was not deficient. Defense counsel likely decided that their strategy of sparing Nicholson's life would not be served by educating the jurors on concepts that would be explained by the trial court. *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 66.

### 3. Failure to object to misstatements about the indictment

{¶ 323} Nicholson contends that defense counsel failed to object to "repeated erroneous statements" by the trial court and the state with respect to the number of aggravated-murder counts in the indictment. But defense counsel did object to the continued misstatements. Thus, Nicholson cannot establish deficient performance.

#### 4. Failure to object to gruesome photographs and videos

{¶ 324} Nicholson next contends that defense counsel failed to object to the admission of gruesome and cumulative photographs and video footage during the trial phase. As explained under our analysis of Nicholson's fourth proposition of law, the trial court did not err by admitting this evidence, so defense counsel was not ineffective for failing to object to the evidence.

#### 5. Failure to impeach Polanco's testimony

{¶ 325} A significant portion of the state's case against Nicholson included text messages between Nicholson and Polanco, which were extracted from their cellphones by BCI analyst Natasha Branham. Branham produced a report analyzing the extracted data from multiple cellphones.

{¶ 326} Nicholson contends that defense counsel should have used these exhibits to impeach Polanco's direct-examination testimony. Specifically, Nicholson asserts that had counsel asked Polanco about certain text messages that allegedly demonstrated their "affectionate and loving" relationship and the lack of tension between Nicholson and M.L. and Giselle, the jury would not have convicted him of aggravated murder.

{¶ 327} Nicholson's argument, however, fails to satisfy the first prong of *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Highlighting text messages from Nicholson containing affectionate or loving language would not undermine the probative value of the many text messages demonstrating Nicholson's view that M.L. and Giselle were destroying his relationship with Polanco.

#### 6. Failure to object to leading questions

{¶ 328} Defense counsel repeatedly objected to the state's examination of various witnesses on the basis of improper leading questions. Nicholson contends that had counsel objected, even just more often, the result of the trial phase would have been different. Counsel's failure to object more frequently to such questions

did not constitute ineffective assistance. *See Jackson*, 92 Ohio St.3d at 449, 751 N.E.2d 946, citing Staff Note, Evid.R. 611(C).

### 7. *Failure to impeach the state's rebuttal witness*

{¶ 329} Nicholson further argues that his counsel rendered ineffective assistance by failing to impeach Lieutenant Vargo, who testified during the state's case-in-chief and as a rebuttal witness about his phone conversation with Nicholson during the standoff following the shootings. According to Lieutenant Vargo, Nicholson did not mention self-defense during the conversation or say that Giselle or M.L. had retrieved Nicholson's service gun from the trunk of his car or pointed it at him. Nor did Nicholson say that Polanco struck him with a can of Lysol shortly before the shootings.

{¶ 330} Nicholson argues that during defense counsel's rebuttal cross-examination of Lieutenant Vargo, defense counsel failed to ask whether Nicholson discussed self-defense during their phone conversation. Nicholson points out that his father can be overheard on Officer Cramer's body-camera footage saying to Nicholson: "If somebody jumped you, they'll figure all of that out." But this statement does not provide enough information to surmise that Nicholson was telling Lieutenant Vargo that he shot M.L. and Giselle in self-defense.

{¶ 331} Moreover, Nicholson overemphasizes the significance of Lieutenant Vargo's rebuttal testimony and its relevance to his defense. There was ample evidence supporting the jury's finding that the state disproved Nicholson's self-defense claim beyond a reasonable doubt. Most importantly, the medical examiner testified that M.L. was shot eight times, almost all in his back, and that Giselle was shot four times, three times in the back. That testimony and the supporting physical evidence disproves Nicholson's claim that he acted in self-defense: M.L. and Giselle were not facing Nicholson when he shot them.

8. *Failure to raise the affirmative defense of blackout caused by a posttraumatic stress disorder ("PTSD") dissociative episode*

{¶ 332} Nicholson also claims that defense counsel rendered ineffective assistance by failing to ask the trial court for a jury instruction on the "affirmative defense of blackout caused by a PTSD dissociative episode."

{¶ 333} Nicholson points to the statements he made to Lieutenant Vargo soon after he killed M.L. and Giselle, in which he said that he had "blacked out," and to the report and potential testimony of Dr. Fabian. He argues that this evidence would inspire any reasonable trial attorney to present evidence and request a jury instruction on the affirmative defense of blackout. Nicholson explains that defense counsel should have presented Dr. Fabian's testimony supporting the blackout defense during the trial phase instead of just using his testimony during the mitigation phase, because when combined with Dr. Fabian's testimony, Nicholson's statements that he had blacked out would have supported the jury's finding him "not guilty of most—if not all counts—with which he was charged."

{¶ 334} To obtain a jury instruction on the blackout defense, Nicholson had to present evidence that he shot and killed M.L. and Giselle while he was unconscious, as in a blackout due to disease or injury. *See State v. Ireland*, 155 Ohio St.3d 287, 2018-Ohio-4494, 121 N.E.3d 285, ¶ 1, 4, 6, 24-26 (lead opinion). Thus, the blackout defense requires proof that the defendant was "unconscious" and acted involuntarily during the offense, *State v. Blanton*, 2023-Ohio-89, 206 N.E.3d 14, ¶ 35-40 (2d Dist.), citing *State v. Cutlip*, 11th Dist. Lake No. 99-L-149, 2001 WL 687493 (June 15, 2001).

{¶ 335} The record contains insufficient evidence suggesting that Nicholson had been unconscious and had involuntarily shot M.L. and Giselle. Under these circumstances, trial counsel did not render ineffective assistance.

### 9. *Failure to limit the defense's mitigation report*

{¶ 336} Nicholson next argues that defense counsel should not have disclosed Dr. Fabian's report to the state without first redacting the pages that, according to Nicholson, "purported [to be a] transcript of statements made by" him. Like Nicholson claimed in his first and ninth propositions of law, he here contends that counsel's disclosure of the unredacted report prejudiced him because it "apprised [the state] of the precise factual basis for [his] self-defense claim" and allowed the state to "investigate * * * Nicholson's version of events during the weeks before trial."

{¶ 337} First, Nicholson attaches significance to the fact that the report is dated August 23, 2019, which was the deadline for the defense to disclose its expert reports. Nicholson contends that based on the report's date, "it can be surmised that defense counsel did not meaningfully review this report before giving it to the [s]tate, which was most certainly unreasonable." He also complains that the report contained a " 'legal history' of this case, * * * includ[ing] a 5-page summary of the items [Dr. Fabian] reviewed from [the Garfield Heights Police Department's] records and the Cuyahoga County Grand Jury Case Synopsis." Nicholson argues that competent counsel "surely would have objected" to a report that included Nicholson's "detailed account of the events of September 5, 2018 and [his] self-defense claim."

{¶ 338} However, Nicholson fails to show that defense counsel performed deficiently with respect to Dr. Fabian's report. The record contains little to no direct evidence of defense counsel's strategy or choices with respect to Dr. Fabian's report and testimony, so Nicholson can only speculate that counsel's performance was constitutionally deficient.

{¶ 339} The record undermines, rather than supports, Nicholson's argument. Defense counsel communicated with Dr. Fabian throughout 2019. In May 2019, defense counsel told the trial court: "[We] would like to take the time

to speak further with Dr. Fabian. [We] have both been in contact with Dr. Fabian as recently as a week ago, and he's still working through issues that he needs to work through in order to properly evaluate [Nicholson]." And in August 2019, defense counsel told the court that they had provided the state with expert reports from Dr. Fabian; Dr. Travis Snyder, a neuroradiologist; and James Aiken, an expert in correctional management. On this record, Nicholson cannot show that defense counsel functioned below an objective standard of reasonable representation with respect to the disclosure of Dr. Fabian's report. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 340} Nicholson further contends that by "turning over to the [s]tate an expert report that contained a detailed write-up" of his self-defense theory, defense counsel gave the state "the opportunity to preempt specific points related to or otherwise suggestive of his self-defense claim that would subsequently portray him as a witness who was not credible." But defense counsel had been ordered to disclose all expert reports no later than 21 days before trial. Counsel did not perform deficiently by disclosing Dr. Fabian's report in compliance with the trial court's order.

{¶ 341} Nicholson also claims that the state "sought to impeach * * * Nicholson with Dr. Fabian's report by representing during the culpability phase of trial that Dr. Fabian's unverified synopsis of what * * * Nicholson told him was a prior inconsistent statement * * * Nicholson made. But this does nothing to further Nicholson's ineffective-assistance claim. As Dr. Fabian testified and as explained in his report, he asks a defendant about the current offense because it helps him gain perspective on the defendant, and along with other tests and assessments, he can then "provide an explanation as to what happened and why."

{¶ 342} Nicholson has not established deficient performance by his counsel, much less prejudice with respect to Dr. Fabian's report, and thus he cannot

show that his right to the effective assistance of counsel was denied during the trial phase.

### 10. Cumulative trial-phase ineffective assistance of counsel

{¶ 343} Nicholson argues that at the very least, the cumulative effect of defense counsel's errors during the trial phase prejudiced him and that he is therefore entitled to a new trial. The doctrine of cumulative error applicable to claims of ineffective assistance of counsel asks whether counsel's errors, when viewed cumulatively, show " 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different' " even though none of the errors individually warrant relief. *Bradley*, 42 Ohio St.3d at 146-147, 538 N.E.2d 373, quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *see also State v. Howard*, 2020-Ohio-3819, 156 N.E.3d 433, ¶ 85 (2d Dist.). However, because none of Nicholson's "individual claims of ineffective assistance has merit, he cannot establish a right to relief simply by joining those claims together," *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 296.

{¶ 344} For these reasons, we reject Nicholson's 16th proposition of law.

### Q. Ineffective assistance of counsel during the mitigation phase

{¶ 345} In his 17th proposition of law, Nicholson argues that defense counsel were ineffective during the mitigation phase of the trial.

### 1. Failure to investigate or present significant evidence in mitigation

{¶ 346} Nicholson claims that defense counsel rendered ineffective assistance in their use of Dr. Fabian's report during the mitigation phase. Nicholson also argues that counsel's failure to "prepare and present significant mitigating evidence of his sexual abuse history" amounted to ineffective assistance.

{¶ 347} Nicholson argues that defense counsel should have objected to the trial court's discovery order requiring the defense to disclose Dr. Fabian's report to the state before the trial phase. Crim.R. 16(K) requires the parties to exchange

expert reports at least 21 days before trial, and the trial court issued an order requiring the parties to do so. Thus, defense counsel did not perform deficiently by complying with the rule and the court's order. Had counsel not timely disclosed Dr. Fabian's report, the trial court could have excluded Dr. Fabian's testimony. *See State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, ¶ 142.

{¶ 348} Nicholson also contends that defense counsel should have retained and used a child-sex-abuse expert during the mitigation phase and that the failure to do so prejudiced him. However, whether to hire a specific type of expert for mitigation is considered a strategic decision within counsel's ambit as long as the decision follows an adequate investigation. *State v. Keith*, 79 Ohio St.3d 514, 536, 684 N.E.2d 47 (1997).

{¶ 349} Nicholson bases this argument on Dr. Fabian's mitigation testimony that "[a] child sex abuse expert could have been utilized in this case." When Dr. Fabian offered that opinion, the state was inquiring as to the scope of his investigation. Dr. Fabian reported that he had interviewed Nicholson several times, in addition to interviewing Nicholson's parents, brother, and aunt. Dr. Fabian had also reviewed Nicholson's medical reports, his educational reports, his employment records, police reports, "a lot of the discovery or evidence in th[e] case," and expert reports prepared by Dr. Snyder and Mary Ceci McDonnell, a licensed independent social worker. Dr. Fabian also had phone discussions with Dr. Snyder and McDonnell. During Dr. Fabian's cross-examination, he testified that although children-and-family-services records had been requested, none were provided.

{¶ 350} Dr. Fabian's comment appears to be based on Nicholson's self-reporting during his interviews with Dr. Fabian. According to Dr. Fabian, Nicholson "initially reported no history of sexual abuse as a youth" but eventually admitted to having been sexually abused when he was five years old. Nicholson had reported that a female cousin of his, aged about eight or nine, "was babysitting him and told him to take off his clothes and kiss her." Nicholson provided no

additional, "more specific" details, and his mother was unable to corroborate his memory.

{¶ 351} Nicholson also reported a second incident of sexual abuse to Dr. Fabian. According to Dr. Fabian:

[Nicholson] reported that his best friend, I guess that they engaged in sexual activity. And it's difficult to, again, state the consensual versus the abusive nature of it or how it affected him. But again, there—I think there is some victimization here of [Nicholson].

And then some peculiar behaviors of, you know, dressing I think in his mother's clothes on occasion that he did not want to talk to me about. Okay?

And so he talked about—again, same paragraph—raped by his best friend Ryan when he was 22 years of age. And then Ryan moved away, and, you know, [Nicholson] was confused about the situation. You know he didn't endorse being overly traumatized by it.

And it was very difficult to really assess or get him to process this type of experience of traumatic event years later while we're looking at this type offense and this type of evaluation.

So I would say that there's two periods and two experiences of sexual abuse developmentally for him in childhood, around age 5 and then around age 22, I believe.

{¶ 352} The prosecutor asked Dr. Fabian if he had confirmed "that [Nicholson] knew a person named Ryan China." Dr. Fabian responded: "No, I didn't follow up on that. That is part of kind of the sexual abuse investigation that we could have developed more in this case." But Dr. Fabian testified that the

information available to him did not support a diagnosis for any disorder related to sexual abuse or gender dysphoria. On this record, Nicholson cannot establish that defense counsel failed to adequately prepare for mitigation by not consulting a child-sex-abuse expert.

{¶ 353} Nicholson's counsel researched his background and presented multiple witnesses who testified regarding his difficult childhood. Counsel engaged four experts: Dr. Fabian, a mitigation expert, a prison-life expert, and a neuroradiologist who interpreted a magnetic-resonance-imaging ("MRI") scan that Nicholson underwent in preparation for the mitigation phase. Counsel's mitigation theory was premised on extreme domestic violence occasioned by Nicholson's father against Nicholson, his mother, and his older brother, in combination with neuroradiological evidence that Nicholson had suffered traumatic brain injury ("TBI"). Based on this record, we hold that counsel's mitigation investigation was reasonable and that counsel made a strategic decision not to have a child-sex-abuse expert testify.

### 2. *Failure to request jury instructions on specific statutory mitigating factors*

{¶ 354} Nicholson asserts that his counsel rendered ineffective assistance by failing to object to the mitigation-phase jury instructions and failing to request an instruction on the specific mitigating factors that Nicholson had raised.

{¶ 355} The United States Supreme Court has rejected the argument that the Eighth and Fourteenth Amendments to the United States Constitution require trial courts to provide capital juries with "express guidance on the concept of mitigation, and to instruct the jury on particular statutorily defined mitigating factors." *Buchanan v. Angelone*, 522 U.S. 269, 275-276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). And a trial court does not err "by simply following the statutory language and declining to instruct that particular evidence was a specific mitigating factor." *State v. Goff*, 82 Ohio St.3d 123, 130, 694 N.E.2d 916 (1998).

{¶ 356} Nicholson has not established that his counsel were ineffective for failing to ask the trial court to instruct the jury on specific statutory and nonstatutory mitigating factors. Indeed, defense counsel relied only on R.C. 2929.04(B)(7), the catchall mitigating factor, in arguing for a life sentence during the mitigation phase. Thus, we reject this aspect of Nicholson's mitigation-phase ineffective-assistance claim.

### 3. *Failure to ensure that Dr. Fabian was a competent, well-prepared expert*

{¶ 357} On direct examination, Dr. Fabian indicated that Nicholson had a "perception that he was being threatened by" Polanco, M.L., and Giselle. When counsel asked Dr. Fabian whether Nicholson had informed him of specific facts about Nicholson's state of mind leading up to and during the shootings, Dr. Fabian stated:

> Now, the facts you brought up that he had testified to about perceiving they had a gun, * * * he's not been fully consistent in his stories, but he has reported they were—basically self-defense claim with his testifying—testimony to you and in his discussion with me.
> * * *
> [I]t's hard to say it was self-defense if these children had injuries in what appeared to be a retreating type fashion.

Nicholson contends that Dr. Fabian would not have made this statement if counsel had adequately prepared him to testify. He argues that "[n]o reasonable capital counsel would have instructed their mitigation expert to testify about the plausibility of defendant's self-defense claim after it had been rejected by the jury."

{¶ 358} Defense counsel was attempting to tie Nicholson's statements about the offenses to Dr. Fabian's diagnoses regarding Nicholson's mental health. Indeed, Dr. Fabian opined that Nicholson is "more likely the kind of person that's

going to misperceive situations, feeling threatened when other people may not." He also described Nicholson as impulsive and quicker to anger than most people. Given Dr. Fabian's assessment of Nicholson, Dr. Fabian's isolated statement about Nicholson's self-defense claim was less harmful than Nicholson suggests. Nicholson has not established that he received ineffective assistance of counsel.

### 4. Failure to object to the state's improper questioning and remarks during mitigation

{¶ 359} Finally, Nicholson contends that defense counsel rendered ineffective assistance by failing to object to the state's remarks about his alleged prior domestic abuse against Polanco and Thomas. He argues that "counsel's failure to object to the [s]tate's repeated improper attempts to discount [his] lack of a prior criminal record by offering irrelevant other acts evidence that had no meaningful bearing on [the lack-of-criminal-history] statutory mitigating factor thereby precluded the jury from giving this factor the attention and consideration it deserved, to the detriment of [Nicholson]."

{¶ 360} During the state's mitigation-phase closing argument, the prosecutor stated:

[Nicholson's] never been in trouble before. That's an interesting way of phrasing that. Right? He's never been in trouble before. That's the defense's phrasing that they used over and over again in this case. Not that he's never done anything wrong before, he's never been in trouble before. Meaning he's never been arrested before; he's never been convicted before.

Well, let's talk about that for a second. Why has he never been arrested before? Why has he never been in trouble before?

The prosecutor referred to Polanco's testimony about Nicholson's threats to kill her and M.L. and Giselle before arguing that the R.C. 2929.04(B)(5) mitigating factor "is different. * * * [I]t has to be earned by a good lifetime of law-abiding behavior." The prosecutor continued:

> And you should ask yourself, did the defendant earn this mitigating factor? And, if so, what did he do to earn it, other than the threats that * * * Polanco told you about?
>
> He earned this mitigating factor through four years of punches, and chokes, and bruises, and threats to kill her, kill her children if she ever went to the police.
>
> He earned this mitigating factor through four years of a reign of terror that he imposed on * * * Polanco and her children that stopped her from going to the police and turning him in a long time before this happened.
>
> And you know from Dr. Fabian's testimony and from his report that it's not the first time that that's happened either. That this is a cycle. Because Dr. Fabian told you that he reviewed police reports regarding [Nicholson's] ex-girlfriend, Lauren Thomas. And that * * * Thomas talked about a similar incident in which he pointed a gun at her and threatened to kill her
>
> * * *
>
> So when you talk about the fact that [Nicholson] has never been in trouble before, do not give him credit for that. Because the reality is, he should have been in prison a long time before this happened.
>
> He should have been in prison the first time that he pointed a gun at * * * Thomas or that he laid a hand on * * * Polanco.

* * *

Do not give this mitigating factor any weight in this case. Give it none whatsoever.

{¶ 361} Prosecutors have latitude to comment on facts in evidence, and a prosecutor's referring to a defendant's other criminal acts (that did not result in convictions) is not erroneous when the other acts are part of the defendant's social history. *See State v. Slagle*, 65 Ohio St.3d 597, 612, 605 N.E.2d 916 (1992) ("A prosecutor can legitimately refer to the facts and the nature and circumstances of the offense, to refute any suggestion they are mitigating or to demonstrate why aggravating circumstances outweigh mitigating factors"). Thus, the state's argument was not improper, and Nicholson has not shown that his counsel were ineffective for failing to object to the state's closing argument.

## R. Denial of request for jury instruction on mercy as a mitigating factor

{¶ 362} In his 18th proposition of law, Nicholson argues that the trial court erred by denying his pretrial motion for an instruction during the mitigation phase on mercy.

{¶ 363} We have held that "mercy * * * is not a mitigating factor and thus is irrelevant to sentencing." *State v. Lorraine*, 66 Ohio St.3d 414, 417, 613 N.E.2d 212 (1993). Citing *Kansas v. Marsh*, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), and *Kansas v. Carr*, 577 U.S. 108, 136 S.Ct. 633, 193 L.Ed.2d 535 (2016), Nicholson argues that this court should reconsider its statements in *Lorraine* about mercy not being a mitigating factor. But we have recently considered and rejected this same argument. *See State v. Hundley*, 162 Ohio St.3d 509, 2020-Ohio-3775, 166 N.E.3d 1066, ¶ 122; *Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 362.

{¶ 364} Because Nicholson has presented no meritorious justification for departing from this settled law, we reject his 18th proposition of law.

## S. Settled issues

{¶ 365} Nicholson's 19th proposition of law challenges the constitutionality of Ohio's death-penalty statutes, claiming that the statutes violate international law and treaties to which the United States is a party. We have previously rejected the same arguments. *See, e.g.*, *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 279-280. We overrule Nicholson's 19th proposition of law.

## T. Cumulative error

{¶ 366} Nicholson argues that cumulative errors and omissions in his case violated his constitutional rights. Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 223.

{¶ 367} As explained above, Nicholson's trial presented few errors, and none were prejudicial to Nicholson. The cumulative effect of any harmless error does not warrant reversal of Nicholson's aggravated-murder convictions or death sentences.

## IV. INDEPENDENT SENTENCE EVALUATION

### A. Aggravating circumstances

{¶ 368} Each aggravated-murder count in the indictment included an aggravating circumstance for a "course of conduct involving the purposeful killing of or attempt to kill two or more persons," R.C. 2929.04(A)(5). "In order to find that two offenses constitute a single course of conduct under R.C. 2929.04(A)(5), the trier of fact 'must * * * discern some connection, common scheme, or some pattern or psychological thread that ties [the offenses] together.' " (Ellipsis and brackets added in *Sapp*.) *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822

N.E.2d 1239, syllabus, quoting *State v. Cummings*, 332 N.C. 487, 510, 422 S.E.2d 692 (1992).

{¶ 369} Nicholson killed M.L. and Giselle at the same time and in the same place, so "the murders were directly linked in time and location," *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 159. Additionally, Nicholson's relationship with M.L. and Giselle was strained because of his jealousy over their close relationship with Polanco. His threats typically envisioned violence against all three of his cohabitants, providing the " 'psychological thread,' " *Sapp* at syllabus, quoting *Cummings* at 510, tying the murders together. Accordingly, the record demonstrates that Nicholson murdered M.L. and Giselle as part of a single course of conduct.

### B. Mitigating factors

{¶ 370} During the mitigation phase, the defense presented seven witnesses: Angel, Robert Jr., Kain, Dr. Fabian, Aiken, Dr. Snyder, and McDonnell. Dr. Fabian interviewed Nicholson for a total of about 15 hours and also interviewed Angel, Robert Sr., and Robert Jr. Dr. Fabian also reviewed information obtained by McDonnell, who gathered records regarding Nicholson's educational, employment, medical, criminal, and neuropsychological history.

### *1. Statutory mitigating factors, R.C. 2929.04(B)(1) through (6)*

{¶ 371} Under R.C. 2929.04(B)(5), "[t]he offender's lack of a significant history of prior criminal convictions" is a mitigating factor. Prior to this case, Nicholson had no record of criminal convictions or juvenile adjudications. Historically, we have given significant weight to evidence presented under this factor. *See State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 280. Yet in this case, as in *Hand*, the weight of this factor is diminished by the evidence that Nicholson had previously abused Polanco (and likely his ex-girlfriend, Thomas) and that he had intimidated Polanco, causing her to fear contacting law enforcement. *See id.*

{¶ 372} The other mitigating factors set forth in R.C. 2929.04(B)(1) through (6) are inapplicable. Dr. Fabian did diagnose Nicholson with several mental-health disorders, but he did not testify that any of them deprived Nicholson of the "substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law," R.C. 2929.04(B)(3).

### 2. Other mitigating factors

{¶ 373} We must also consider "the nature and circumstances of the offense, the history, character, and background of the offender," R.C. 2929.04(B), and "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death," R.C. 2929.04(B)(7).

{¶ 374} Nicholson's mitigation defense was principally based on his history, character, and background, including his motor-vehicle-accident history and history of brain trauma.

### a. Nicholson's upbringing

{¶ 375} Nicholson's parents, Angel and Robert Sr., met when Angel was 15 years old and Robert Sr. was 18 years old. They married when their oldest child, Robert Jr., was about ten years old and Nicholson was about one year old.

{¶ 376} According to McDonnell, Nicholson reported that his first memory is from when he was about four or five years old. Nicholson told McDonnell that he remembered punching a hole through a glass door because he was frustrated and frightened by his parents' fighting and that he thought if he broke a window, they would stop fighting. McDonnell testified that Nicholson and Robert Jr. had described a "childhood [that] was filled with violence and stress." She testified that the brothers "never felt safe because they never knew exactly when the fights between their parents would start and they never knew when they would be targeted." She continued: "[B]oth boys witnessed screaming, fighting, * * * the parents being violent towards each other, and also a lot of shaming, and yelling and verbal abuse towards both boys, but particularly [Nicholson] from his father."

Robert Sr. would call Nicholson a "bitch," a "pussy," "stupid," and a "waste of space."

{¶ 377} Robert Jr. testified that he and Angel had been severely abused by Robert Sr. At some point, Angel left Robert Sr. in the middle of the night and moved with Robert Jr. to California because of the domestic violence. After they returned to Ohio, Kain became heavily involved in taking care of Robert Jr., who often spent the summer with her.

{¶ 378} Robert Jr. testified that domestic violence occurred daily in the home when Nicholson was a young boy. He described that when Nicholson was about four years old, he watched as their "dad held [their] mother over the edge of a couch and choked her" almost to the point of unconsciousness. Robert Sr. verbally and physically abused the boys. Robert Jr. recalled being choked and hit in the face with a box of nails, but he believed that Nicholson was primarily verbally abused. Robert Jr. also told Dr. Fabian that Angel had initiated some of the domestic violence.

{¶ 379} Robert Jr. testified that Nicholson was "his [father's] everything" and that Robert Sr. drove a wedge between the brothers. When Nicholson was around nine or ten years old, Robert Jr. was preparing to depart for military training. Robert Jr. recalled that his father would not let Nicholson come down the driveway to say goodbye to Robert Jr. He explained that he and Nicholson continually experienced that type of "division."

{¶ 380} Robert Jr. testified that while growing up, he "had people who believed in [him]" and that he, in contrast to Nicholson, "had some great influences." He testified that the biggest mistake he had made was "leaving" Nicholson behind to grow up with his parents, saying that Nicholson had "had to eat what [Robert Jr.] had to eat for quite some time." Robert Jr. observed that Nicholson did not have the same opportunity to escape the toxic home environment. Dr. Fabian testified that according to Robert Jr., Nicholson's parents did not want

Nicholson to become a police officer or join the military; they were overprotective and kept Nicholson "sheltered in this kind of dysfunction."

**{¶ 381}** To Dr. Fabian, Robert Jr.'s statements were consistent with Nicholson's reluctance to discuss "the nuts and bolts of the toxicity of his * * * family." Robert Jr. told Dr. Fabian that in later years, Nicholson became "more isolated, more depressed," and "flat angry, full of hate and depression."

**{¶ 382}** Robert Jr. tried to spend time with Nicholson during the summers when he was home from the military. Eventually, though, Robert Jr. noticed that Nicholson had become very withdrawn and would not leave his room, even when Robert Jr. came home for holidays. Robert Jr. described a photograph from his wedding, saying he was struck by the "look of pain" on Nicholson's face. He commented that it was a look "that a child, a teenager, shouldn't have."

**{¶ 383}** Robert Sr. was an alcoholic, and Angel drank more and more as the domestic violence increased over the years. Robert Jr. testified that he had "listened to [Polanco's] testimony and * * * listened to her saying increasing, increasing, increasing. And literally [he was] watching the cycle, just listening to it increase, increase, increase." On cross-examination, Robert Jr. elaborated on how the evidence at trial showed that the abuse cycle had "literally repeated itself from how [he and Nicholson] grew up and the things that [he] saw, the things that [he] witnessed." He explained that the abuse had "carried itself into the unfortunate incident that [they were] sitting [t]here today dealing with."

**{¶ 384}** When asked whether Angel and Robert Sr. "appreciate[d] what impact they[] had on [him] and [Nicholson]," Robert Jr. responded: "It took an act of God himself to get my mother in here. My aunt was fully on board because * * * she knows what really took place * * * the 40 years plus of secrets." Robert Jr. testified that his parents were in denial about the negative impact that their conduct had had on him and Nicholson: "Denial? * * * I would say it's almost an understatement. We were taught not to ever say anything about what was going on

in that house. You were told to keep quiet, and if you didn't, other things happened." Robert Jr. said that Nicholson had never been convicted of a crime and that Nicholson was Robert Jr.'s "voice of reason."

{¶ 385} Kain testified that she had a close relationship with Nicholson, which began when Nicholson was young. She testified that she and Angel had been "very close" but that they "became very estranged when * * * [Angel] confided in [Kain] * * * about the abuse."

{¶ 386} After Kain learned that Robert Sr. was abusive to Angel, she reached out to Nicholson and Robert Jr. and tried to support them as much as possible. Kain had noticed how nervous the boys were, that they could not focus, and that they were withdrawn. She testified that Robert Sr. had had "such a strong hold on [Nicholson] that [Robert Sr.] wouldn't let [Nicholson] * * * come over to [Kain's] home and spend any significant time [with her]."

{¶ 387} According to Kain, Robert Sr. drank heavily and was "an angry person." She testified that Nicholson and Robert Jr. saw "their mother being choked[,] * * * strangled, * * * running down the street from weapons, * * * [and] sleeping inside of a car." Ultimately, there "was just so much violence between [Nicholson's parents] that they would drink and then * * * the kids didn't matter at that point." According to Kain, Nicholson and Robert Jr. had hid the abuse and hid inside the house.

{¶ 388} Kain testified that Angel would never allow Kain to take her to the hospital. She reasoned that Angel and Robert Sr. had been "together for 40 something years. When * * * you are beaten, and you are basically told, I will kill you—because he's told her that. He's even told her, I'll kill the kids. Because I believe that's one of the reasons she stayed with him. * * * I fear for my sister's life."

{¶ 389} Kain confirmed that Robert Sr. continues to abuse Angel, even up to the day Kain testified. Kain further testified that Robert Sr. had a strong hold on

both Nicholson and Angel, to the point that they have "not talked to [Kain] or * * * been around family." According to Kain, Robert Sr. tried to drive a wedge between Nicholson and Robert Jr. and would say things to Nicholson like: "Your brother don't love you. Your brother thinks he's this and that. He got a new house. He got this and that. Just demean, just character assassinate [Robert Jr.]" When asked to describe how Nicholson and his brother grew up, Kain testified: "Horrific. Horrific. Abuse." She stated that there "was so much abuse and so much dysfunction in that house that [she thought Nicholson] probably thought [it] was normal behavior."

{¶ 390} Angel testified that she also grew up in a chaotic and violent household in which she saw her stepfather abuse her mother and threaten her with a gun. On one occasion, Angel's mother decided that she did not want to be hit anymore, so she fired a gun. Angel testified that her mother was trying to shoot Angel's stepfather, but the shot wounded Angel's two-year-old sister, whom Angel had been sheltering with her body.

{¶ 391} Angel did not share her entire family background with Dr. Fabian, because "it [was] painful" and she was "not proud of it." She indicated that the first incident of violence in her marriage occurred soon after Robert Jr. was born and her friends came to the house to see him. Because some of Angel's friends were men, Robert Sr. became jealous and walked out. When he returned, he started an argument with Angel and "jumped on" her, even though she was still recovering from childbirth. Another time, Robert Sr. accused Angel of "looking at his brother-in-law" during a party. Robert Sr. wrestled her to the floor and tried to suffocate her while Nicholson and Robert Jr. watched.

{¶ 392} Angel testified that at times, she and the children would sleep in her car overnight "because [she] needed to get out of the house so that they wouldn't hear and see the fighting all the time. But they were there and they saw it. And [Robert Sr.] * * * never respected [the] kids [and] * * * [h]e didn't care."

According to Angel, Nicholson witnessed many incidents of domestic violence, and the police were called at least once regarding the abuse.

{¶ 393} Angel testified that Robert Sr. had "mentally abuse[d]" Nicholson. Nicholson "had some challenges" in elementary school, and one of his teachers suggested that he be tested for attention-deficit/hyperactivity disorder ("ADHD"). But according to Angel, Robert Sr. was against having Nicholson tested, so she did not obtain treatment for Nicholson. Robert Sr. would berate Nicholson by calling him "halfwits and things like that." Angel testified that what Nicholson had witnessed had a negative impact on him and that if she had left Robert Sr., Nicholson might have had a better life.

{¶ 394} Angel admitted that she physically abused Nicholson when he was young. For example, she once "whooped" Nicholson with the vacuum-cleaner cord when she was drunk. However, when Dr. Fabian tried to bring up the abuse allegations with Robert Sr., he "could not recall more than one occasion in which he physically abused and hit Angel." And although Robert Sr. attended the trial, he did not testify.

{¶ 395} McDonnell explained to the jury the difference between one-event traumas, such as an airplane crash or a serious car accident, and "developmental trauma," which affects "the entire course" of a person's development. She also stated that when a person "grow[s] up with a particular set of events that are horrible and [he or she has] no control over [those events], which is really the definition of trauma, * * * [he or she] tend[s] to keep repeating those patterns [when] actually trying to * * * make it different." McDonnell testified that "unless there's real intervention in terms of mental health, it doesn't change."

*b. Dr. Fabian's report and testimony*

{¶ 396} According to Dr. Fabian, Nicholson was cooperative but "was protective of his parents and family * * * [a]nd * * * lacked insight into the dysfunction within the family that * * * contributed to why he [was there], in part."

Dr. Fabian expressed his view that Nicholson's inability to perceive the dysfunction in his childhood home and the effect it had on him were major obstacles to completing a thorough mitigation investigation.

{¶ 397} Dr. Fabian's testimony and written report corroborated the family history provided directly by Angel and Kain and indirectly by McDonnell. Dr. Fabian found it "clear" that there was domestic violence in Nicholson's family history. According to him, there had been "a lot of physical and emotional abuse and violence initiated by [the] father," along with threats and intimidation. Dr. Fabian testified that Angel had developed an addiction to alcohol and admitted to physically abusing Nicholson when he was young.

{¶ 398} Dr. Fabian agreed "for the most part" with Robert Jr.'s description of Angel and Robert Sr. as emotionally and mentally abusive. According to Dr. Fabian, "the attachment between * * * a child and caregivers is quite critical," including "the immediate emotional, physical bonding, nurturance, love, affection, that a youth has." He testified that a child's ability to "develop a connection with [their] primary caregiver, both [parents], ideally, * * * kind of filters [their] view of * * * other relationships throughout * * * life." Dr. Fabian noted that attachment disorder and attachment deficits are often "rooted in * * * trauma."

{¶ 399} Dr. Fabian did not believe that Nicholson and Robert Jr. had been neglected or lacked "basic necessities," but he "question[ed] * * * the integrity of the bonding between * * * [Nicholson] and his parents." According to him, this attachment deficit "paved the way" for Nicholson's "problems in relationships down the road."

{¶ 400} Dr. Fabian recounted the multigenerational trauma on both sides of Nicholson's family. He observed that Robert Jr. had said that his parents were decent providers and that the family never lacked food, clothes, or shelter. Dr. Fabian also noted that although Nicholson's parents were still married, their "toxic" relationship damaged Robert Jr.'s and Nicholson's development.

{¶ 401} Significantly, Dr. Fabian is the only defense witness who interviewed Robert Sr. Dr. Fabian testified that Robert Sr. was "very emotional on the phone" and "cried at different times" during the interview. According to Dr. Fabian, Robert Sr. "choked up," apparently because he never knew his biological parents, and he told Dr. Fabian that his "mother gave [him] away to another lady" who "lived in the same * * * apartment or duplex." Robert Sr. said that his adoptive parents abused alcohol and that his adoptive father was violent toward his adoptive mother. According to Dr. Fabian, Robert Sr. acknowledged that he drank too much and that his drinking had led "to some domestic issues." Robert Sr. "talked more about verbal than physical abuse * * * [and] denied physically assaulting Angel and said he never hit his sons." Dr. Fabian opined that Robert Sr. may have minimized "his exact role in [the] domestic violence." According to Dr. Fabian, under these circumstances, a family member is "in defensive stance" and "often ha[s] not dealt with these issues."

{¶ 402} Dr. Fabian noted that Robert Sr. had corroborated Angel's statements about Nicholson's childhood development. According to Dr. Fabian's report, Robert Sr. described Nicholson as "impulsive[,] * * * hyper, restless, and overactive." Robert Sr. also said that Nicholson had "problems with concentration [and] distractibility."

{¶ 403} Developmental trauma affected Angel's childhood and upbringing as well. According to Dr. Fabian, Angel never met her father and was raised by her aunt. Records indicated that Angel's "mother had * * * seven kids total from four fathers. And she did have a stepfather. They were poor. And she talked about living with her aunt 'because [she could] be [her] mother's sister's husband's child.' " Dr. Fabian explained that the impact of multigenerational trauma manifests itself in people who "often fall in the same cycles, even when they don't want to, that they kind of witnessed or experienced in their own childhood."

{¶ 404} Angel described specific acts of domestic violence committed by Robert Sr., but in Dr. Fabian's estimation, her stories were tempered. Angel acknowledged that there were alcohol-fueled fights between her and Robert Sr., and she admitted that Nicholson and Robert Jr. saw some of the domestic violence. At bottom, Dr. Fabian reported "[a] history of domestic violence and alcoholism and dysfunction in both Angel and Robert Sr.'s lives that [led] them to do exactly what they witnessed when they were kids."

{¶ 405} Dr. Fabian administered a battery of psychological and neuropsychological tests to Nicholson. The Wechsler Adult Intelligence Scale-IV indicated that Nicholson has "a Full Scale IQ of 80," which is in the 9th percentile and borderline range, which is "basically mildly impaired." Dr. Fabian testified that Nicholson "struggled [with] verbal abstract reasoning skills" and had "difficulties with social compensation and judgment" and "perceptual reasoning skills." In addition, Nicholson "had some more significant problems with mental flexibility," his memory was subpar, and he exhibited an impaired ability to process information. Dr. Fabian's testing indicated that Nicholson is "lower functioning" and that he showed evidence of having ADHD. Dr. Fabian determined that Nicholson "has some attention, working memory, [and] processing speed deficits, and he's got executive functioning deficits * * * [such as] problem solving * * * and decision making tasks."

{¶ 406} Dr. Fabian also administered the Personality Assessment Inventory "to assess [Nicholson] for psychopathology, personality, and emotional functioning." Dr. Fabian noted that Nicholson "had a tendency to somaticize, meaning he report[ed] a lot of physical complaints, medical complaints, aches, [and] pains." According to Dr. Fabian, Nicholson's "results on the protocol indicated that his Negative Impression Management score was elevated," meaning that "he was in significant psychological and emotional distress and it is likely a cry for help type protocol."

**{¶ 407}** Dr. Fabian determined that Nicholson suffered from "psychiatric/psychological, neurological and neurological/neuropsychological deficits, impairments, and conditions that would compromise his emotional, behavioral, and cognitive functioning at the time of a stressful and perceived stressful and threatening event." He diagnosed Nicholson with (1) mild neurocognitive disorder due to TBI, (2) ADHD (which affected some of Dr. Fabian's cognitive testing of Nicholson), (3) PTSD related to childhood trauma and the nature of the offenses for which he was being tried, (4) major depressive disorder, recurrent and moderate without psychotic features, and (5) borderline personality disorder with paranoid traits.

**{¶ 408}** Dr. Fabian explained that "neurodevelopmental disorders" are "compromises in brain development, prenatal, at birth or even developmental years before age 18." Dr. Fabian determined that of Nicholson's various neurodevelopmental disorders, "ADHD is the most relevant" disorder, which he explained is characterized by "inattention, impulsivity, and/or hyperactivity."

**{¶ 409}** Dr. Fabian also diagnosed Nicholson with PTSD. He explained that PTSD symptoms can be intrusive, such as frequent or repetitive nightmares of prior traumatic events or "flashbacks, kind of a daydream during the day of something that happened, you get caught in it, or you disassociate." Nicholson told Dr. Fabian that the major traumas that he experienced were his parents' abuse and his act of shooting M.L. and Giselle. Dr. Fabian opined that Nicholson acknowledged his depression more during his evaluation than at the time of the offenses because he had lacked insight into his own issues.

*c. Neuropsychological testing*

**{¶ 410}** The defense also presented the testimony of Dr. Snyder, who had interpreted an MRI that Nicholson underwent in preparation for the mitigation phase. Dr. Snyder's report was admitted into evidence.

{¶ 411} Using a PowerPoint presentation, Dr. Snyder pointed to white "dots" on the MRI and told the jury that they represented "white matter lesions," which are "abnormal[,] especially in a 30-year-old." According to Dr. Snyder, the lesions were "consistent with head trauma * * * such as a mild TBI." He testified that "even though it's called mild, the[se patients] can still have significant symptoms and significant problems."

{¶ 412} Dr. Snyder compared Nicholson's MRI to those in two case studies from peer-reviewed articles that examined the MRI results of a patient with white-matter lesions in the frontal lobes. The state's rebuttal expert, Dr. Richard Ryan Darby, a neurologist at Vanderbilt University, suggested that Dr. Snyder had intentionally cropped images from the literature to mislead the jury. Dr. Snyder explained that he had done the cropping "to show the white matter * * * because we're just talking about white matter lesions here." According to Dr. Snyder, Nicholson's MRI results were "very similar" to the results in the studies showing frontal-lobe "shearing injur[ies]." A "shearing injury," or "diffuse axonal injury," occurs "when there's a forceful injury, typically a deceleration injury, or a blast injury * * * [because] [i]t basically injures or breaks the tissue." Dr. Snyder opined that Nicholson's "white matter [lesions] are * * * consistent with shearing injuries, or diffuse axonal injuries."

{¶ 413} Dr. Fabian's report correlates with Dr. Snyder's radiological findings: Nicholson reported symptoms of frontal-lobe deficits, and Dr. Snyder found six white-matter lesions in Nicholson's frontal lobes. According to Dr. Snyder, the correlation is also supported by available medical records (including a prior computed tomography ("CT") scan) and Nicholson's history of head trauma as reported and corroborated by Nicholson's family members.

{¶ 414} Dr. Snyder testified that the human brain has five types of lobes: frontal, parietal, temporal, occipital, and cerebellum. He explained that the volume of Nicholson's frontal lobe is in the 29th percentile, his parietal lobes are in the

68th percentile, his occipital lobes are in the 39th percentile, his temporal lobes are in the 53rd percentile, and his cerebellum is in the 86th percentile. After comparing the volume of each area of Nicholson's brain, Dr. Snyder opined that Nicholson's frontal lobe had "by far the lowest, in terms of volume" of the five lobes. And according to Dr. Snyder, "the frontal lobe is where those white matter findings are. It's also the most common lobe of the brain to be involved in head trauma." Also, Dr. Snyder testified that Nicholson's "cortical volumes are lowest in that region." Dr. Snyder concluded that "the key about this case is that his frontal lobes are decreased as compared to the rest of the lobes." According to Dr. Snyder, this finding is "consistent with the head trauma and the white matter findings and all of that."

{¶ 415} Dr. Snyder further testified that contusions and hemorrhages in the brain are uncommon and indicate severe trauma. He testified that when "you have a patient that has hemorrhages and you scan them on MRI right after they have a head injury, if you scan them later about 80 percent of those hemorrhages will resolve. So you won't see them." Thus, Dr. Snyder explained, "It is certainly possible that * * * Nicholson had hemorrhages at the time of his injuries."

{¶ 416} Defense counsel asked Dr. Snyder to comment on a conclusion offered by neuroradiologist Dr. Thomas Masaryk, who testified for the state, that there was no clinical correlation for mild TBI. In response, Dr. Snyder testified that he had reviewed the MRI and found evidence of trauma before he ever learned of Nicholson's history. Only after reviewing Dr. Fabian's "in depth review of the history" and other expert reports in preparation for trial did Dr. Snyder perform neuropsychological correlations, which he said showed "that actually it was head trauma. So the history was concordant with the imaging review."

{¶ 417} Dr. Snyder agreed that the results of Dr. Fabian's neuropsychological testing showing executive functioning deficits was consistent with the frontal-lobe deficits shown on the MRI. And Dr. Snyder noted that

122

according to Dr. Fabian's report, Nicholson's medical records reflect "multiple head traumas."

#### d. Ability to comply with institutional adjustment

{¶ 418} Defense counsel asked Aiken, the defense's expert in correctional management, to assess Nicholson in the prison-operational context based on his criminal history and ability to succeed in institutional adjustment.

{¶ 419} Aiken testified that Nicholson had been confined in the Cuyahoga County Jail for over a year pending trial and had had no disciplinary violations. According to Aiken, the fact that Nicholson would be 30 years old when he entered prison boded well for his compliance with prison rules. As inmates age, Aiken testified, they "transition into * * * more compliant behavior pattern[s]." Aiken concluded that Nicholson could be adequately housed, managed, and secured in a high-security facility for the remainder of his life without causing undue risk of harm to staff, inmates, or the general public.

{¶ 420} On cross-examination, Aiken acknowledged that Nicholson had been in protective custody in the county jail throughout the 13 months he had been awaiting trial. In Aiken's view, Nicholson is "a high risk, for vulnerability. Just by of nature of his offenses, he's a high risk for the public, so therefore he's got a double whammy going on. He's got to be in a high security setting, and well within a high security setting within that high security setting." At bottom, Aiken opined that Nicholson's "vulnerability is much higher than his potential for causing harm to other people."

### C. State's rebuttal witnesses

{¶ 421} The state called two witnesses in rebuttal during the mitigation phase.

### 1. Dr. Masaryk

{¶ 422} Dr. Masaryk reviewed Nicholson's MRI and Dr. Snyder's report and drafted a report memorializing his findings. Over a defense objection, the trial court deemed Dr. Masaryk an expert in the field of neuroradiology.

{¶ 423} With regard to Nicholson's MRI, Dr. Masaryk first explained that Dr. Snyder had evaluated "the integrity of the brain" by looking at its volume and using "a special technique to look for chronic bleeding in the brain." Dr. Masaryk testified that "there are some small areas of high signal intensity * * * in the frontal white matter." He did not dispute that the white-matter lesions shown in Nicholson's MRI could have been caused by trauma. However, Dr. Masaryk testified that because those white spots are nonspecific, they could have been caused by "a plethora of other things, [such as] Lyme disease, migraine headache, tension headache, hypertension, microvascular disease, [or] multiple sclerosis." In Dr. Masaryk's opinion, white-matter lesions, without more, are insufficient for a TBI diagnosis. And Dr. Darby testified that white spots might be caused by vascular disease, multiple sclerosis, migraine headaches, and psychiatric disorders.

{¶ 424} But Dr. Masaryk testified that there was nothing "specific on those scans that leads [to the conclusion] that there was significant brain trauma." He testified, to a reasonable degree of neuroradiological certainty, that Nicholson's brain scan does not conclusively prove that the white-matter lesions are shearing or diffuse axonal injuries.

{¶ 425} In Dr. Masaryk's opinion, Dr. Snyder's finding that the volume of Nicholson's frontal lobe was decreased in comparison to his other brain lobes does not conclusively indicate injury or even an abnormality. Moreover, Dr. Masaryk saw no hemorrhages or brain bleeds in Nicholson's MRI, although he did concede that the location of the white-matter lesions "is somewhat characteristic" of a shearing injury. Dr. Masaryk testified that there was nothing abnormal about

Nicholson's MRI and that he could not conclude to any degree of certainty that the white spots on the MRI are shearing injuries.

### 2. *Dr. Darby*

{¶ 426} The state's second rebuttal witness was Dr. Darby. The trial court recognized Dr. Darby as an expert in the field of neurology, over a defense objection. Dr. Darby reviewed Nicholson's medical and educational records, police reports, and testing information and then drafted a report memorializing his findings.

{¶ 427} Dr. Darby noted that there was "no documentation in any of the police reports or medical records that [he] reviewed [showing] that [Nicholson] ever had symptoms of a traumatic brain injury." Dr. Darby testified that the most common neurological symptoms of a mild TBI are memory loss, amnesia, or loss of consciousness and that a person must have at least one of those symptoms to be diagnosed with a TBI.

{¶ 428} According to Dr. Darby, following Nicholson's October 2014 motor-vehicle accident, his medical records "did not note any abnormality, including volume loss." Dr. Darby testified that Nicholson's October 2014 medical records indicated that "even though there was a hit to the head, there was not evidence of a brain injury or a concussion" and that "a CAT scan [was] unnecessary * * * [b]ecause there [was] not evidence of serious trauma or loss of consciousness." Thus, Dr. Darby found to a reasonable degree of scientific certainty that "there was insufficient evidence to support findings of [TBI]" based on the MRI.

{¶ 429} Dr. Darby also considered whether Nicholson's MRI supported a finding of a mild TBI. Dr. Darby disagreed with Dr. Snyder's conclusion that the six white-matter lesions depicted on the MRI represented a shearing or diffuse axonal injury. Dr. Darby noted that the MRI showed "no evidence of microbleeds * * * to support [finding the presence of a diffuse axonal injury]." Moreover, Dr.

Darby noted, white-matter lesions are "a common finding that is not specific to TBI or any other neurological disease, as they can happen in persons without neurological diseases."

{¶ 430} Further, according to Dr. Darby, the expected size of a patient's particular brain region is related to the patient's age. The radiologist who reviewed Nicholson's 2019 MRI found no significant volume loss for his age and no signs of significant damage to the cortex from even a mild TBI. Consistently with Dr. Masaryk's testimony, Dr. Darby opined that the fact that Nicholson was in the 29th percentile for frontal-lobe volume was insignificant because people are born with different sized brains. In Dr. Darby's estimation, the volume of Nicholson's frontal lobe is not unusual; its volume is the same as or similar to those of one-third of all people. Dr. Darby determined that Nicholson's 2019 MRI did not reveal evidence of a TBI.

{¶ 431} Dr. Darby also reviewed Dr. Fabian's report regarding Nicholson's neuropsychological test results. In Dr. Darby's estimation, those results did not point to a diagnosis of a mild neurocognitive disorder due to a TBI. Dr. Darby reasoned that the report and the testing did not clarify whether there was a true difference in Nicholson's test results from what might be expected based on his prior level of functioning; Nicholson's high-school and college test scores showed that he was low-functioning before the 2014 motor-vehicle accident. Moreover, because mood can affect cognition, the test results could have been affected by Nicholson's depression following the shootings.

{¶ 432} Moreover, Dr. Darby disagreed with Dr. Fabian's conclusion that Nicholson presented with a frontal-lobe behavioral disorder that affected his ability to conform his conduct to the law. Dr. Darby testified that to diagnose a frontal-lobe disorder, there would have to be a showing that someone had been normal, then suffered an injury or a disease, and then developed the behaviors associated with a frontal-lobe disorder. Dr. Darby also agreed with Dr. Masaryk's testimony

that if a person does not have symptoms such as memory loss, amnesia, or loss of consciousness, a concussion or mild TBI cannot correctly be diagnosed. Thus, Dr. Darby concluded that Nicholson did not meet the criteria for being diagnosed as having an acquired frontal-lobe disorder.

**{¶ 433}** On cross-examination, Dr. Darby admitted that significant early-childhood trauma can affect brain development and that pediatric brain injuries can cause changes to the brain later in a person's life. Dr. Darby also conceded that the white-matter lesions shown on Nicholson's MRI are located at the junction of white and gray matter, which is typically where a diffuse axonal injury occurs. However, he testified that even with pediatric trauma, "patients usually have clear areas of scarring, of contusions, or bleeding at the time of the injury."

### D. Weight of mitigating factors

**{¶ 434}** Nicholson urges us to assign weight to the following mitigating factors: (1) his history, character, and background, especially his traumatic childhood; (2) Dr. Fabian's mental-health diagnoses of a mild neurocognitive disorder due to TBI, PTSD, ADHD, borderline personality disorder with paranoid traits, and major depressive disorder; (3) his lack of a significant history of criminal convictions, *see* R.C. 2929.04(B)(5); (4) his low risk to prison staff and inmates; and (5) the fact that he has the love and support of his family.

### 1. History, character, and background

**{¶ 435}** Regarding Nicholson's history, character, and background, the state argues that although the evidence of physical and mental domestic abuse is "disturbing," it mostly predated Nicholson's birth. The evidence belies the state's claim. Robert Sr. and Angel abused and taunted Nicholson. Angel verified that Nicholson witnessed physical violence between her and Robert Sr. She provided details of horrific abuse at their home, including an incident in which Robert Sr. accused Angel of "looking at his brother-in-law" during a party and then wrestled her to the floor and tried to suffocate her—all while Nicholson and Robert Jr.

watched. Moreover, Robert Jr. testified that domestic violence was a daily occurrence in the home, even after Nicholson was born. And the evidence showed that with the passage of time, Angel drank more and more as the domestic violence increased.

{¶ 436} Robert Jr. opined that the cycle of abuse was continuing. Dr. Fabian unequivocally concluded that Nicholson had "learn[ed] that domestic violence was a way of solving disputes in his home and to process negative emotion." Thus, Nicholson's mitigation evidence indicates that he is a product of his development, which was negatively impacted by trauma.

{¶ 437} Because the record is replete with evidence that Nicholson was raised in a toxic and dangerous environment, we assign significant weight to his history, character, and background.

### 2. Lack of a significant history of prior criminal convictions

{¶ 438} Nicholson contends that because he had never been arrested or indicted for any criminal conduct, we should give significant weight to his lack of criminal convictions or juvenile adjudications. Although this case marks the first time Nicholson has been indicted for a crime, the evidence at trial showed that Nicholson physically and emotionally abused Polanco and assaulted Giselle at least once before the shootings. Accordingly, we assign only minimal weight to Nicholson's lack of a significant history of criminal convictions or juvenile adjudications.

### 3. Mental-health diagnoses

{¶ 439} Dr. Fabian diagnosed Nicholson with mild neurocognitive disorder due to TBI, PTSD, ADHD, borderline personality disorder with paranoid traits, and major depressive disorder. Nicholson contends that this court should accord significant weight to these diagnoses, cumulatively. Because Nicholson did not argue that he "lacked substantial capacity to appreciate the criminality" of his conduct owing to a mental disease or defect, R.C. 2929.04(B)(3), we consider the

mental-health evidence under the mitigation catchall provision, R.C. 2929.04(B)(7).

{¶ 440} Dr. Fabian concluded that Nicholson's psychiatric, psychological, neurological, and neuropsychological deficits, impairments, and conditions compromise his emotional, behavioral, and cognitive functioning, especially during a perceived stressful and threatening event and domestic-violence situation. Dr. Fabian testified that Nicholson "has psychological and problem psychiatric diagnoses and brain dysfunction that we can kind of quibble about * * * but he's impaired at the end of the day and was at the time of this offense." We also give this evidence some weight.

### 4. Nicholson's other mitigating evidence

{¶ 441} Nicholson urges us to assign weight to the fact that he would be a low risk to other inmates. Aiken convincingly testified that Nicholson can be adequately managed and secured in a high-security facility for the rest of his life without undue risk. Aiken's testimony is entitled to some weight. *See State v. Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, ¶ 239, 242.

{¶ 442} Nicholson also asks this court to give weight to the strong love and support from his family. Mitigation testimony established that Nicholson does have "strong love and support from his family," *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 178, and we assign modest weight to that factor, *see id*.

### E. Reweighing

{¶ 443} Nicholson presented significant evidence that he was raised in a violent household and was controlled by abusive parents who told him not to report the abuse lest he be taken from the family. Combined with the other mitigating evidence, the cumulative weight of Nicholson's mitigation is not slight. The evidence indicates that Nicholson is a product of his upbringing and that he never learned any positive ways to manage conflict.

**{¶ 444}** However, the strength of the aggravating circumstances cannot be overstated. Nicholson murdered two unarmed teenagers in front of their mother and mounted a defense that the physical evidence flatly contradicts. Therefore, we affirm Nicholson's death sentences based on our independent reweighing of the aggravating circumstances and mitigating factors.

### F. Proportionality

**{¶ 445}** We conclude that the death sentences imposed in this case are both appropriate and proportionate when compared to death sentences imposed in other capital cases. This court has upheld death sentences based on a course-of-conduct specification under R.C. 2929.04(A)(5) many times. *See Hundley*, 162 Ohio St.3d 509, 2020-Ohio-3775, 166 N.E.3d 1066, at ¶ 153; *Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 241; *Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, at ¶ 181.

### V. CONCLUSION

**{¶ 446}** We affirm Nicholson's convictions and death sentences.

Judgment affirmed.

DeWine and Deters, JJ., concur.

Kennedy, C.J., concurs, with an opinion.

Donnelly, J., concurs in part and dissents in part, with an opinion.

Brunner, J., concurs in part and dissents in part, with an opinion joined by Stewart, J.

––––––––––––

**Kennedy, C.J., concurring.**

**{¶ 447}** I concur in the majority's judgment affirming appellant Matthew Nicholson's convictions and death sentences for the aggravated murders of M.L. and Giselle Lopez. I also join most of the majority opinion's analysis supporting that judgment, except for paragraphs 193-194, 197-198, and 334. But I part ways with the majority in two respects. First, I disagree with its reliance on *State v.*

*Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, to determine whether the trial court erred in admitting some of the allegedly improper victim-impact testimony that Nicholson challenges in his seventh proposition of law. *See* majority opinion at ¶ 193-194, 197-198. Second, I disagree with its reliance on *State v. Ireland*, 155 Ohio St.3d 287, 2018-Ohio-4494, 121 N.E.3d 285 (lead opinion), in characterizing blackout as an affirmative defense in analyzing Nicholson's 16th proposition of law. *See* majority opinion at ¶ 334.

{¶ 448} Numerous witnesses testified during the trial phase of Nicholson's trial. Relevant here, witnesses testified about M.L.'s and Giselle's personal characteristics and qualities—specifically, that they were "good," "respectful," "polite," intelligent, and family-centered children. The majority relies on the analysis conducted in *Graham* and its factors for determining whether testimony is "overly emotional" in concluding that the trial court did not err in admitting the challenged testimony.

{¶ 449} For the reasons set forth in my separate opinion in *Graham*, the factors for determining whether testimony is "overly emotional" and the analysis conducted in *Graham* were advisory. *See id.* at ¶ 250 (Kennedy, J., concurring in judgment only in part and dissenting in part). Therefore, the majority errs in relying on *Graham* in concluding that the trial court did not error in admitting the testimony relating to M.L.'s and Giselle's personal characteristics and qualities.

{¶ 450} Under this court's precedent, the personal-characteristics-and-qualities testimony challenged here was inadmissible victim-impact testimony, and the trial court erred in admitting it. But because the trial court's admission of that testimony was not plain error, the majority properly rejects Nicholson's seventh proposition of law, though partially for the wrong reason.

{¶ 451} Also, Nicholson testified that he "blacked out" when he murdered M.L. and Giselle, and he argues that his trial counsel were ineffective for not raising blackout as an affirmative defense. But in my view, the defense of blackout is a

failure-of-proof defense, not an affirmative defense as asserted by Nicholson and the majority. *See Ireland*, 155 Ohio St.3d 287, 2018-Ohio-4494, 121 N.E.3d 285, at ¶ 70 (Kennedy, J., dissenting). Regardless, the majority's mischaracterization does not change the conclusion that defense counsel did not render ineffective assistance by failing to request a jury instruction on the defense of blackout. The majority properly rejects Nicholson's 16th proposition of law.

### Victim-Impact Testimony

{¶ 452} To be admissible, evidence must be relevant. Evid.R. 402. Evid.R. 403(A) prohibits the admission of relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Victim-impact testimony includes evidence relating to " 'the personal characteristics of the victim and the emotional impact of the crimes on the victim's family.' " *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 259, quoting *Payne v. Tennessee*, 501 U.S. 808, 817, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Victim-impact testimony is admissible during the trial phase of a death-penalty trial when the testimony concerns the circumstances surrounding the commission of the murder. *See State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 62 (lead opinion), citing *State v. Fautenberry*, 72 Ohio St.3d 435, 440, 650 N.E.2d 878 (1995). Such testimony may not be overly emotional. *See State v. Reynolds*, 80 Ohio St.3d 670, 679, 687 N.E.2d 1358 (1998).

{¶ 453} The majority rightly concludes that the trial court did not err in admitting the testimonies of Henry Billingslea, Kristin Bailey, America Polanco, and Garfield Heights Police Lieutenant Robert Petrick. The majority also correctly concludes that the state did not improperly highlight victim-impact evidence in its opening statement and closing arguments with the goal of swaying the jury and that there was no carryover effect on the mitigation phase regarding any victim-impact evidence that was erroneously admitted during the trial phase.

**{¶ 454}** But the majority fumbles regarding the remaining challenged testimony. The testimony describing M.L. and Giselle as "good," "respectful," "polite," intelligent, and family-centered children was irrelevant to the circumstances of M.L.'s and Giselle's murders; it merely described the personal characteristics and qualities of M.L. and Giselle. *See McKelton* at ¶ 259. Therefore, contrary to the majority's conclusion, which is based on its improper reliance on *Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, that testimony was inadmissible victim-impact testimony and the trial court erred in admitting it. But that does not end the analysis.

### Plain Error

**{¶ 455}** Nicholson did not contemporaneously object to the challenged personal-characteristics-and-qualities testimony; therefore, he forfeited all but plain-error review of his challenge to it. *See* Crim.R. 52(B); *State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, 103 N.E.3d 784, ¶ 36. Accordingly, the trial court's error in admitting that testimony "must have affected the outcome of the trial," *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). We take notice of plain error with "the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

**{¶ 456}** The trial court's admission of the victim-impact testimony was not plain error. Nicholson does not make any specific arguments regarding the effect of the admission of the personal-characteristics-and-qualities testimony. Rather, he argues that all the testimony he challenges as improper victim-impact testimony "cumulatively inflamed the passions of the jurors." Such testimony, he argues, "inhibited the jurors from making objective and rational decisions" regarding his guilt.

**{¶ 457}** This broad, generalized argument does not overcome the tremendous hurdle of showing that the testimony affected the outcome of

Nicholson's trial. And Nicholson argues that he is entitled to a new trial based, in part, on the testimonies of Billingslea, Bailey, and Polanco—testimony that we have already determined was admissible. Nicholson's argument is conclusory and does not display any manifest miscarriage of injustice. Because Nicholson has not demonstrated plain error by showing how the personal-characteristics-and-qualities testimony affected the outcome of the trial phase of his trial, the majority properly rejects his seventh proposition of law.

### Blackout Defense

**{¶ 458}** The majority also errs in labeling the defense of blackout as an affirmative defense. But in the end, it properly rejects Nicholson's ineffective-assistance-of-counsel claim arguing that his counsel should have raised the defense. In *Ireland*, 155 Ohio St.3d 287, 2018-Ohio-4494, 121 N.E.3d 285, at ¶ 1, the lead opinion determined that blackout is an affirmative defense. For the reasons set forth in my dissenting opinion in that case, blackout is a failure-of-proof defense, not an affirmative defense. *Id.* at ¶ 69-70 (Kennedy, J., dissenting).

**{¶ 459}** So while I disagree with the majority's characterization of blackout as an affirmative defense, I concur in its conclusion that Nicholson's trial counsel did not render ineffective assistance by failing to request a jury instruction on blackout, because "[t]he record contains insufficient evidence suggesting that Nicholson had been unconscious and had involuntarily shot M.L. and Giselle," majority opinion at ¶ 335. The majority properly rejects Nicholson's 16th proposition of law.

### Conclusion

**{¶ 460}** While I disagree with the majority's decision to use the advisory test from *Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, regarding "overly emotional" testimony and would adhere to our established precedent in determining whether the trial court erred in admitting the challenged testimony, I ultimately concur in the majority's decision to reject Nicholson's

seventh proposition of law. And even though the majority improperly characterizes the defense of blackout as an affirmative defense instead of a failure-of-proof defense, I concur in its decision to reject Nicholson's 16th proposition of law. I join the remainder of the majority opinion.

_____

**DONNELLY, J., concurring in part and dissenting in part.**

{¶ 461} I concur in the majority's decision affirming the convictions against appellant, Matthew Nicholson. But because I would reverse his death sentences, I respectfully dissent in part.

{¶ 462} I fully agree with Justice Brunner's opinion concurring in part and dissenting in part that the aggravating circumstances do not outweigh the mitigating factors in this case. And I agree with her criticism of the charade that we call proportionality review in Ohio and her conclusion that Nicholson's death sentences are disproportionate to the penalties that have been imposed in similar cases. I further agree with Justice Brunner's observation that the aggravating circumstances in this case barely make it eligible to be a capital case. It is a close call.

{¶ 463} Close calls are not appropriate for the death penalty. In close-call cases, constitutional problems arise because the tiebreaker tends to be the county in which the offenses are prosecuted rather than anything relevant to the merits of the case.

{¶ 464} Around the time that the Cuyahoga County Prosecutor's Office sought the death penalty against Nicholson, there was a sudden uptick in Cuyahoga County of aggravated-murder cases in which death sentences were pursued. In 2019, a total of seven death sentences were imposed in Ohio's courts of common pleas. Ohio Attorney General, *Annual Report, 2019 Capital Crimes, State and Federal Cases*, at 27 (2019), available at https://www.ohioattorneygeneral.gov /Files/Reports/Capital-Crimes-Annual-Reports/2019-Capital-Crimes-Annual-Report (accessed Feb. 2, 2024) [https://perma.cc/5DC5-X3T6]. Cuyahoga County

was responsible for four of those death sentences—the same amount as for the previous eight years *combined* in Cuyahoga County.  *See id.* at 30.

{¶ 465} The number of death sentences imposed in Cuyahoga County in 2019 was not just an outlier for that county or for the state of Ohio but for the entire United States.  *See* Death Penalty Information Center, *The Death Penalty in 2019: Year End Report*, https://deathpenaltyinfo.org/facts-and-research/dpic-reports /dpic-year-end-reports/the-death-penalty-in-2019-year-end-report  (accessed Feb. 2, 2024) [https://perma.cc/T388-J7BX] (the number of death sentences in Cuyahoga County around 2019 was "more than in any other county in the country").  The executive director of the Death Penalty Information Center, Robert Dunham, noted that there was no corresponding spike in homicide cases around 2019, and he commented that the county in which the crime was committed, rather than the severity of the crime, is what tends to determine whether the death penalty is imposed.  Pelzer, *Cuyahoga County leads the nation in death-penalty sentences, study finds*, Cleveland.com (Dec. 17, 2019), https://www.cleveland.com/open /2019/12/cuyahoga-county-leads-the-nation-in-death-penalty-sentences-study -finds.html (accessed Feb. 2, 2024) [https://perma.cc/CL97-4UVY].

{¶ 466} If the death penalty is being imposed based more on irrelevant factors such as geography than on relevant circumstances of the offenses, then it seems clear that the death penalty is being imposed arbitrarily.  *See Glossip v. Gross*, 576 U.S. 863, 920, 135 S.Ct. 2726, 192 L.Ed.2d 761 (2015) (Breyer, J., dissenting); Ditchfield, *Challenging the Intrastate Disparities in the Application of Capital Punishment Statutes*, 95 Geo.L.J. 801, 803-804 (2007), quoting *Furman v. Georgia*, 408 U.S. 238, 310, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring) ("geography, which is a powerful predictor of whether a capital crime will be charged as such, is the sort of arbitrary factor mentioned in *Furman v. Georgia* that leads to the 'wanton[] and * * * freakish []' imposition of death

sentences that violate the Eighth Amendment" [brackets and ellipsis added in Ditchfield]).

{¶ 467} Nicholson, in a senseless rage, murdered two young people, and for that he deserves severe punishment. However, I am convinced that in any Ohio county in any year *other* than Cuyahoga County in 2019, the punishment for offenses like Nicholson's here would have been life in prison, not death. Until the General Assembly figures out a better method for determining which aggravated-murder defendants should be eligible for the death penalty, this court should not uphold death sentences in close-call cases in which the only apparent deciding factor was something as arbitrary as where the offenses occurred. Accordingly, I dissent from the portion of the majority's decision that affirms Nicholson's death sentences.

_____

**BRUNNER, J., concurring in part and dissenting in part.**

{¶ 468} I agree that appellant Matthew Nicholson's convictions were supported by the evidence, and I do not question the jury's rejecting his self-defense claim. Nicholson admitted that he had "snapped" when he purposefully shot and killed two young people—M.L. and Giselle Lopez. I concur in this court's judgment affirming Nicholson's convictions for aggravated murder.

{¶ 469} However, I part ways with the trial court in imposing and with my colleagues in affirming Nicholson's death sentences. The decision whether a defendant should be executed is an incredibly heavy burden that the law places on jurors who are ordinary citizens and residents of the same county as the defendant. Even judges, who typically receive training and otherwise prepare to make the ultimate sentencing decision when a jury has recommended a death sentence, seldom find it to be an easy one. When this court conducts an independent review of a death sentence, as it is charged with doing, R.C. 2929.05, its role is not to second-guess the initial sentencing deciders or supplant their judgment with that of

this court. It is our task to determine whether the defendant's conduct was so abhorrent that the law permits punishment by death. We must examine various interests—like whether the offender's culpability, conduct, and background place him in the category of offenders for whom the death penalty is reserved—against factors provided under the law to guide this decision, all with the understanding that we are channeling in imperfect waters not of our own making.

**{¶ 470}** We must apply the statutes governing the imposition of the death penalty so as to ensure that it is reserved for people who kill with extreme culpability. *See Atkins v. Virginia*, 536 U.S. 304, 318-319, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) ("the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State"), citing *Godfrey v. Georgia*, 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (lead opinion); *see also State v. Murphy*, 91 Ohio St.3d 516, 563, 747 N.E.2d 765 (2001) (Pfeifer, J., dissenting) (finding that "[w]hen Ohio's death penalty statute was enacted, it was designed to be narrowly tailored to allow the execution of only the most vile and evil murderers"). After considering the aggravating and mitigating evidence in this case and the sentences imposed in similar cases, I cannot conclude that Nicholson should be put to death.

## I. SENTENCING REVIEW UNDER R.C. 2929.05

**{¶ 471}** This court has a duty to review death sentences imposed by a trial court. R.C. 2929.05. That review includes determining whether the evidence supports the jury's finding of aggravating circumstances that *qualify* the defendant for the death penalty under R.C. 2929.04. R.C. 2929.05(A). We must also conduct an independent review of the evidence in the record and determine whether the aggravating circumstances of the offenses *outweigh* beyond a reasonable doubt the mitigating factors relating to the defendant. *Id.*; *State v. Lawson*, 165 Ohio St.3d 445, 2021-Ohio-3566, 179 N.E.3d 1216, ¶ 126. And before we may uphold

138

a death sentence, we must find that death is the appropriate sentence based on the penalties imposed in similar cases. R.C. 2929.05(A).

**A. Weighing the aggravating circumstances and mitigating factors**

{¶ 472} I agree with the majority that there was sufficient evidence for the jury to conclude that Nicholson purposefully killed M.L. and Giselle as part of a single course of conduct under R.C. 2929.04(A)(5). Nicholson shot and killed M.L. and Giselle close in time in the same location using the same weapon. I do not dispute that Nicholson's offenses qualify him for the death penalty.

{¶ 473} However, on balancing the aggravating circumstances and the mitigating factors, I do not believe that Nicholson should be put to death. In conformity with the law, when I juxtapose the aggravating circumstances with the mitigating factors, I view the mitigating factors as "strongly militat[ing] against imposing the death sentence," *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 105. The majority acknowledges that "the record is replete with evidence that Nicholson was raised in a toxic and dangerous environment." Majority opinion, ¶ 437. And it assigns substantial weight to this mitigating evidence. Indeed, Nicholson was raised in a home where his father regularly physically abused Nicholson's mother. He witnessed his father choking his mother and chasing her with a gun. His father was controlling and abusive and called him names. He suffered abuse and neglect by his mother, who failed to remember the details of those events because she was so intoxicated when they occurred.

{¶ 474} Adding to the trauma caused by his parents, Nicholson survived at young ages a house fire and a tornado that hit the family home. He disclosed to Dr. John Fabian, a forensic and clinical psychologist called by the defense, two incidents in which he was sexually abused (once by an older female cousin when he was around five or six years old and once by a friend when he was 22). There was also evidence that he had been injured in multiple car accidents. Nicholson grew up never feeling safe and with dysfunction, feelings of fear, and violence

being the norm in his childhood environment. The evidence of trauma and suffering that Nicholson endured during his childhood and adolescence should be and has been given substantial weight in mitigation by the majority, and for multiple, salient reasons. However, it is important that we explain why this evidence is deserving of such weight.

{¶ 475} Nicholson presented mitigating evidence from a licensed independent social worker and mitigation specialist, Mary Ceci McDonnell. McDonnell explained that in her private practice as a therapist, she counsels people who have experienced trauma. She testified that Nicholson exhibited "repetition compulsion," which occurs when a person experiences trauma as a child and repeats the same dysfunctional behavior as an adult in an effort to change the outcome.

{¶ 476} Also, Dr. Fabian, who interviewed and evaluated Nicholson and spoke with members of Nicholson's family, explained that Nicholson's situation was the result of a multigenerational cycle. Nicholson's parents had fallen into the same cycle of domestic violence, alcoholism, and dysfunction that they witnessed as children. McDonnell noted that mental-health intervention is necessary to change such a cycle. But Dr. Fabian explained that Nicholson, like many of the defendants he had interviewed, had never "processed any of [his family's] baggage."

{¶ 477} So like his parents, Nicholson continued the cycle of dysfunction and violence through his relationships with America Polanco and her children. And Nicholson's access to firearms made these relationships substantially more deadly. It is well documented that a female partner's risk of being killed by her abuser is five times greater when the abuser has access to a firearm. Campbell et al., *Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study*, 93 Am.J.Pub. Health 1089, 1092 (2003), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1447915/ (accessed Jan. 2, 2024) [https://perma.cc/Q86L-8PJ8]. Nicholson seemingly recognized this, having told

law enforcement, "If I would have kn[own] something, martial arts or something, maybe I could have did that instead [of shooting M.L. and Giselle]." The influence of family violence and its dynamics in this case cannot be overstated, and the majority rightly assigns substantial weight to this mitigating factor.

{¶ 478} The majority also recognizes that Nicholson suffered from psychological and neurological impairments that "compromise[d] his emotional, behavioral, and cognitive functioning, especially during a perceived stressful and threatening event and domestic-violence situation." Majority opinion at ¶ 440. The majority assigns this evidence some weight. In my view, however, these psychological and neurological impairments explain more about Nicholson's culpability for the murders than the majority seems willing to recognize.

{¶ 479} Dr. Fabian testified that Nicholson suffered from or had reported experiencing mild depression, obsessive thinking, rigidity in thinking, evidence of posttraumatic stress disorder (both prior to and resulting from the murders), impulsivity problems, aggression, borderline personality disorder (involving impulsivity, volatility, emotional and relationship dysfunctions, self-esteem problems, and self-destructive behavior), and instability in mood and relationships. He characterized Nicholson as a "lower functioning guy" who exhibited evidence of attention-deficit/hyperactivity disorder and problems with executive functioning. Dr. Fabian noted that while Nicholson wanted to appear "with it," that was a facade masking "a fragile sense of self" and "somebody who [feels] really inadequate, who has low self-esteem."

{¶ 480} Dr. Fabian explained that characteristics shown by Nicholson such as "impulsivity[,] volatility in mood, relationship[s], suicidality, kind of high drama, [and] fear[] of abandonment in relationships" are often rooted in childhood trauma and implicate "attachment issue[s]" and "parental d[y]sfunction." Dr. Fabian opined that Nicholson had learned that violence was a way to solve domestic disputes. Dr. Fabian also explained the undercurrents of Nicholson's relationships

with M.L., Giselle, and Polanco, and his disorders' eruptive effects on his interactions with them on the day of the murders:

> He's fearing abandonment. He's more likely to misperceive or overblow, exaggerate threatening situations. And [he] certainly cannot cope well with th[is] type of high level stress, chaotic situations that in part he obviously creates.

**{¶ 481}** All of this together shows that more weight should be accorded to the behavioral and psychological effects that Nicholson's childhood trauma had on him and how they manifested on the day that he killed M.L. and Giselle. Under R.C. 2929.04(B)(2), a court must consider in mitigation "[w]hether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation." To be clear, neither Polanco, M.L., nor Giselle provoked the murders Nicholson committed, but this factor *does not* require that the provocation was occasioned by the victim. *See State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 201 (Pfeifer, J., concurring in part and dissenting in part).

**{¶ 482}** Nicholson's inability to reasonably perceive and cope with his since-childhood, hardwired insecurities during his relationship with Polanco contributed to the initial argument soon before the murders. And his impulsive and aggressive tendencies escalated the situation. Based on the testimonies of Dr. Fabian and McDonnell, this court should conclude that Nicholson's inability to cope with M.L.'s and Giselle's rejection of him—i.e., their "disrespect" toward him—coupled with his access to a gun was ultimately the trauma-fueled, psychological trigger that propelled him to shoot and kill them. Based on the expert testimony, it is apparent that in the moments leading up to the shootings, Nicholson was acting out of self-preservation, fear of abandonment, and duress, all of which

were hardwired into his psyche and affected his executive-functioning capacity because of the traumatic events of his childhood and adolescence and the multigenerational cycle of violence that he later recognized upon reflecting on the horror of his conduct. For this reason, this mitigating factor weighs even more heavily in Nicholson's favor, qualifying as a separate factor under R.C. 2929.04(B)(2).

**{¶ 483}** I agree with the majority's assignment of diminished weight in mitigation to Nicholson's lack of a significant history of criminal convictions or juvenile adjudications, *see* majority opinion at ¶ 438. I also agree with the majority's assignment of some weight to the evidence demonstrating Nicholson's ability to be housed and effectively managed in prison, *see id.* at ¶ 441 and its assignment of modest weight to the strong love and support that Nicholson has from his family, *see id.* at ¶ 442. Taken together, these mitigating factors are compelling and weigh enough in Nicholson's favor to outweigh the aggravating circumstances of his egregious conduct.

**{¶ 484}** Regarding the aggravating circumstances of Nicholson's conduct, it is a given that Nicholson senselessly and selfishly killed M.L. and Giselle. We must compare the aggravating circumstances with other heinous killings for which we have affirmed the imposition of the death penalty. After doing so, it is clear that the aggravating circumstances of Nicholson's offenses do not rise to the level of those in other cases in which we have affirmed death sentences.

**{¶ 485}** For example, Nicholson did not commit the murders in this case while committing another felony or with prior calculation and design. *Compare State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 17-18. Nicholson did not lie in wait to commit the murders. *Compare Lawson*, 165 Ohio St.3d 445, 2021-Ohio-3566, 179 N.E.3d 1216, at ¶ 185. He did not commit multiple murders over the course of several years. *Compare State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 4-6, 10-15, 29-30. He did not

gain access to his victims through deception, *compare State v. Beuke*, 38 Ohio St.3d 29, 29-31, 526 N.E.2d 274 (1988), nor did he murder one victim in order to cover up the murder of another victim, *compare State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 72-73. While Nicholson's conduct was abhorrent and senseless and the results were tragic, the aggravating circumstances that do exist in this case place Nicholson's conduct just over the bar for what may qualify for capital punishment. He is not the worst of the worst, having not exhibited the most extreme culpability, and the aggravating circumstances of Nicholson's conduct do not outweigh beyond a reasonable doubt the cumulative mitigating evidence presented. For these reasons, I would reverse Nicholson's death sentences.

### B. Proportionality of the death sentences

{¶ 486} R.C. 2929.05(A) requires us to conduct a proportionality review of Nicholson's death sentences. This court limits the cases to be used for such proportionality comparison to those in which the death penalty was imposed. *See State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987), paragraph one of the syllabus. Scholars and a justice of this court have suggested that limiting our proportionality review by considering only cases in which a death sentence was imposed renders the review meaningless, especially because no such review by this court has resulted in the reversal of a death sentence. *See State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 219 (Donnelly, J., concurring); Berry, *Ending the Death Lottery: A Case Study of Ohio's Broken Proportionality Review*, 76 Ohio St.L.J. 67, 71, 76-77 (2015).

{¶ 487} A more meaningful review would require consideration of cases in which the defendant was convicted of crimes similar to those involved in the case under review and cases in which the death penalty was *not* imposed but potentially could have been. As an example of a non-death-sentence case involving facts similar to those in this case, in *State v. Rodgers*, 2023-Ohio-734, 210 N.E.3d 88 (2d

Dist.), a defendant was sentenced to an aggregate prison term of 72 years to life after being found guilty of shooting and killing a 28-year-old man and a 20-year-old pregnant woman, *id.* at ¶ 1-3, 21, 30-31, 43, 87. As another example, in *State v. Sheets*, 4th Dist. Jackson No. 21CA6, 2023-Ohio-2591, the defendant had shot and killed his sister-in-law, had attempted to kill his brother by shooting and then bludgeoning him after the gun malfunctioned, and had been complicit in killing his friend, *id.* at ¶ 5, 132. He was sentenced to life in prison without the possibility of parole. *State v. Sheets*, Jackson C.P. No. 20CR0076 (June 8, 2021). And in *State v. Young*, 5th Dist. Coshocton No. 21CA0028, 2022-Ohio-4726, the defendant had shot and killed his wife and her brother following an argument and was sentenced to life in prison without the possibility of parole, *id.* at ¶ 2-6, 13.

{¶ 488} The method by which this court currently conducts its required proportionality review under R.C. 2929.05(A) is inherently weighted in favor of affirming death sentences. By failing to compare a death-sentence case under review with similar cases in which death sentences were *not* pursued or imposed, we fail to compare the case under review with cases in which the death penalty was inappropriate even though the offender was eligible for that sentence. And there is no cogent argument that we should limit the cases that may be compared to the case under review to only this court's cases. Even though *Rodgers*, *Sheets*, and *Young* were not decided by this court, the sentencing decisions in those cases were made by trial courts and affirmed by district courts of appeals—both of which are more immersed in reviewing evidence than this court will ever be. The trial-court judges presumably heard aggravating and mitigating evidence and arguments concerning the evidence, and the appellate courts presumably reviewed all aspects of the record. Their collective decisions are no less valuable for proportionality-review purposes than our decisions made under R.C. 2929.05.

{¶ 489} I conclude that even if we do not expand the cases that we consider on proportionality review to those in which the death penalty could have been

imposed but was not—that is, if we continue to employ the limited-scope proportionality review used by the majority in this case—Nicholson's offenses were not the worst of the worst.

{¶ 490} The majority concludes that we have affirmed death sentences that were based on the course-of-conduct specification found by the jury in this case "many times," and it summarily concludes that Nicholson's death sentences are therefore proportionate and appropriate when compared to death sentences imposed in other cases. Majority opinion at ¶ 445. I respectfully submit that our duty on plenary review of death sentences under R.C. 2929.05 calls for more than such a truncated analysis before we may sanction a defendant's execution.

{¶ 491} Nicholson was sentenced on two counts of aggravated murder, each with a course-of-conduct death specification under R.C. 2929.04(A)(5). The majority cites the following course-of-conduct cases for comparison with this case: *State v. Hundley*, 162 Ohio St.3d 509, 2020-Ohio-3775, 166 N.E.3d 1066; *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051; and *Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716. The facts and circumstances of each of those cases as compared with the facts and circumstances of this case do not support the majority's decision to affirm Nicholson's death sentences.

{¶ 492} We affirmed Hundley's death sentence following his convictions for aggravated murder with a course-of-conduct specification, attempted murder, felonious assault, and two counts of aggravated arson. *Hundley* at ¶ 1-2. Hundley beat and strangled Erika Huff, who was wheelchair-bound and had allowed Hundley to stay in her home. *Id.* at ¶ 1, 3, 148. He had also beat Huff's mother with a hammer, *id.* at ¶ 148, and had lied to emergency personnel who responded to the activation of Huff's medical-alert device, telling them that he had accidentally triggered the device and that nothing was wrong, *id.* at ¶ 10-11. Hundley had lit Huff's body on fire and attempted to set her mother on fire. *Id.* at

¶ 148. Following an independent review of the trial-court record, this court found that "mitigating factors [were] nonexistent." *Id.* at ¶ 152.

{¶ 493} In this case, Nicholson shot and killed M.L. and Giselle within a matter of seconds following the argument with Polanco and M.L., whereas it seems that Hundley had been unprovoked and was methodical and driven to kill using a hammer and his own hands. And Nicholson did not lie to authorities or attempt to cover up the murders as Hundley did. Further, Nicholson presented substantial mitigating evidence, whereas Hundley presented virtually none. Therefore, *Hundley* cannot be used to justify Nicholson's death sentences as being proportionate or appropriate.

{¶ 494} In *Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, we affirmed Mammone's death sentences following his convictions for the aggravated murders of his former mother-in-law, his five-year-old daughter, and his three-year-old son. *Id.* at ¶ 1. Mammone's three death sentences were each supported by a course-of-conduct specification under R.C. 2929.04(A)(5). *Mammone* at ¶ 189. And one of Mammone's death sentences was supported by a specification for committing murder in the course of an aggravated burglary under R.C. 2929.04(A)(7), while the other two were each supported by a specification for committing the murder of a child under the age of 13 under R.C. 2929.04(A)(9). *Mammone* at ¶ 189. This court found that Mammone had planned and prepared for the murders for months and that he committed the murders as revenge against his ex-wife. *Id.* at ¶ 190. Mammone stabbed and killed his children as they sat strapped in their car seats and then drove to his mother-in-law's home where he shot and killed her. *Id.* Nicholson did not plan the murders he committed—rather, he "snapped."

{¶ 495} This court credited Mammone with several mitigating factors, including the "difficult circumstances of [his] childhood," *id.* at ¶ 237, and his diagnosis of having a severe personality disorder, *id.* at ¶ 239. Those factors,

however, did not outweigh the aggravating circumstances of the three preplanned, brutal murders that Mammone committed. *Id.* at ¶ 240. But the circumstances in this case do not equate to those in *Mammone*, and *Mammone* does not support the majority's determination that Nicholson's death sentences are proportionate and appropriate.

{¶ 496} In *Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, we affirmed Kirkland's death sentences following his convictions for the aggravated murders of two teenage girls. *Kirkland* at ¶ 1-3. Kirkland was also convicted of the murders of two adult women and sentenced to 70 years to life in prison regarding those murders. *Id.* at ¶ 1.

{¶ 497} Kirkland gave police multiple accounts of how and multiple reasons why he killed his victims, and he admitted setting two of the victims' bodies on fire. *Id.* at ¶ 16-28. Each of Kirkland's two death sentences were based, in part, on a course-of-conduct specification under R.C. 2929.04(A)(4). *Id.* at ¶ 145. He was also found guilty of death-penalty specifications under R.C. 2929.04(A)(7) for committing murder in the course of committing attempted rape and committing murder in the course of committing aggravated robbery. *Id.* at ¶ 29-30, 145. He was also found guilty of specifications under R.C. 2929.04(A)(3) for committing murder to escape detection. *Id.* at ¶ 145. As noted above, in this case, Nicholson "snapped"; he did not plan the murders of M.L. and Giselle ahead of time or try to cover up the murders. Nor is any other category of death-penalty specification involved in this case.

{¶ 498} Further, Kirkland presented evidence that he suffered from traumatic brain injuries that effected his ability to regulate his aggressive impulses. *Id.* at ¶ 153. This court gave this evidence no weight in mitigation, however, because "serious questions existed concerning [the] theories and diagnostic methods" supporting the evidence of Kirkland's brain scans and any potential trauma-induced brain abnormalities. *Id.* at ¶ 173. In contrast, two experts testified

on Nicholson's behalf and provided significant psychological mitigation evidence. Each of their expert opinions complemented the other like a double helix, starkly depicting a multigenerational cycle and trauma-filled environment that shaped Nicholson's brain development and resulted in his dangerously defective coping skills.

{¶ 499} Moreover, Kirkland presented significant evidence of his childhood abuse and neglect. *Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, at ¶ 164-169. But this court found that Kirkland "was in his late 30s and early 40s" when he committed the murders and therefore " 'had considerable time to distance himself from his childhood and allow other factors to assert themselves in his personality and his behavior,' " *id.* at ¶ 175, quoting *State v. Campbell*, 95 Ohio St.3d 48, 53, 765 N.E.2d 334 (2002). Relying on that antiquated view of the effect of a person's childhood trauma on his or her development, this court assigned no weight in mitigation to Kirkland's difficult childhood, *id*. In contrast, Nicholson's experts explained how the trauma he experienced during his childhood was compounded as he aged and that he had lacked necessary mental-health treatment to develop constructive ways to cope with loss, which were significant mitigating factors regarding Nicholson's commission of the murders.

{¶ 500} Kirkland also presented evidence of his history of alcohol and drug abuse, which this court gave some weight in mitigation, *id.* at ¶ 176, and Kirkland confessed to his offenses, which we also gave some weight, *id.* at ¶ 177. But when combined, the mitigating factors in Kirkland's case did not outweigh the significant aggravating circumstances of the murders. *Id.* at ¶ 180.

{¶ 501} *Hundley*, *Mammone*, and *Kirkland* do not support a finding that Nicholson's death sentences are proportionate and appropriate. *Mammone* and *Kirkland* involved additional death specifications beyond the course-of-conduct specification. For that reason alone, those cases are inapplicable to the proportionality review in this case. And while the only death specification in

*Hundley* was a course-of-conduct specification, Hundley's conduct was far more depraved than Nicholson's and he presented no mitigating evidence, 162 Ohio St.3d 509, 2020-Ohio-3775, 166 N.E.3d 1066, at ¶ 56.

**{¶ 502}** To conduct a more accurate proportionality comparison, we should also examine cases in which we upheld death sentences that were based only on course-of-conduct specifications under R.C. 2929.04(A)(5). *See, e.g.*, *State v. Sowell*, 39 Ohio St.3d 322, 323-324, 337, 530 N.E.2d 1294 (1988). It does not appear that there have been more than a handful of such cases in the last two decades. *See State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 232, 250; *Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, at ¶ 9, 23; *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 77. In *Vrabel*, there was evidence that the defendant had "suffer[ed] from paranoid schizophrenia or a personality disorder with schizophrenic features." *Id.* at ¶ 79. Under R.C. 2929.025, which became effective in April 2021, Vrabel's diagnoses may have disqualified him for the death penalty. So *Vrabel* is inapposite to our proportionality review.

**{¶ 503}** Like *Vrabel*, *Wilks* and *Conway* do not compel affirmance of Nicholson's death sentences. The evidence presented in mitigation in *Wilks* was scant in comparison to that presented on Nicholson's behalf. *See Wilks* at ¶ 234-240. And I agree with the justice concurring in part and dissenting in part in *Conway* that the circumstances of the murder in that case should have taken it outside the realm of offenses that are appropriate for the death penalty. *See id.* at ¶ 201 (Pfeifer, J., concurring in part and dissenting in part).

**{¶ 504}** In short, there is little in our precedent to support Nicholson's death sentences, because each is based solely on a course-of-conduct specification and there is substantial mitigating evidence. Nicholson should not be put to death. The majority opinion's analysis concluding that Nicholson's death sentences are neither

disproportionate nor inappropriate when compared to the sentences in similar cases is incorrect.

## II. CONCLUSION

{¶ 505} I concur in this court's judgment affirming Nicholson's convictions. I dissent from its decision that he may be put to death for his crimes. I would remand Nicholson's case to the trial court for resentencing under R.C. 2929.06, consistent with this opinion.

STEWART, J., concurs in the foregoing opinion.

_____

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brandon A. Piteo and Daniel T. Van, Assistant Prosecuting Attorneys, for appellee.

The Tyack Law Firm Co., L.P.A., Jonathan T. Tyack, and Holly B. Cline, for appellant.

_____